# Exhibit 106

# THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| SMARTMATIC INTERNATIONAL CORPORATION, ET AL., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DOMINION VOTING SYSTEMS INTERNATIONAL CORPORATION, ET AL., | )  C.A. No. 7844-VCP |
| | ) |
| Defendants. | ) |
| | ) |
| DOMINION VOTING SYSTEMS INTERNATIONAL CORPORATION, ET AL., | ) |
| | ) |
| Counterclaim-Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| SMARTMATIC INTERNATIONAL CORPORATION, ET AL., | ) |
| | ) |
| Counterclaim-Defendants. | ) |
| | ) |
| DOMINION VOTING SYSTEMS INTERNATIONAL CORPORATION, ET AL., | ) |
| | ) |
| Third-Party Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| SMARTMATIC TIM CORPORATION, | ) |
| | ) |
| Third-Party Defendant. | ) |

## MEMORANDUM OPINION

Submitted:  January 14, 2013
Decided:  May 1, 2013

Raymond J. DiCamillo, Esq., Kevin M. Gallagher, Esq., RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Bruce D. Oakley, Esq., Aaron R. Crane, Esq., HOGAN LOVELLS US LLP, Houston Texas; *Attorneys for Plaintiffs and Counterclaim-Defendants Smartmatic International Corporation and Smartmatic USA Corporation, Plaintiff Smartmatic International Holding B.V., and Third-Party Defendant Smartmatic TIM Corporation.*

R. Judson Scaggs, Jr., Esq., Megan Ward Cascio, Esq., Matthew R. Clark, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Richard A. Johnston, Esq., Peter C. Mulcahy, Esq., WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, Massachusetts; *Attorneys for Defendants Dominion Voting Systems International Corporation, Dominion Voting Systems Corporation and Dominion Voting Systems, Inc.*

**PARSONS, Vice Chancellor.**

The motion before me presents the narrow issue of whether the term —inthe United States," as used in an October 2009 license agreement, includes Puerto Rico. The license agreement grants the plaintiffs a worldwide (other than the United States and Canada) nonexclusive license to certain technology the defendants developed related to automated voting machines. The agreement's noncompetition provision prohibited the plaintiffs from selling the licensed products —inthe United States." The plaintiffs attempted to sell such products in Puerto Rico. In response, the defendants purported to terminate the license agreement for breach of the noncompetition provision. The defendants also ceased performing their obligations under the agreement. This lawsuit followed.

The motion before me is the plaintiffs' motion for partial summary judgment on the meaning of the term —inthe United States." For the reasons stated in this Memorandum Opinion, I find that the license agreement is ambiguous and that the ambiguity cannot be resolved on the limited record before me. I therefore deny the plaintiffs' motion.

## I.      BACKGROUND

### A.      Parties

There are three plaintiffs in this action: Smartmatic International Corporation, a Barbados corporation; Smartmatic USA Corporation, a Delaware corporation; and Smartmatic International Holding B.V, a Netherlands corporation (collectively, —Smartmatic" or "Plaintiffs").

1

There are two sets of defendants.  The first set includes: Dominion Voting Systems International Corporation, a Barbados corporation; Dominion Voting Systems, Inc., a Delaware corporation; and Dominion Voting Systems Corporation, a Canadian corporation (collectively, ―Dominion" or ―Defendants").  The remaining defendant, Iron Mountain Intellectual Property Management, Inc., a Delaware corporation, did not brief the motion before me.

In their Answer, Verified Counterclaim, and Third-Party Complaint, Defendants asserted claims against a third-party defendant, Smartmatic TIM Corporation, a Philippines corporation.

### B.      Facts

In October 2009, Dominion granted Smartmatic a worldwide (except for the United States and Canada) nonexclusive license to certain precinct count optical scan ("PCOS") voting systems that Dominion had developed (the ―License Agreement" or the ―Agreement").  The License Agreement granted Smartmatic rights to certain patents and patent applications that Dominion owned or controlled (the ―Licensed Patent Rights") and to ―all know-how, trade secrets, methodologies and other technical information owned or possessed by Dominion" (the ―Licensed Technology").[1]  The License Agreement contains a noncompetition provision.  This provision limits Smartmatic's

---

[1]      Clark Aff. Ex. A, PCOS Framework License Agreement (―License Agreement"), §§ 1.2 & 1.4.  The full definition of Licensed Patent Rights, Licensed Products, and Licensed Technology is set forth *infra* Part II.B.4.a.

rights to develop, market, or sell[2] products that embody the Licensed Technology (the "Licensed Products").  The noncompetition provision, discussed in detail *infra*, restricts Smartmatic's right to sell both Licensed Products (*i.e.*, Dominion PCOS voting systems) and non-Dominion PCOS voting systems.   These restrictions apply differently in different parts of the world.  The section of the noncompetition provision that gives rise to this dispute is Section 3.4(b), which states in relevant part that "Smartmatic shall not develop, market or sell any Licensed Product *in the United States*."[3]

When the parties entered into the License Agreement, Dominion intended to focus its efforts on Canada and the United States.[4]  Smartmatic would focus on emerging international markets.[5]  In fact, before entering the License Agreement and based on prior agreements with Dominion, Smartmatic contracted with the Republic of the Philippines to provide certain technology and services to modernize and automate the Philippines' national elections.[6]

The parties' relationship hit a snag in June 2011 after the Puerto Rico State Elections Commission issued a request for proposals.  The Commission sought to acquire

---

[2]    Each relevant subsection in the noncompetition provision refers to limitations on Smartmatic's right to "develop, market, or sell" certain types of products.  In the interest of brevity, I use the shorthand "sell" to refer to this group of actions.

[3]    License Agreement § 3.4(b) (emphasis added).

[4]    Answer, Verified Countercl., and Verified Third Party Compl. of the Dominion Defs. ("Answer") ¶ 24.

[5]    Compl. ¶ 24.

[6]    Compl. ¶ 14.

products to implement a uniform electronic vote-counting system using optical scanning voting technology like Dominion's. Both Smartmatic and Dominion submitted bids. On May 23, 2012, Dominion notified Smartmatic by letter that Smartmatic was in breach of the License Agreement because it submitted a bid to the Government of Puerto Rico to sell Licensed Products ―in the United States" in violation of Section 3.4(b). Dominion also purported to terminate the agreement as a result of Smartmatic's alleged breach.[7] In a May 24 response, Smartmatic rejected Dominion's termination as invalid because Puerto Rico is not ―in the United States." The parties now contest, among other things, the validity of Dominion's purported termination. Since the termination, Dominion has not performed its obligations under the License Agreement.

### C.    Procedural History

Smartmatic filed a complaint and a motion for expedited proceedings on September 6, 2012. Dominion filed an answer and counterclaims on October 12. On October 29, Plaintiffs moved for partial summary judgment on the issue of whether Puerto Rico is ―in the United States" for purposes of the License Agreement. Defendants responded to Smartmatic's motion by requesting in their answering brief that the Court deny the motion and instead declare ―that[:] (i) Puerto Rico is _in the United States' for the purposes of the non-competition provisions in the License Agreement; (ii)

---

[7]    Section 7.2 of the License Agreement allows for termination by either party if the other party is ―in default of any of its obligations hereunder and shall fail to remedy any such default within sixty (60) days after notice" to the defaulting party. Dominion maintained that Smartmatic's breach could not be remedied. Clark Aff. Ex. K.

Smartmatic violated the relevant non-competition provision by competing against Dominion and/or marketing Dominion's voting systems in Puerto Rico; (iii) Dominion was entitled to terminate the license agreement as a result of such competition; and (iv) Dominion validly terminated the license agreement."[8]  Although Defendants did not cross move for partial summary judgment, they requested the opportunity to submit a cross motion if the Court finds it necessary.  I do find Defendants' request for summary declaratory relief to be overly broad, but I do not consider it productive for Defendants to cross move for partial summary judgment at this time.[9]  Smartmatic understandably has briefed and argued only the issue that is the subject of their motion for partial summary judgment.[10]  Thus, I will treat the motion before me and Dominion's response as the equivalent of a cross motion for partial summary judgment on the issue of whether Puerto Rico is ―in the United States" for the purposes of the noncompetition provision in the License Agreement.

The validity of Dominion's purported termination of the License Agreement depends on the resolution of this threshold issue.  Whether the License Agreement

---

[8]     Dominion Defs.' Answering Br. in Opp'n to Pls.' Mot. for Partial Summ. J. (―Defs.' Opp'n Br.") 2.

[9]     The Court of Chancery has ―the inherent authority to grant summary judgment *sua sponte* against a party seeking summary judgment." *Stroud v. Grace*, 606 A.2d 75, 81 (Del. 1992).

[10]    *Id.* (―[T]he Court of Chancery should only *sua sponte* grant summary judgment against a party seeking summary judgment when the state of the record is such that the non-moving party is clearly entitled to such relief." (citations omitted)).

properly was terminated will affect whether Dominion owes Smartmatic continuing obligations under the Agreement. Moreover, such obligations are important to other claims the parties have against each other that are not relevant to the motion now before me.

The parties argued Plaintiffs' motion on December 21, 2012. Shortly after the argument, I requested that the parties submit additional briefing to address whether, in construing the License Agreement, I should consider the fact that, under 35 U.S.C. § 100(c), Dominion's United States patents would apply to actions taken by Smartmatic in Puerto Rico. The parties completed briefing on this issue on January 14, 2013. This Memorandum Opinion constitutes my ruling on Plaintiffs' motion for partial summary judgment.

### D.      Parties' Contentions

Both parties argue that the License Agreement is unambiguous and should be interpreted in their favor. Smartmatic asserts that the ordinary meaning of ―in the United States‖ does not include Puerto Rico. In support of this assertion, they rely on dictionary definitions, case law, and statutes that explicitly distinguish between Puerto Rico and the United States. Plaintiffs also argue that because the term at issue appears in the License Agreement's noncompetition provision, it should be construed narrowly.

Dominion counters that the ordinary meaning of ―in the United States‖ includes Puerto Rico. To support their interpretation, Defendants assert that Puerto Rico is considered to be part of the United States under most federal laws. They also rely on language in the noncompetition provision to demonstrate that the parties specifically

6

address the question of competition ―in the United States,‖ in Section 3.4(b), and ―in any country other than the Unites States,‖ in Section 3.4(c).  Dominion argues that because Puerto Rico is not a ―country other than the United States,‖ it must be included in the contract language ―in the United States.‖  Thus, according to Defendants, the plain language of the License Agreement demonstrates the parties‘ intent that the term ―in the United States‖ would include Puerto Rico.  In addition, Defendants emphasize that the statute most relevant to the Agreement, the Help America Vote Act, treats Puerto Rico as part of the United States.[11]  They also dispute that dictionary definitions and case law support Smartmatic‘s argument that the ordinary meaning of United States excludes Puerto Rico.  Lastly, Dominion contends that the canons of construction *noscitur a sociis* and *ejusdem generis* favor their interpretation.

## II.   ANALYSIS

### A.   Summary Judgment Standard

The parties chose Delaware law to govern the License Agreement.[12]  In Delaware, ―[s]ummary judgment is granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

---

[11]   *See* 42 U.S.C. § 15541 (defining ―State‖ to include ―the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, and the United States Virgin Islands‖).

[12]   License Agreement § 8.2.

law."[13]   When considering a motion for summary judgment, the evidence and the inferences drawn from the evidence are to be viewed in the light most favorable to the nonmoving party.[14]   As noted *supra*, at Defendants' request, I have treated the parties' submissions as presenting cross motions for partial summary judgment.  Thus, I draw no inferences in Dominion's favor based on its technical status as the nonmoving party. Furthermore, although the parties agree that the issue before me can be resolved as a matter of law, the Court ―maintains the discretion to deny summary judgment if it decides that a more thorough development of the record would clarify the law or its application."[15]

When the issue being presented for summary judgment is one of contractual interpretation, summary judgment may be appropriate where ―the dispute centers on the proper interpretation of an unambiguous contract."[16]   Therefore, the threshold inquiry on a motion for summary judgment is whether the contract is ambiguous.[17]   Ambiguity is said to exist ―when the provisions in controversy are reasonably or fairly susceptible of

---

[13]   *Twin Bridges Ltd. P'ship v. Draper*, 2007 WL 2744609, at *8 (Del. Ch. Sept. 14, 2007) (citing Ct. Ch. R. 56(c)).

[14]   *Id.*; *see also Judah v. Del. Trust Co.*, 378 A.2d 624, 632 (Del. 1977).

[15]   *Tunnell v. Stokley*, 2006 WL 452780, at *2 (Del. Ch. Feb. 15, 2006) (quoting *Cooke v. Oolie*, 2000 WL 710199, at *11 (Del. Ch. May 24, 2000)).

[16]   *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *2 (Del. Ch. Nov. 8, 2007) (citing *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007)); *see also AHS N.M. Hldgs., Inc. v. Healthsource, Inc.*, 2007 WL 431051, at *3 (Del. Ch. Feb. 2, 2007).

[17]   *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

different interpretations or may have two or more different meanings."[18]  Ambiguity does

not exist, however, simply because the parties disagree about what the contract means.[19]

When interpreting a contract, the court will give effect to the parties' intent based

on the parties' words and the plain meaning of those words.[20]  The Court will give

disputed terms their ordinary and usual meaning.[21]  Of paramount importance is what a

reasonable person in the position of the parties would have thought the language of the

contract meant.[22]  If either party demonstrates that their construction of the contract —is

the *only* reasonable interpretation," that party will be entitled to summary judgment.[23]  In

addition, —i‖f parties introduce conflicting interpretations of a term, but one

interpretation better comports with the remaining contents of the document or gives effect

to all the words in dispute, the court may, as a matter of law and without resorting to

---

[18]  *Rhône-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[19]  *United Rentals, Inc.*, 937 A.2d at 830.

[20]  *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[21]  *AHS N.M. Hldgs., Inc.*, 2007 WL 431051, at *3.

[22]  *Id.* (citing *Rhône-Poulenc Basic Chems. Co.*, 616 A.2d at 1195–96).

[23]  *United Rentals, Inc.*, 937 A.2d at 832 n.104 (noting that a party seeking summary judgment effectively bears the burden to demonstrate that its interpretation is the *only* reasonable interpretation as a matter of law).

extrinsic evidence, resolve the meaning of the disputed term in favor of the superior interpretation."[24]

"[E]xtrinsic, parol evidence cannot be used to manufacture an ambiguity in a contract that facially has only one reasonable meaning."[25]  If the words of a contract, however, "can *only* be known through an appreciation of the context and circumstances in which they are used[,] a court is not free to disregard extrinsic evidence of what the parties intended."[26]  In this regard, the Delaware Supreme Court stated in *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.* that

> [t]here may be occasions where it is appropriate for the trial court to consider some undisputed background facts to place the contractual provision in its historical setting without violating [the principle that, if a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of

---

[24]  *Wills v. Morris, James, Hitchens & Williams*, 1998 WL 842325, at *2 (Del. Ch. Nov. 6, 1998) (accepting one party's interpretation where the other party's interpretation resulted in an internal redundancy).

[25]  *United Rentals, Inc.*, 937 A.2d at 830.

[26]  *City Investing Co. Liquidating Trust v. Continental Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993) (citing *Klair v. Reese*, 531 A.2d 219, 223 (Del. 1987)) (internal quotation marks omitted).  In *Klair*, the Supreme Court stated that "the court is not free to exclude or disregard extrinsic evidence; for the meaning of words used in an agreement can only be known through an appreciation of the context and circumstances in which they were used."  *Klair*, 531 A.2d at 223.  Since 1993, however, the Supreme Court has limited this language: "*Klair* should be construed narrowly to conform to the principle that, where contract language is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create ambiguity."  *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys.*, 708 A.2d 989, 993 n.19 (Del. 1998); *see also Capital Mgmt. Co. v. Brown*, 813 A.2d 1094, 1097 n.1 (Del. 2002) (reiterating disapproval of *Klair*).

the parties, to vary the terms of the contract, or to create an ambiguity].[27]

The Supreme Court cautioned that ―the trial court must be careful in entertaining background facts to avoid encroaching on the basic principles set forth [in *Eagle Industries, Inc.*].‖[28]   Thus, to the limited extent the License Agreement's language can only be understood through an appreciation of the context and circumstances in which it is used, I may consider undisputed background facts to place the Agreement in its historical setting.

## B.   Ordinary Meaning of the Term "in the United States"

The narrow issue before me is whether the term ―in the United States," as used in Section 3.4(b) of the License Agreement, includes or excludes Puerto Rico.   Section 3.4(b) states in relevant part: ―Smartmatic shall not develop, market or sell any Licensed Products in the United States at any time during the term of this Agreement."[29]   I consider first the plain and ordinary meaning of the term ―United States."[30]

---

[27]   702 A.2d 1228, 1232 n.7 (Del. 1997).

[28]   *Id.*

[29]   License Agreement § 3.4(b).   Section 3.4 is set forth in its entirety *infra* Part II.B.4.

[30]   *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. Jan. 17, 2008) (stating that to determine the parties' shared intent, the court first reviews the words in the contract and ―ascribes to the words their ‗common or ordinary meaning,' and interprets them as would an ‗objective reasonable third-party observer'" (citations omitted)).

## 1.       Dictionary definitions of the term "United States"

Delaware courts ―will look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."[31]  The Random House Webster's Unabridged Dictionary defines the United States as ―a republic in the N[orth] Western Hemisphere comprising 48 coterminous states, the District of Columbia, and Alaska in North America, and Hawaii in the N[orth] Pacific."[32]  Black's Law Dictionary defines the United States as ―a federal republic formed after the War of Independence and made up of 48 coterminous states, plus the state of Alaska and the District of Columbia in North America, plus the state of Hawaii in the Pacific."[33]  Webster's New World Dictionary provides that the United States of America is a ―country made up of the N[orth] American area extending from the Atlantic Ocean to the Pacific Ocean between Canada and Mexico, together with Alaska & Hawaii."[34]  Similarly, the New Oxford American Dictionary defines the Unites States as ―a country that occupies most of the southern half of North America as well as Alaska and the Hawaiian Islands."[35]  The American Heritage

---

Absent a termination for breach, the term of the Agreement was from October 19, 2009 until April 3, 2014, or approximately four years and six months.  License Agreement preamble & § 7.1.

[31]   *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006).

[32]   Pls.' Mot. for Partial Summ. J. 15 (citing Random House Webster's Unabridged Dictionary 2077 (2d ed. 2001)).

[33]   Black's Law Dictionary 1675 (9th ed. 2009).

[34]   Webster's New World Dictionary 1552–53 (2d ed. 1986).

[35]   New Oxford American Dictionary 1892 (3d ed. 2010).

College Dictionary of the English Language, however, provides this definition of the United States: ―A country of central and northwest North America with coastlines on the Atlantic and Pacific Oceans.  It includes the non-contiguous states of Alaska and Hawaii and various island territories in the Caribbean Sea and Pacific Ocean."[36]

Thus, the cited dictionary definitions, although not unanimous, overwhelmingly suggest that the ordinary meaning of the United States includes only the forty-eight contiguous states, the District of Columbia, Alaska, and Hawaii.  I consider next how the courts have defined the United States.

### 2.    Case law considering the definition of "United States"

Although no Delaware court squarely has addressed whether Puerto Rico is ―in the United States," courts in other jurisdictions have considered this question.  Most notably, in *In re Airline Ticket Commission Antitrust Litigation*, the United States Court of Appeals for the Eighth Circuit considered the scope of a settlement agreement that covered ―a[ll] travel agencies in the Unites States who, at any time from February 10, 1995, to the present, issued tickets . . . for travel on any of the defendant airlines within and between the continental United States, Alaska, Hawaii, Puerto Rico and the U.S. Virgin Islands."[37]  The Eighth Circuit applied Missouri law, but the Delaware Supreme

---

[36]    Am. Heritage College Dictionary of the English Language 1895 (5th ed. 2011).  As Smartmatic notes, this dictionary also includes a depiction of the United States that does not show Puerto Rico.  Pls.' Reply in Supp. of Their Mot. for Summ. J. (―Pls.' Reply Br.") 5–6 & Ex. A.

[37]    *In re Airline Ticket Comm'n Antitrust Litig.*, 268 F.3d 619, 621 (8th Cir. 2001).

Court has observed that Missouri law comports with Delaware law.[38]  The court affirmed the district court's finding that the settlement agreement's reference to —alltravel agencies in the United States" did not include travel agencies in Puerto Rico.  The court of appeals approved of the district court's reliance on a lay person's understanding and a dictionary definition of the term —United States."  Notably, the Eighth Circuit rejected the appellant's argument that the district court should have considered the following definition of the —United States" from the Federal Aviation Act: —the States of the United States, the District of Columbia, and the territories and possessions of the United States, including the territorial sea and the overlying airspace."[39]  Instead, the Eighth Circuit found that —the [district] court correctly gave the contract language its plain and ordinary meaning.  Indeed, it heeded the admonition that a court should not ignore the common and popular usage of a contract term."[40]  In addition, the court relied on the language of the agreement in question that referred first to the —UnitedStates" and then later to —travel . . . within and between the continental United States, Alaska, Hawaii, Puerto Rico, and the U.S. Virgin Islands."[41]  To give effect to all the terms of the agreement, the

---

[38]    *AT&T Corp. v. Lillis*, 953 A.2d 241, 253 n.35 (Del. 2008) (—Missouri law comports with Delaware law requir[ing] contractual terms be given their plain and ordinary meaning, absent a specific definition provided in the contract." (citations omitted)).

[39]    *In re Airline Ticket Comm'n Antitrust Litig.*, 268 F.3d at 623.

[40]    *Id.*

[41]    *Id.* at 622.

14

court reasoned that the first reference to the ―United States‖ must have excluded Puerto Rico.

Several courts, including Delaware courts, have noted that Puerto Rico is ―part of‖ the United States.  First, the Delaware Supreme Court stated that Puerto Rico is ―part of‖ the United States in *State of Sao Paulo v. American Tobacco Co.*[42]  In this case, two foreign governments appealed a Superior Court decision that the governments lacked standing to assert their claims as *parens patriae*.  *Parens patriae* standing allows U.S. states, but not foreign sovereigns, to assert claims on behalf of their citizens in certain limited circumstances.  In considering this issue, the Supreme Court summarized a prior case that had accorded Puerto Rico *parens patriae* standing because ―Puerto Rico, like the fifty American States, had given up certain sovereign rights to become *part of the United States*.‖[43]  The Court noted that ―[f]oreign governments . . . on the other hand, retained the full array of sovereign rights that the American States and Puerto Rico had ceded to the United States government.‖[44]

In addition, the Delaware Family Court held that travel to Puerto Rico is not considered travel outside of the United States in a ruling on visitation rights to a child.[45]  In that case, the child‘s paternal grandmother petitioned to take the child to Puerto Rico

---

[42]     919 A.2d 1116, 1122 (Del. 2007).

[43]     *Id.* (emphasis added).

[44]     *Id.*

[45]     *See J.A. v. I.A.*, 2005 WL 3560810, at *1 (Del. Fam. 2005).

and his mother asked to take him to Ecuador.  The court permitted the mother to take the child to Ecuador because Ecuador is a signatory to The Hague Convention on International Child Abduction and, if the child were wrongfully retained in Ecuador, the mother could be required to return him to Delaware.  The court, however, would not allow the paternal grandmother to take the child to Puerto Rico without the mother's consent because ―Puerto Rico is a territory of the United States," and such a trip ―would not be considered travel outside of the United States and The Hague Convention would not apply."[46]

The United States Court of Appeals for the First Circuit also has stated that Puerto Rico is ―part of" the United States.  Dominion avers that First Circuit cases are particularly authoritative on issues involving Puerto Rico because the First Circuit's jurisdiction includes Puerto Rico.  In *Lopez Lopez v. Aran*, the First Circuit considered a challenge by a person from Puerto Rico to a U.S. Immigration and Naturalization Services (―INS") checkpoint at an international airport in Puerto Rico.  In describing the basis for the plaintiff's claims, the First Circuit noted that ―[]s Puerto Rico is part of the United States, it is not an immigration threshold, and the only excuse for the INS procedure is that illegal aliens find Puerto Rico an especially facile location to obtain freedom of movement to the mainland by concealment of status."[47]

---

[46]     *Id.*

[47]     *Lopez Lopez v. Aran*, 894 F.2d 16, 17 (1st Cir. 1990).

The second First Circuit case Defendants rely on is *Uffner v. La Reunion Francaise, S.A.*[48]  According to Defendants, the First Circuit found that the District Court of Puerto Rico was a proper venue for a dispute between parties who had agreed by contract to submit to ―the jurisdiction of a court of competent jurisdiction within the United States of America.‖  Even considering Dominion‗s gloss on the court‗s decision,[49] this case is not particularly helpful to them.  In setting forth the case background, the *Uffner* court mentioned that the underwriting agent ―places yacht policies in the United States (including Puerto Rico).‖[50]  By specifically mentioning Puerto Rico, the First Circuit implicitly recognized that the term ―in the United States‖ does not categorically include Puerto Rico.

---

[48]   244 F.3d 38 (1st Cir. 2001).

[49]   The court considered whether venue was proper under 28 U.S.C. § 1391(a) which states, in relevant part, that a civil action may be brought in ―a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.‖  *Id.* at 41–42.  The dispute at issue in *Uffner* was an insurance claim for a vessel that sunk in Puerto Rico.  The court concluded that ―in a suit against an insurance company to recover for losses resulting from a vessel casualty, the jurisdiction where that loss occurred [(*i.e.*, Puerto Rico)] is ‗substantial‗ for venue purposes.‖  *Id.* at 43.  The court added that its conclusion did not run contrary to the statute‗s purpose ―to protect the defendant against the risk that a plaintiff will select an unfair or inconvenient place of trial‖ for several reasons.  One of those reasons was that the parties broadly had agreed to submit to the jurisdiction of a court of competent jurisdiction within the United States of America.  *Id.* at 43 & n.7.

[50]   *Id.* at 40.

17

An additional case relied upon by Smartmatic is of only marginal relevance.  In *Iberia Foods Corp. v. Romeo*,[51] the sole statement on point appears in a footnote in which the Third Circuit agreed ―with the district court's conclusion that the [license] agreement transferred to Iberia only those trademark rights relating to the continental United States.‖[52]  The district court, however, partly based its decision on extrinsic evidence that the parties intended contract language granting trademark rights that ―relate to the United States‖ to grant rights only with respect to the continental United States.[53]

Thus, a review of the cases reveals that courts have engaged in a case-by-case determination with no consensus on whether the term ―in the United States‖ has only one reasonable meaning.  The Delaware Supreme Court recognized that Puerto Rico is ―part of‖ the United States, but Puerto Rico's status was not the question before the Court.  Thus, the statement in *State of Sao Paulo* is neither controlling nor very probative on the issue presented here.  Likewise, the Delaware Family Court did not analyze whether the ordinary meaning of ―in the United States‖ includes Puerto Rico.  Rather, it simply noted

---

[51]    150 F.3d 298 (3d Cir. 1998).

[52]    *Id.* at 301.

[53]    In another case relied on by Plaintiffs, *Bolen International, Inc. v. Medow*, 191 So. 2d 51 (Fla. Dist. Ct. App. 1966), the Florida court interpreted the term ―the area of the United States‖ in a noncompetition agreement.  That court considered the term in ―a geographical sense‖ and held that ―the Commonwealth of Puerto Rico is not within the United States.‖  *Id.* at 53.  Dominion criticizes the *Bolen* case because, among other things, it relies on authority from 1827 and 1930 and has never been cited for the proposition that the United States does not include Puerto Rico.  It is unnecessary to evaluate those criticisms, however, because the different language at issue in *Bolen* renders it distinguishable.

the fact that travel between the United States and Puerto Rico generally is not considered to be international travel.

The Eighth Circuit's decision in *In re Airline Ticket* is the most apposite to this case. There, the Eighth Circuit upheld the district court's holding that the ordinary meaning of "in the United States" excludes Puerto Rico. In addition, the court noted that "if the parties intended to include Puerto Rico and the U.S. Virgin Islands, they knew the language to do so."[54] The Agreement at issue in that case, however, expressly addressed travel "within and between the continental United States, Alaska, Hawaii, *Puerto Rico* and the U.S. Virgin Islands."[55] That fact alone renders the decision in *In re Airline Ticket* only marginally helpful in construing the License Agreement here.

### 3. Definition of "United States" in statutes

The parties take a different approach in assessing the relevance of federal statutes. Dominion focuses on the fact that many statutes treat Puerto Rico as part of the United States or as the equivalent of a state. Indeed, the statutes most relevant to the parties' dispute define the "United States" to include Puerto Rico. These statutes include federal laws that regulate voting,[56] federal patent and trademark laws,[57] and the Help America

---

[54] *In re Airline Ticket Comm'n Antitrust Litig.*, 268 F.3d 619, 623 (8th Cir. 2001).

[55] *Id.* at 621 (emphasis added).

[56] *See* 42 U.S.C. § 1971(a)(1).

[57] *See* 35 U.S.C. § 100(c).

Vote Act.[58]  In addition, federal courts presume that federal statutes apply to Puerto Rico as though it were a state unless specific evidence otherwise indicates.[59]  Defendants also highlight that Puerto Rico is integrated into the United States' judicial system,[60] economy,[61] political system,[62] legal system,[63] and national defense regime.[64]  In addition, Dominion cites nearly twenty provisions of the Delaware Code that include Puerto Rico within the definition of the terms ―United States‖ and ―State.‖  These facts, according to Defendants, bolster their argument as to the interpretation of the License Agreement, *i.e.*, that the only reasonable meaning of ―in the United States‖ includes Puerto Rico.  Moreover, they contend that this Court may consider this evidence of the context of the

---

[58]  *See* 42 U.S.C. § 15541.

[59]  Defs.' Opp'n Br. 32 (citing *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 322 (1st Cir. 2012) (―[A]lthough we now generally presume that Congress intends its laws to have the same effect on Puerto Rico as they do on any state, that presumption can be overcome by ‗specific evidence' to the contrary or by ‗clear policy reasons embedded in' a statute.")).

[60]  *Id.* at 19 (Puerto Rico is a U.S. judicial district and has a federal district court).

[61]  *Id.* (Puerto Rico uses American currency and the same postal system); *id.* at 19–20 (goods passing between the United States and Puerto Rico are not subject to duties or tariffs).

[62]  *Id.* at 18 (Puerto Ricans are U.S. citizens and are represented in the U.S. House of Representatives by a non-voting delegate); *id.* at 21 (the Puerto Rico constitution was approved by the U.S. Congress and signed into law by the President of the United States).

[63]  *Id.* at 20 (Puerto Ricans are subject to U.S. securities laws, federal patent and trademark laws, environmental laws, and food and drug safety laws, and they benefit from Medicare, Social Security, and federal unemployment insurance).

[64]  *Id.* at 21 (Puerto Ricans serve in the U.S. armed forces).

License Agreement because Delaware's objective theory of contract requires a determination of what ―a reasonable person *in the position of the parties* would have thought [the agreement] meant."[65]  The parties to the License Agreement in question here are sophisticated technology firms who reasonably could be expected to understand relevant federal laws, especially the laws governing U.S. patents and the voting system industry.

Smartmatic counters that the fact that the statutes Defendants rely on contain express language extending the laws of the United States to Puerto Rico affirms their position that the plain and ordinary meaning of ―in the United States" does not include Puerto Rico.  According to Plaintiffs, ―if Puerto Rico were actually in the United States, the laws would apply there by their own force."[66]  In this regard, the Help America Vote Act supports Plaintiffs' interpretation.  This statute governs the parties' business of developing and selling voting systems.  In this context, when the drafters intended to include Puerto Rico within the definition of ―State," they did so expressly: ―In this Act, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, and the United States Virgin Islands."[67]   Additionally, Smartmatic points out that the reason federal courts presume that federal statutes apply to

---

[65]    *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006) (emphasis added).

[66]    Pls.' Reply Br. 13.

[67]    42 U.S.C. § 15541.

Puerto Rico is not because Puerto Rico is "in the United States," but because the U.S. Code explicitly provides that "[t]he statutory laws of the United States not locally inapplicable, except as hereinbefore or hereinafter otherwise provided, shall have the same force and effect in Puerto Rico as in the United States."[68]

Additionally, Plaintiffs argue that the United States Constitution supports their interpretation. The Fourteenth Amendment provides: "All persons born or naturalized *in the United States*, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."[69] Puerto Ricans are not citizens of the United States by virtue of the Fourteenth Amendment.[70] Rather, citizenship has been extended to Puerto Ricans by statute.[71] Thus, Smartmatic argues, the Constitution compels a conclusion that the ordinary meaning of "in the United States"—the same term that the parties' used in the noncompetition provision in the License Agreement—excludes Puerto Rico.

---

[68]    48 U.S.C. § 734; *see also United States v. Acosta-Martinez*, 252 F.3d 13, 18 (1st Cir. 2001) ("[T]he default rule for questions under the Puerto Rican Federal Relations Act is that, as a general matter, a federal statute does apply to Puerto Rico pursuant to 48 U.S.C. § 734.")

[69]    U.S. Const. amend. XIV, § 1 (emphasis added).

[70]    *See Nolos v. Holder*, 611 F.3d 279, 282 (5th Cir. 2010) ("The courts of appeals explained that the term 'United States' as it is used in the Citizenship Clause of the Fourteenth Amendment did not, without more, include 'United States territories simply because the territories [were] 'subject to the jurisdiction' or 'within the dominion' of the United States.'" (citing Second, Third, and Ninth Circuit cases)).

[71]    Jones Act, Pub. L. No. 64-368, § 5, 39 Stat. 951, 953 (1917).

### 4.    Use of the term "United States" in the noncompetition provision

Although Dominion responded to each of Smartmatic's previous ―ordinary meaning" arguments, Dominion's main contention is that the Agreement itself supports its interpretation.  The noncompetition provision provides as follows:

> 3.4    <u>Non-Compete</u>.
>
> a)    Smartmatic shall not develop, market or sell any PCOS voting systems in Canada at any time during the term of this Agreement.
>
> b)    Smartmatic shall not develop, market or sell any Licensed Products *in the United States* at any time during the term of this Agreement.  Smartmatic shall also not develop, market or sell any third party PCOS voting systems in the United States for a period of twelve (12) months commencing on the Effective Date, and Smartmatic shall also not develop, market or sell its own PCOS voting systems in the United States for a period of four (4) years and six (6) months commencing on the Effective Date.    For clarification, Smartmatic shall only have the right to market or sell third party PCOS voting systems in the United States after the 12 month US non-compete provision has ended.
>
> c)    Smartmatic shall not develop, market or sell any PCOS voting systems other than the Licensed Products *in any country other than the United States* for a period of four (4) years and six (6) months commencing on the Effective Date.  For clarification, Smartmatic shall only have the right to develop, market and sell other PCOS voting systems (its own or third party systems) in markets outside the United States after the four (4) year six (6) months non-compete provision has ended. . . .[72]

---

[72]    License Agreement § 3.4 (emphasis added).    The provision also contains a subsection (d) that is not relevant here.

According to Dominion, the language and organization of Section 3.4 restricting Smartmatic's ability to compete in various respects supports Defendants' construction of "in the United States" to include Puerto Rico.

### a.   Restrictive covenant

"Delaware courts construe restrictive covenants narrowly as written."[73]   To the extent the term "in the United States" does not clearly include Puerto Rico, therefore, I generally would construe the term in its most narrow sense, *i.e.*, as including only the fifty U.S. states and the District of Columbia.[74]   In the License Agreement, however, the term "in the United States" appears not only in the noncompetition provision but also in the license-granting provisions.   For example, Section 2.1 states in part: "Dominion hereby grants to Smartmatic a worldwide (other than the United States and Canada), nonexclusive license under all of the Licensed Patent Rights and Licensed Technology, to . . . sell Licensed Products."   Section 2.3, entitled "License Limitations," states in relevant part: "The licenses granted to Smartmatic in Section 2.1 also do not include the right to authorize resale of any Licensed Products *in the United States* and Canada."[75] Because the term "in the United States" is used in other parts of the Agreement, besides

---

[73]   *Concord Steel, Inc. v. Wilm. Steel Processing Co.*, 2008 WL 902406, at *6 (Del. Ch. Apr. 3, 2008); *Equitable Trust Co. v. O'Neill*, 420 A.2d 1196, 1201 (Del. Super. 1980) ("It is no surprise that restrictive covenants which act to restrain trade, are strictly construed.").

[74]   *See Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1024 (Del. Ch. 2006); *see also Concord Steel, Inc.*, 2008 WL 902406, at *6 ("Delaware courts construe restrictive covenants narrowly *as written*." (emphasis added)).

[75]   License Agreement § 2.3 (emphasis added).

24

the noncompetition provision, I do not find it appropriate to rely as heavily as Smartmatic suggests on the canon that calls for narrowly interpreting terms in a noncompetition agreement.  Rather, it is only one of many factors relevant to my analysis.

To accept Smartmatic's "narrow" interpretation of "in the United States," for example, would create an internal inconsistency within the Agreement.  In Section 2.1, "Dominion . . . grants to Smartmatic a worldwide (other than the United States and Canada), nonexclusive license under all of the Licensed Patent Rights and Licensed Technology, to make, have made, use, import, offer for sale, lease and sell Licensed Products."  The Agreement defines Licensed Patent Rights, Licensed Products, and Licensed Technology as follows:

> 1.2     "Licensed Patent Rights" means all patents and patent applications . . . throughout the world, covering or relating to the Licensed Technology, including any substitutions, extensions, reissues, reexaminations, renewals, divisions, continuations or continuations-in-part, which Dominion owns or controls, and under which Dominion has the right to grant sublicenses to Smartmatic, as of the date of this Agreement and thereafter.
>
> 1.3     "Licensed Products" means a product which embodies the Licensed Technology.
>
> 1.4     "Licensed Technology" means all know-how, trade secrets, methodologies and other technical information owned or possessed by Dominion as of the date of this Agreement and thereafter, whether patentable or otherwise, relating to the generally released Dominion PCOS voting systems . . . which information is used for the manufacture, use and/or sell Licensed Products [under the License Agreement].[76]

---

[76]     *Id.* §§ 1.2–1.4.

Thus, Licensed Products include both PCOS voting systems made by Dominion and PCOS voting systems produced by Smartmatic that embody the Licensed Technology, including, potentially, technology covered by Licensed Patent Rights.

By definition, Licensed Patent Rights include or could include Dominion's U.S. patents.  The plain and ordinary meaning of the license grant in Section 2.1 is that Dominion did not grant Smartmatic a license under any Dominion U.S. patent.  U.S. patent rights extend to Puerto Rico.[77]  Thus, assuming Dominion has U.S. patents or in the future may have U.S. patent rights, those patents would give Dominion the right to exclude Smartmatic from, among other things, selling products embodying Dominion's patented inventions in Puerto Rico.[78]  Stated differently, because Smartmatic has no license under Dominion's U.S. patents, it would be an infringement of those patents if Smartmatic were to sell a product embodying the patented invention in Puerto Rico.

In contrast, under a narrow interpretation of ―in the United States‖ in Section 3.4(b) that excludes Puerto Rico, that provision would not prevent Smartmatic from selling Licensed Products in Puerto Rico.  Thus, Smartmatic could compete in Puerto Rico without breaching the terms of the noncompetition provision, but potentially would be exposed to a patent-infringement lawsuit for the same conduct.  Construing the Agreement more ―broadly,‖ in accordance with Dominion's position, would result in no

---

[77]    *See* 35 U.S.C. § 100(c).

[78]    *See id.* (defining United States to include Puerto Rico); *id.* § 271(a) (―[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent . . . infringes the patent.‖).

such inconsistency between the scope of Smartmatic's license and the geographic area in which the Agreement permits Smartmatic to compete.[79]

Based on the apparent inconsistency that could result from accepting a narrow construction, it would be unwise to favor Smartmatic's interpretation based largely on the canon of construction applicable to restrictive covenants. In addition, Smartmatic and Dominion are sophisticated parties who negotiated a relatively complex allocation of rights in different areas of the world in which the party receiving a license to the other party's technology could compete against that party. In this case, therefore, I consider it preferable to determine the parties' intent, through extrinsic evidence if necessary, before resorting to a "narrow" meaning of "in the United States" based on a canon of construction.

### b.     Additional canons of construction

Dominion argues that two additional canons of construction favor their interpretation: (1) that a word in a contract is to be read in light of the words around it (*noscitur a sociis*); and (2) that the last, catch-all term in a list of terms is limited in scope

---

[79]   In this scenario, there also would be no internal conflict with Section 2.3 of the License Agreement. In Section 2.3, the parties agreed that "the licenses granted to Smartmatic in Section 2.1 also do not include the right to authorize resale of any Licensed Products in the United States or Canada, and Smartmatic shall use its best efforts to enter into an agreement with each of its customers to which it sells or otherwise distributes Licensed Products in which each such customer agrees not to resell any Licensed Products into the United States or Canada." Thus, for example, if Dominion had a patented invention covered by patents in Mexico and the United States, Smartmatic would be licensed to sell a product that included that invention in Mexico, but the purchaser would not be authorized to resell that product in the United States, including Puerto Rico.

by the terms that come before it (*ejusdem generis*).    Defendants contend that to understand Section 3.4(b), the Court must read it in the context of the entire noncompetition provision.    Specifically, Defendants aver that, based on the words used in Section 3.4(c), the only reasonable interpretation of Section 3.4(b)'s term ―in the United States‖ is that it includes Puerto Rico.

Preliminarily, it will be helpful to clarify the groups of products at issue in the noncompetition provision.    First, the provision addresses PCOS voting systems in general.    Second, it addresses Licensed Products, which are defined to ―mean[] a product which embodies the Licensed Technology.‖[80]    Such products would include Dominion's own PCOS products and others embodying Dominion's Licensed Technology.    Lastly, the provision addresses ―any PCOS voting systems other than the Licensed Products,‖ which could include both Smartmatic systems and third party systems.    I will refer to these as ―Non-Dominion PCOS Voting Systems.‖

The License Agreement delineates Smartmatic's rights as to these different groups of product as follows:

> (a)    Smartmatic cannot sell *any* PCOS voting systems ―in Canada‖;
>
> (b)(i) Smartmatic cannot sell Licensed Products ―*in the United States*‖ and (ii) for twelve months after the Effective Date of the License Agreement, it cannot sell any third party

---

[80]    ―Licensed Technology,‖ in turn, is defined to ―mean[] all know-how, trade secrets, methodologies and other technical information owned or possessed by Dominion as of the date of this Agreement and thereafter, whether *patentable* or otherwise . . . .‖  License Agreement § 1.4 (emphasis added).

PCOS voting system ―*in the United States*,‖ and, (iii) for four years and six months, it cannot sell its own PCOS voting systems in the United States; and

(c)     Smartmatic cannot sell ―an‖ PCOS voting systems other than Licensed Products‖ (*i.e.*, Non-Dominion PCOS Voting Systems) ―*in any country other than the United States*‖ for a period of four years and six months after the Effective Date.[81]

During the period before 2014, the noncompetition provision can be summarized as follows: (1) Smartmatic cannot compete with Dominion at all in Canada (Dominion's home state), (2) (i) Smartmatic cannot compete with Dominion in the United States at all using Licensed Products, but after twelve months it may compete using third party PCOS voting systems, and (3) Smartmatic can compete with Dominion in any country other than the United States using only Licensed Products.

Based on these provisions, Dominion argues that Section 3.4(c)'s reference to ―an‖ country other than the United States‖ is a ―catch-all.‖  According to Defendants, the Agreement carves the world into three zones: Canada, the United States, and any country other than the United States.  Thus, Dominion argues that any place that is not a country other than the United States is ―in‖ the United States.‖  Because Puerto Rico is not a country but a territory of the United States, Defendants aver that the agreement must be interpreted to include Puerto Rico in the meaning of the term ―in‖ the United States.‖

---

[81]     *See id.* § 3.4 (emphasis added).  In this regard, I note that the four year six month period corresponds to the term of the License Agreement.  *Id.* § 7.1.

Smartmatic denies that the parties intended the terms used in Sections 3.4(b) and 3.4(c) to be ―flip sides of the same coin.‖[82]  They contend that these subsections address two distinct limitations on Smartmatic‗s use of PCOS voting systems: one limiting Smartmatic‗s use of Licensed Products in subsection (b) and the other limiting Smartmatic‗s use of Non-Dominion PCOS Voting Systems in subsection (c).  Smartmatic asserts that ―[o]ne [subsection] does not spring from the other, and the two do not complement each other.‖[83]  In addition, Dominion purported to terminate the License Agreement based solely on Smartmatic‗s alleged violation of subsection (b).  Therefore, Smartmatic maintains that the language of subsection (b) is what is important and urges the Court to reject Dominion‗s focus on the language of subsection (c) as a red herring.

I find Dominion‗s arguments as to the applicability of the *noscitur a sociis* and *ejusdem generis* canons of construction more persuasive, but they are not dispositive in the circumstances of this case.  First, I agree with Dominion that Section 3.4(b) must be read in the context of the entire noncompetition provision.  In that regard, Smartmatic‗s contention that subsections (b) and (c) address two distinct limitations on its ability to sell various PCOS voting systems that do not complement each other is strained.  Unlike Smartmatic, I consider it more appropriate to focus on the way those two sections treat Licensed Products.  Section 3.4(b) precludes Smartmatic from selling Licensed Products in the United States, while 3.4(c) provides that, in any country other than the United

---

[82]    Pls.‗ Reply Br. 17.

[83]    *Id.* at 18.

States, Smartmatic may sell only Licensed Products for four years and six months after the Effective Date.

Thus, I am inclined to accept Dominion's argument that Sections 3.4(a), (b), and (c) should be read as a list and that, under the principles of *nocsitur a sociis* and *ejusdem generis*, Section 3.4(c)'s reference to "any country other than the United States" informs the definition of the terms that come before it.   In applying these canons of construction together, the Delaware Supreme Court stated:

> words grouped in a list should be given related meaning . . . [and] where general language follows an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.[84]

The purpose of *ejusdem generis*, therefore, is to limit the general language following a list of related things to things of the same general kind or class as the things previously specified.[85]   Here, however, it is not particularly relevant what the scope of "any country other than the United States" is in Section 3.4(c).   In addition, the second sentence of Section 3.4(c) sets forth a "clarification": "For clarification, Smartmatic shall only have the right to develop, market and sell other PCOS voting systems (its own or third party systems) *in markets outside the United States* after the four (4) year six (6) months non-

---

[84]     *See Del. Bd. of Nursing v. Gillespie*, 41 A.3d 423, 427–28 (Del. 2012).

[85]     *See* 17A Am. Jur. 2d *Contracts* § 364 (2013).

compete provision has ended."[86]   This suggests that the parties considered the phrases "any country other than the United States" and "markets outside the United States" to be synonymous.   One reasonable inference from this usage is that the parties were not focused on defining "United States" with precision, and that their intention in using the words "any country other than the United States" in Section 3.4(c) was not deliberately to include Puerto Rico in the scope of the term "in the United States" in Section 3.4(b).

Notably, however, if Puerto Rico is not "in the United States" and is not covered by the phrase "any country other than the United States," then the noncompetition provision would be silent on Smartmatic's ability to compete in Puerto Rico.   According to Dominion, this result is unreasonable and does not harmonize the entire agreement.[87] That conclusion finds some support in the use of "the United States" elsewhere in the License Agreement.

**5.      Use of the term "United States" elsewhere in the Agreement**

In construing the term "in the United States" in the noncompetition provision, I consider, lastly, whether reference to "the United States" elsewhere in the License Agreement helps to give meaning to that term in the noncompetition provision. Importantly, this disputed term appears in a license agreement.   As mentioned, the license

---

[86]     License Agreement § 3.4(c) (emphasis added).

[87]     Defs.' Opp'n Br. 39 (citing *Axis Reins. Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del. 2010) ("Where a contract provision lends itself to two interpretations, a court will not adopt the interpretation that leads to unreasonable results, but instead will adopt the construction that is reasonable and that harmonizes the affected contract provisions.")).

grant in Section 2.1 of the Agreement explicitly states that its scope is ―worldwide (other than the United States and Canada).‖  The plain and ordinary meaning of that license grant is that it does not grant Smartmatic a license under any of Dominion‘s U.S. or Canadian patents.  In this regard, I note that Dominion‘s U.S. patents extend, as a matter of law, to the United States‘ territories and possessions.[88]  Under patent law, therefore, Smartmatic would infringe Dominion‘s U.S. patent rights if it ―makes, uses, offers to sell, or sells any patented invention‖ in the United States or its territories and possessions, which include Puerto Rico.[89]  Thus, one reasonable interpretation of the license grant provision excluding the United States from the scope of Smartmatic‘s license is that the parties recognized that Smartmatic‘s sale of Licensed Products covered by Licensed Patent Rights in Puerto Rico could infringe Dominion‘s U.S. patent rights.  The same logic also could be extended to mean that the parties intended to impose the same geographic limitation on Smartmatic‘s right to compete ―in the United States‖ by way of selling Licensed Products.[90]  Based on this possibility, I asked the parties to submit additional briefing on the issue of whether the definition of ―United States‖ under federal patent law affects the definition of that term in the License Agreement.

---

[88]  *See* 35 U.S.C. § 100(c) (―The terms ―United States‖ and ―this country‖ mean the United States of America, its territories and possessions.‖).

[89]  35 U.S.C. § 271(a).

[90]  Evidence of the parties‘ intent to limit Smartmatic‘s right to compete in the United States also appears in Section 2.3.  *See supra* note 79.

Smartmatic maintains that this Court cannot consider the definition of ―United States" under federal patent law for three reasons.   First, they argue that the Eighth Circuit's *In re Airline Ticket* decision[91] addressed and rejected a similar argument that the Federal Aviation Act should be used to inform the interpretation of United States in the context of a settlement agreement involving travel agencies.   The Eighth Circuit— applying Missouri law which the Delaware Supreme Court has said ―comports with Delaware law"[92]—applied a ―lay person" standard to give the contract language its plain and ordinary meaning.   Second, Plaintiffs assert that federal patent law is extrinsic evidence that should not be used to create ambiguity.   Third, Smartmatic contends that, even if reading the specialized meaning of a term under patent law were appropriate in a license agreement, the term United States does not qualify as a term with specialized meaning.

Dominion argues that Smartmatic has no license to sell Licensed Products covered by the Licensed Patent Rights in Puerto Rico.   Specifically, Defendants assert in their supplemental briefing that they hold one U.S. Patent: No. 8,195,505.   Defendants also contend that their U.S. patent and the federal patent law are appropriate evidence for the Court to consider in construing the term ―in the United States" in the noncompetition provision, because Delaware law requires an inquiry into ―what a reasonable person *in*

---

[91]   *See In re Airline Ticket Comm'n Antitrust Litig.*, 268 F.3d 619, 621 (8th Cir. 2001).

[92]   *See AT&T Corp. v. Lillis*, 953 A.2d 241, 253 n.35 (Del. 2008).

*the position of the parties* would have thought [the agreement] meant."[93]   Emphasizing that the parties to the License Agreement are sophisticated technology firms, Dominion maintains that a reasonable person in the position of the parties would have understood the definition of United States under U.S. patent law.  It also avers that the phrase "in the United States" in the noncompetition provision must be read in context with the usage of "United States" elsewhere in the Agreement to give effect to every term and reconcile all provisions.[94]   According to Defendants, such a reading compels the conclusion that the term "in the United States" includes Puerto Rico.

Having carefully considered the parties' supplemental briefs, I conclude that the definition of United States under federal patent law is extrinsic evidence that the Court should not rely on in determining whether the noncompetition provision is ambiguous. This is not a case where the definition of United States "can *only* be known through an appreciation" of federal patent law.[95]   The Agreement defines the Licensed Technology to include not only patentable technology but also Dominion's "know-how, trade secrets,

---

[93]   *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006) (emphasis added).

[94]   *See* Dominion Defs.' Opening Supplemental Mem. of Law 4 (citing *Stonewall Ins. Co. v. E.I. du Pont de Nemours & Co.*, 996 A.2d 1254, 1260 (Del. 2010) ("A[] single clause or paragraph of a contract cannot be read in isolation, but must be read in context.")); *see also Whittington v. Dragon Gp. L.L.C.*, 2011 WL 1457455, at *10 (Del. Ch. Apr. 15, 2011).

[95]   *City Investing Co. Liquidating Trust v. Continental Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

methodologies and other technical information."[96]  The Agreement is governed by state law.[97]  The parties do not refer to U.S. patent law in their agreement.  The Agreement does not identify any Dominion patent.  Rather, it defines ―Licensed Patent Rights" in broad and general terms.

I recognize that excluding Puerto Rico from the definition of ―in the United States," would create a potential inconsistency between the license-granting provisions and the noncompetition provision.  I am not convinced, however, that the parties ever focused on this point.  The Agreement is silent on federal patent law and how it defines the United States.  At the same time, Section 2.1 indicates that Smartmatic is not licensed under Dominion's U.S. patents, which would give Dominion the right to preclude Smartmatic from selling the patented invention in Puerto Rico.[98]  Presumably, therefore, if Smartmatic were competing in Puerto Rico using products protected by a Dominion U.S. patent, it would be infringing that patent.   Whether Smartmatic is infringing a Dominion U.S. patent, however, is not the issue before this Court.  The question before me relates to the meaning of the term ―in the United States" in the noncompetition

---

[96]     License Agreement § 1.2.

[97]     *See Pfizer Inc. v. Elan Pharm. Research Corp.*, 812 F. Supp. 1352, 1359 (D. Del. 1993) (determining that state law governs the interpretation of a patent license agreement).

[98]     Conceivably, Dominion could grant Smartmatic a limited license to practice Dominion's U.S. patented technology solely in the territories and possessions of the United States.  Nothing in the License Agreement, however, suggests that the parties intended to enter into such a license.

provision. In this context, I cannot decide on the limited record before me whether the parties intended that the definition of ―United States‖ under U.S. patent law would be controlling throughout the License Agreement.

### C.    Is the License Agreement Subject to More than One Reasonable Interpretation?

Against this backdrop, I consider whether the Agreement's noncompetition provision is subject to only one reasonable interpretation. If it is, then summary judgment is appropriate. If I conclude that the provision is subject to more than one reasonable interpretation, then the contract is ambiguous and I must consider extrinsic evidence to determine what meaning the parties intended to give the noncompetition provision. In that case, summary judgment would be inappropriate based on the existence of a genuine issue of material fact and the need for a more thorough development of the record.[99]

I conclude first that Smartmatic's interpretation is reasonable. The ordinary meaning of ―in the United States‖ could be said to exclude its territories and possessions such as Puerto Rico. Dictionaries almost universally define United States to include only the fifty U.S. states and the District of Columbia. Case law and statutory support also exist for a definition of the United States that excludes Puerto Rico. Several cases have recognized the noncontroversial proposition that Puerto Rico is not a foreign country and

---

[99]    *See Cooke v. Oolie*, 2000 WL 710199, at *11 (Del. Ch. May 24, 2000) (―The Court . . . maintains the discretion to deny summary judgment if it decides that a more thorough development of the record would clarify the law or its application.‖).

is ―part of‖ the United States.  These determinations, however, do not address whether Puerto Rico is encompassed by the term ―United States,‖ or more specifically, the term ―in the United States.‖  Statutes, including the Help America Vote Act and federal patent law, expressly include Puerto Rico in the definition of United States when it is their intention to extend the definition of ―United States‖ to include its territories.  This suggests that the ordinary meaning of United States excludes Puerto Rico and the United States‘ other territories.  Thus, Smartmatic has adduced sufficient evidence to support a finding that the plain and ordinary meaning of ―in the United States‖ excludes Puerto Rico and that it was the parties‘ intent to incorporate this plain meaning into the License Agreement.

I consider next whether Dominion‘s interpretation is also reasonable.  ―A court must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole.‖[100]  Thus, even faced with substantial evidence that the plain meaning of ―in the United States‖ would exclude Puerto Rico, I must interpret that term in a way that reconciles all the provisions of the License Agreement, if possible.  In that regard, I conclude that Dominion‘s interpretation of ―in the United States‖ as including Puerto Rico is also reasonable.

Defendants‘ position rests on two main theories.  First, that the Court should consider the language of the entire noncompetition provision and reconcile how the

---

[100]     *Council of Dorset Condo. Apartments v. Gordon*, 801 A.2d 1, 7 (Del. 2002).

parties divided the world up among independent sovereign countries. Second, Dominion argues that I should consider undisputed background information to place this License Agreement in context. Specifically, they highlight that the Agreement was entered into to take advantage of the 2002 Help America Vote Act, that Dominion was formed in 2003 after this Act was passed, that the definition of United States in the Help America Vote Act includes Puerto Rico, that Puerto Rico is eligible for aid under the Act, and that Dominion intended to focus its efforts on Canada and the United States while Smartmatic would focus on emerging international markets.

I base my conclusion that Dominion's competing interpretation is also reasonable, however, primarily on the language used in the noncompetition provision and in the license grant. At this preliminary stage of the litigation, I have not relied on the historical information that Dominion presented. In the noncompetition provision, the use of the term —a country other than the United States" in Section 3.4(c) reasonably could inform how the parties intended to define the term —in the United States" in Section 3.4(b). These two provisions address different restrictions on Smartmatic's right to compete. In that regard, it is reasonable to infer that the geographical scopes they address are related. This is particularly so where, as here, to employ Smartmatic's interpretation and exclude Puerto Rico from the term —in the United States" would mean that virtually the only areas of the world not addressed by the noncompetition provision would be Puerto Rico and the other territories of the United States.

I also find Dominion's interpretation to be reasonable based on the context of this Agreement as a license agreement that grants Smartmatic certain rights under, among

other things, Dominion's patents.  The Agreement does not grant Smartmatic a license to Dominion's U.S. patents.  This fact supports a reading of the term —in the United States" in the Agreement's noncompetition provision that is consistent with the definition of United States under U.S. patent law, *i.e.*, as including Puerto Rico.  In addition, this fact counsels against a mechanical application in the context of this case of the canon of construction that favors construing restrictive covenants narrowly.  The Delaware Supreme Court has instructed courts to be cautious when entertaining background facts and to avoid using extrinsic evidence to vary the terms of a contract or to create ambiguity.[101]   In reaching my conclusion, therefore, I have eschewed incorporating wholesale the definition of —United States" under federal patent law to avoid any potentially improper use of extrinsic evidence.  Rather, I have limited consideration of such evidence to the license grant in Sections 2.1 and 2.3 as to the Licensed Patent Rights, where use of the federal statute is plainly apposite.

In sum, the parties have advanced two mutually exclusive, but reasonable interpretations of the disputed phrase —in the United States" in the noncompetition provision.  Therefore, I find that the term is ambiguous and deny the parties' cross motions for summary judgment in favor of a more thorough development of the record on the parties' intent.

---

[101]   *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232–33 & n.7 (Del. 1997).

## III.      CONCLUSION

For all of these reasons, I deny Smartmatic's motion for partial summary judgment and Dominion's implicit cross motion for summary judgment because both Smartmatic and Dominion have presented reasonable, albeit mutually exclusive, interpretations of ―in the United States" as that term is used in the License Agreement.

**IT IS SO ORDERED.**