# EXHIBIT 1

1

2

3

4   SELECT COMMITTEE TO INVESTIGATE THE

5   JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

6   U.S. HOUSE OF REPRESENTATIVES,

7   WASHINGTON, D.C.

8

9

10

11   DEPOSITION OF:    SIDNEY POWELL

12

13

14

15                                    Saturday, May 7, 2022

16

17                                    Washington, D.C.

18

19

20          The deposition in the above matter was held via Webex, commencing at 10:02

21   a.m.

22          Present:    Representatives Schiff, Lofgren, and Murphy.



1

2    Appearances:

3

4

5    For the SELECT COMMITTEE TO INVESTIGATE

6    THE JANUARY 6TH ATTACK ON THE U.S. CAPITOL:

7

8    ███████████ STAFF ASSOCIATE

9    ███████████ SENIOR INVESTIGATIVE COUNSEL

10   ███████████ SENIOR INVESTIGATIVE COUNSEL

11   ███████████ CHIEF INVESTIGATIVE COUNSEL

12   ███████████ CHIEF CLERK

13   ███████████ INVESTIGATIVE COUNSEL

14   ███████████ PROFESSIONAL STAFF MEMBER

15   ███████████ CHIEF ADMINISTRATIVE OFFICER

16   ███████████ SENIOR INVESTIGATIVE COUNSEL

17

18

19   For SIDNEY POWELL:

20

21   DAVID TOBIN

22   MARC EISENSTEIN

23   ROBERT HOLMES

24   ABIGAIL FRYE

25   BARRY COBURN

1

2          ████████        We are on the record at 10:02.

3          This is the deposition of Sidney Powell conducted by the House Select Committee

4   to Investigate the January 6th Attack on the United States Capitol pursuant to House

5   Resolution 503.

6          Ms. Powell, could you please state your full name and spell your last name for the

7   record?

8          The <u>Witness</u>.    Sidney Katherine Powell, P-o-w-e-l-l.

9          ████████        And counsel for Ms. Powell, can you please identify yourselves for

10  the record?

11         Mr. <u>Tobin</u>.    Yes.    This is David Tobin, and with me is Marc Eisenstein, Bob

12  Holmes, and Abbie Frye, all counsel to Ms. Powell.

13         Mr. <u>Coburn</u>.    And this is Barry Coburn, also counsel to Ms. Powell, in a different

14  location.

15         ████████        Thank you.

16         This will be a staff-led deposition.    Members of the select committee may join us

17  and may, of course, choose to ask questions.

18         My name is ████████    I'm a senior investigative counsel for the select

19  committee.

20         Also in the room today with me are ████████ investigative counsel, and

21  ████████ professional staff.    We may have other staff members who join at

22  various points in the deposition.

23         I don't see ████████ on the call yet, but ████████ will be joining us later.

24  She's a senior investigative counsel, and she may have some questions, or will have some

25  questions for Ms. Powell when I'm finished or when we're finished.

I can see Ms. Murphy is on as well. I'll try and note the members as they come into the call. I may not be able to keep track of when they leave, but I'll try and note their presence when they've joined us. And you too can -- you too will be able to see on the participant list if one of the members has joined.

Mr. Tobin. Thank you.

[redacted] Before we begin, I'll go through a few of the ground rules.

We're going to follow the House deposition rules that we provided to counsel previously. Under the House deposition rules, counsel for other persons or government agencies may not attend. But you, Ms. Powell, are permitted to have attorneys present, as we've noted that you do.

Under House rules, neither committee members, nor staff may discuss the substance of testimony you provide today unless the committee approves its release.

You and your attorney will have an opportunity to review the transcript.

There is an official reporter transcribing a record of this deposition, and I'm sure you know these typical rules for depositions. Make sure that you allow me to complete my question before you begin your response, and I'll do my best to try and let you finish your response before I ask my next question.

As you know, it's difficult for the stenographer to create a proper transcript when we're talking over one another. And you also know that nonverbal responses, such as shaking your head and so forth, can't be transcribed. And so we're going to need to just make sure that we sort of abide by standard deposition rules -- audible responses, not talking over each other, and so forth.

Any questions on any of that?

The Witness. No. I understand. Thank you.

[redacted] We ask, of course, that you provide complete responses to the best

1    of your recollection.    If a question is not clear, of course just ask for clarification, and

2    we'll reframe it or try and address whatever concerns, what lack of clarity you have with

3    the question.    If you don't know an answer, of course simply just say so.

4           You may only refuse to answer a question to preserve a privilege recognized by

5    the select committee.    If you refuse to answer a question based on privilege, staff may

6    either proceed with the deposition or seek a ruling from the chair on the objection.    If

7    the chair overrules such an objection, you are required to answer the question.

8           If you need to consult with counsel at any time during the deposition, of course

9    just let us know, and we can take a break, a brief sidebar, or a longer break for you to

10   consult with your attorneys.

11          If you need a break otherwise at any point during the deposition, just let us know.

12          I want to remind you -- and of course we say this to all witnesses, I'm not

13   suggesting that you're going to be anything other than forthright and truthful -- but I do

14   need to remind you that it's unlawful to deliberately provide false information to

15   Congress.    Since this deposition is under oath, providing false information could result in

16   criminal penalties for perjury and/or providing false statements.

17          Any questions about that?

18          The Witness.    No.

19          ███████████    Would you please raise your right hand to be sworn by the reporter.

20          The Reporter.    Do you solemnly declare and affirm under the penalties of perjury

21   that the testimony you are about to give will be the truth, the whole truth, and nothing

22   but the truth?

23          The Witness.    I do, so help me God.

24          ███████████    Ms. Powell, do you have any questions before we start?

25          The Witness.    No.

1          Mr. <u>Tobin.</u>        ███████  I do have one point, if I may.    Actually, two, if I may.

2          First off, I do want to say we really appreciate the courtesy and professionalism

3      counsel have showed us in this process in getting us to this date and accommodating our

4      schedules.    So we greatly appreciate that.    That's number one.

5          And number two, I have just a brief objection for the record, and then we'll move

6      forward.

7          I want to say the composition of the select committee and its legal authority to

8      issue and conduct interviews and depositions is derived from House Resolution 503

9      establishing the committee and the rules of the House of Representatives, which are

10     incorporated by reference into that resolution.

11         Section 2 of the resolution requires the Speaker to appoint 13 members to the

12     select committee, 5 of whom shall be appointed after consultation with the minority

13     leader.    However, only nine members were appointed, seven Democrats and two

14     Republicans.    Thus, the select committee is not a properly constituted committee

15     because it fails to comport with its own authorizing resolution.

16         As well, House Resolution 503 limits certain actions regarding subpoenas and

17     depositions by requiring consultation with and notice to the ranking minority member.

18     The select committee does not have a ranking member of the minority.    Therefore, the

19     select committee as currently constituted does not have the requisite authority to issue a

20     subpoena to command the appearance of Ms. Powell.

21         But, with this objection on the record, Ms. Powell is present and prepared to

22     respond to your questions.

23         ███████████  Thank you, Dave.

24                         EXAMINATION

25              BY ███████████

1      Q      Ms. Powell, let's start with your -- just some background questions.

2             Can you describe your educational background?

3      A      Yes.    I have a high school degree from Needham Broughton High School in

4      Raleigh, North Carolina.

5             I went to college at the University of North Carolina on a combined degree

6      program, did my undergraduate work in 21 months, taking 18 to 21 hours a semester, Phi

7      Beta Kappa, and proceeded to law school at the ripe old age of 19 or so.

8             I graduated from law school -- gosh, I've forgotten the year -- actually '78, I

9      think -- and began work as an assistant United States attorney in the Western District of

10     Texas.

11     Q      And I understand that you also spent some time in other U.S. attorneys

12     offices after the Western District?

13     A      Yes.    I worked in the Eastern District of Virginia for a brief time, back to the

14     Western District, and then went to the Northern District to start an appellate section for

15     that group.

16     Q      After you left government service, have you been in private practice since

17     then?

18     A      Yes, I have.    I went with a large regional law firm for a while, became a

19     partner there, and then -- I think it was '93 -- I started my own shop, devoted primarily to

20     Federal appeals in the Fifth Circuit.

21     Q      And have you focused mostly on appellate work since that time?

22     A      Yes, primarily.

23     Q      Is there any particular subject, subject matter that you've specialized, or just

24     general civil appeals?

25     A      General civil appeals and some -- an occasional criminal appeal.    Not very

1    many.

2         Q      Have you developed any other areas of specialty in your law practice besides

3    appellate work?

4         A      Not really.    I mean, the appellate law is kind of the last bastion of the

5    generalist.    Our expertise is more procedural than substantive, so we get to take on a lot

6    of different substantive issues.    That's one of the things I've really enjoyed about it.

7         Q      Do you have any background or specialty in cybersecurity issues?

8         A      No.

9         Q      Election law generally?

10        A      No.

11        Q      Okay.    If we can bring up exhibit 1.

12               Ms. Powell, you understand that you're appearing today pursuant to a subpoena

13   that's dated January 18th, 2022, correct?

14        A      Correct.

15        Q      And do you see the -- are you able to see the subpoena on the screen?

16        A      Yes.

17        Q      The first page of it?

18               We're going to do our best to scroll through the relevant portions of the

19   documents.    If at any time you want us to sort of slow down or scroll to a different part

20   of it, just let us know.

21        A      Okay.

22        Q      Part of the subpoena requires that you produce documents and information,

23   including electronically stored information.

24               Do you understand that?

25        A      Yes.

1    Q    Have you reviewed the requested documents that's attached to the

2  subpoena on page 3 -- 3 through 5 -- called "Schedule"?

3    A    I have reviewed everything with my attorneys and given them the authority

4  to get you everything we could find to comply with the subpoena.

5    Q    And did you personally conduct any search for records in response to the

6  subpoena?

7    A    Yes.

8    Q    Can you tell us generally what you did to try to locate responsive

9  documents?

10    A    Yes.    Well, first of all, I handed over everything needed to my lawyers to

11  look at it.    And then, secondly, I did my own review of my Federal appeals emails in

12  particular to make sure you got transmissions to the White House.

13    Q    When you say you handed everything over, do you mean you gave your

14  attorneys access to your computers and other devices?

15    A    Yes.

16    Q    And which devices did you have your attorneys search?

17    A    They were able to search all my email accounts, I believe, and my phones.

18    Q    How many phones?

19    A    Two.

20    Q    And are those -- I don't have my list with me.

21        During the relevant time period, did you only use two phones?

22    A    I only have two phones that are in my name and my ability to get records

23  for.    There was a time period when I used another phone, the number for which I don't

24  recall, but I don't have any access to those records.

25    Q    Okay.    Is that -- is the phone -- the phone that you referred to that's in

1   someone else's control, is that an 803 number, if you know?

2       A    I don't even know.

3       Q    Okay.   Did you ever use that 803 number to send text messages?

4       A    I can't tell you I used an 803 number.

5       Q    Did you use that other phone, the one you're referring to, to send text

6   messages in the time frame that we're talking about, November-December of 2020?

7       A    I would guess I used it for some text messages, yes.

8       Q    Okay.   I'll represent to you that we have a text message from you in late

9   December -- I believe it's from you -- to someone at the White House from an 803

10  number ending in ███   Does that sound like that is a phone that you had at that time?

11      A    Well, if it's a text message from me, it sounds like it was a phone that I had

12  access to.   But I'm sorry, I don't remember the number.

13      Q    Okay.   Did you look for -- going back to your efforts to find responsive

14  documents -- did you look through your records for hard copy documents that you might

15  have that are responsive to the subpoena?

16      A    Yes.

17      Q    And did you search both your office and home?

18      A    Yes.

19      Q    And did you find any documents, hard copy documents, that were

20  responsive?

21      A    Not that I recall.

22      Q    Did you conduct a search or have your attorneys conduct a search for

23  electronically stored documents other than emails?   So, for example, Word documents

24  or Excel spreadsheets.

25          Mr. Tobin.   Let me answer that.   I believe we had someone image her machine.

1        Is that right, Marc?

2        I'm asking Marc Eisenstein.

3        Didn't Jake?   Or did he just download her --

4        Mr. Eisenstein.   Yeah.   We had somebody remote import into her email

5   accounts and sort of collected the entire email account, and then we loaded it into the

6   review platform and searched that way.

7        Mr. Tobin.   I'm sorry, Marc.   Just turn down --

8        Mr. Coburn.   Just to let you know, you've got an echo there, Marc, because

9   you've got your mike on, as well as the mike that's being used by Sidney and Dave.   So if

10   you turn yours off, that'll cure it.

11        That's Marc Eisenstein.

12        ███████        Okay.   Marc, if you could repeat your answer.   We couldn't hear

13   you.

14        Mr. Eisenstein.   Sure.   We had gained access to Ms. Powell's email accounts.

15   We pulled the databases -- or, excuse me, pulled the in-boxes of the entire email

16   accounts, and we loaded that into the review platform, and we searched that way.   So

17   that -- those emails included hard copy documents -- or, excuse me, the electronic

18   documents you talked about.

19        ███████   Thank you.

20        BY ███████

21   Q        Ms. Powell, did you search personally for social media private messages that

22   you might have that would be responsive to the subpoena?

23   A        I don't remember doing that.   I don't remember using social media for

24   private messages.

25   Q        Okay.   Other than -- let me ask you, did you -- have you destroyed, deleted,

1    or otherwise manipulated any documents that might be responsive to the subpoena?

2         A    No.

3         Q    Okay.   Have any documents that you or your attorneys believe are

4    responsive been withheld from production?

5              Mr. Tobin.   I can answer that.   Yes.   And, ▮▮▮ we'll owe you a privilege log.

6              ▮▮▮▮▮    Okay.

7                   BY ▮▮▮▮▮

8         Q    Ms. Powell, how did you first become involved in challenges to the 2020

9    Presidential election?

10        A    I'm not even sure.   I was in D.C. the night of the election.   I just wound up

11   in the middle of all of it.

12        Q    Prior to the election, prior to election night, November 3rd, did you know

13   that you were going to be involved in post-election challenges?

14        A    No.   I didn't even know that the night of the election.

15        Q    Had you been involved in any pre-election litigation related to the election?

16        A    No.

17        Q    After the election, did you get involved in election challenge work?

18        A    Yes.

19        Q    Who did you represent in connection with the work that you did after the

20   election?

21        A    We represented electors and different heads of political subparties or

22   organizations.

23        Q    How did you come to represent those folks?

24        A    Well, any number of people were reaching out to me and other folks

25   involved in trying to figure out what happened, and it developed into the litigation that

1    we brought and filed in the States of Michigan, Wisconsin, Georgia, and Arizona.

2        Q    Did you have any experience in election law prior to November of 2020?

3        A    None.   I've never been political and didn't intend to be political.

4        Q    Do you know how it is that people came to find you as their lawyer in the

5    post-election -- for the post-election litigation?

6        A    Well, I had gained some notoriety in the Flynn case, and people just started

7    reaching out.

8        Q    Prior to the election, did you make any public appearances or public

9    statements regarding the election?

10       A    Not that I recall.   But I think -- I mean, I don't recall any specifics of it, but I

11   may have said something on some public appearance.

12       Q    Yeah.   I think --

13       A    I had concerns.   I know -- I remember having concerns about the election

14   overall.

15       Q    And you were on Steve Bannon's podcast the day before the election.   Isn't

16   that right?

17       A    I couldn't tell you what day it was, but I know it was in proximity to the

18   election.

19       Q    And did you express your concerns about the election on Mr. Bannon's

20   podcast?

21       A    I probably did.

22       Q    What were your concerns prior to the election?

23       A    Well, as I remember them, they were concerns over the mail-in ballots and

24   the ability of computerized voting to be manipulated.

25       Q    Let's talk about the mail-in ballots first.

1       What was your concern in that regard?

2       A       Well, I think many people -- and certainly history has proven it correct -- it

3   was an area that was absolutely ripe for fraud, for ballots to be counterfeited, for ballots

4   to be harvested, for just election rules in general to be violated in an organized fashion.

5       Q       Okay.    I'll note for the record that Ms. Lofgren has joined the call -- or the

6   deposition, excuse me.

7       Was there a particular reason that you felt that there would be more fraud in the

8   2020 election with respect to mail-in ballots than had occurred in previous elections?

9       A       Well, we'd been through the entire fabrication of the Steele dossier in an

10  effort to discredit the Trump administration.    We had seen the special counsel results

11  because of that.    We'd seen just what I would call an unprecedented effort to

12  delegitimize the Trump administration writ large.    And, at that point, there was nothing I

13  would put past anyone to try to make sure Trump was not reelected.

14      Q       And so you thought that that movement to target President Trump would

15  be -- would manifest itself in fraud relating to mail-in ballots?

16      A       Fraud related to anything.    I mean, I remember Attorney General Barr

17  expressing concern about the massive plan for mail-in ballots.    The response to COVID I

18  thought was absolutely ridiculous on the part of the government -- draconian and

19  ineffective and punishing, if not destroying the middle class.

20      Q       I'm curious about how you think that was going to manifest itself in the 2020

21  election with respect to mail-in ballots.

22      A       Right.    It gave cover for having a lot more mail-in ballots than were needed.

23  I think the absentee ballot program that exists in most States should have been sufficient

24  for people that needed to vote other than by in person to follow that procedure.    But,

25  yet, the whole mail-in ballot -- or the, yeah, the whole mail-in ballot thing blanketed the

1    country.

2         Q    You mentioned that you had concerns about electronic manipulation taking

3    place in the 2020 election.

4              What was your concern in that regard prior to the election?

5         A    Well, I had long been concerned about the ability of computers to

6    manipulate votes and was aware of problems, particularly in Dallas County and in other

7    places.   I think I had seen the HBO documentary "Kill Chain", which is just mind blowing.

8              I was aware of Judge Totenberg's decision at some point in the case in Curling v.

9    Raffensperger where she is just scathing of the Dominion machines and would have

10   enjoined their use in the election had it not been so close to the date of the election.

11             There were a number of things that fed my concerns of longstanding

12   machine-related vulnerabilities and lack of reliability.

13        Q    On Mr. Bannon's podcast the day before the election you talked about

14   something called Hammer and Scorecard.

15             Do you recall that?

16        A    I don't even recall -- I have no specific recollection of my conversation with

17   Steve Bannon.

18        Q    Prior to the election, were you aware of something called Hammer and

19   Scorecard?

20        A    Yes.

21        Q    What's your understanding of Hammer and Scorecard?

22        A    That it's essentially a government-instigated program that would allow for

23   real-time monitoring of votes and the ability to predetermine the outcome of an election

24   or run an algorithm against the votes.

25        Q    Where did you learn about that?

1      A      General McInerney has talked about it a lot.    I know Dennis Montgomery

2  has talked about it a lot.    And I eventually found the patent that I think probably covers

3  Hammer and Scorecard that was funded by the Department of Defense back in, oh,

4  roughly 2003 to 2005 time frame, and also the patent for the process to predetermine

5  the result of an election.

6      Q      When did you first become aware of this computer program that could

7  change the outcome of an election?

8      A      I don't know.

9      Q      But on the eve of the 2020 election, you were of the view that that

10  computer program was going to be utilized to steal the election from President Trump?

11      A      I was concerned that the computerized program could be used to

12  manipulate the result for whatever benefit those in charge of that program wanted to do.

13      Q      Do you believe that Hammer and Scorecard was used in the 2020 election to

14  change or manipulate the results?

15      A      I don't know.    I don't know.

16      Q      Who controls that computer system, if you know?

17      A      I don't know that either.

18      Q      Have you ever spoken to Dennis Montgomery?

19      A      Yes.

20      Q      Okay.    How do you know Mr. Montgomery?

21      A      I don't remember how I came to know Mr. Montgomery.

22      Q      When did you speak with him?

23      A      I can't tell you that either.

24      Q      Do you have a rough time frame?

25      A      No.

1        Q    Was it before the election?

2        A    I think I talked to him -- actually, that might be attorney-client privileged.

3        Q    Okay.   When you spoke to him might be privileged?   I don't want the

4    substance of the conversation, just when you spoke with him.

5        A    I can't tell you when I spoke to him.   I think it's been -- it may have been

6    even a couple of years.   I don't know.

7        Q    Do you think it was before the 2020 election?

8        A    Yes.

9        Q    Okay.   You said earlier that you were in Washington on election night in

10    2020?

11        A    Yes.   Yes.

12        Q    Did you watch the election returns at the White House?

13        A    Yes.

14        Q    How did you come to be at the White House for election night?

15        A    I got an invitation.

16        Q    Do you know why you were invited?

17        A    Yes.   Because I let the White House know I was in town and asked if I could

18    come.

19        Q    And did you have a relationship with the President?

20        A    Yes.

21        Q    How did you know President Trump?

22        A    I think that's attorney-client privileged.

23        Q    Okay.   Were you accompanied by anyone at the White House on election

24    night?   I realize there were other people there, but were you there with anyone in

25    particular?

1       A       I can't remember whether I went by myself or with Giuliani and his -- and

2    Dr. Ryan and -- I can't -- I don't remember whether I went with a group or joined them

3    when I was there.

4       Q       But you did interact with Mr. Giuliani on election night?

5       A       Yes.

6       Q       How late did you stay at the White House?

7       A       I don't remember.

8       Q       The polls were coming in obviously late into the night.    I think

9    President Trump spoke at some time in the very early morning hours of November 4th.

10      Were you still at the White House when the President spoke?

11      A       Yes.

12      Q       And were you with Mr. Giuliani sort of up through that time frame?

13      A       Off and on.

14      Q       At any point in that night, did Mr. Giuliani appear to be intoxicated to you?

15      A       That's a possibility.

16      Q       Okay.    Was alcohol served?

17      A       I don't remember registering that he was particularly intoxicated.

18      Q       Was alcohol served at the event?

19      A       I couldn't even tell you that.

20      Q       Okay.    Were you present for any discussions about whether the President

21   should speak that night about the results of the election?

22      A       Not that I recall.

23      Q       Did you ever discuss that with Mr. Giuliani on election night?

24      A       Not that I recall.

25      Q       When did -- I realize you've mentioned that you had concerns going into the

1    election about potential fraud.    Is that fair to say?

2          A     Yes.

3          Q     When did you first become concerned that there actually had been fraud

4    relating to the 2020 election?

5          A     When I saw the unprecedented stopping of vote counting across multiple

6    States at the same time just prior to the President being able to hit the 270 votes needed

7    for the electoral college win.

8          Q     When you say stopping of vote counting, what do you mean?

9          A     I mean the claimed water leak in Atlanta, the complete shutdown of

10   counting votes, almost simultaneously.

11         Q     Which States stopped counting votes on election night that you're aware of?

12         A     If my recollection was -- is correct, it was Michigan, Arizona, Wisconsin,

13   definitely Georgia, maybe Nevada.    There were several.    There were five or six.

14         Q     Who told that you that those States had stopped counting votes on election

15   night?

16         A     I think I was watching FOX News.

17         Q     And are you referring to mail-in or absentee votes, or that the machines

18   were -- results were not being reported?    What does it mean to you when you say that

19   vote counting stopped?

20         A     I don't even remember the specifics of that.

21         Q     Okay.    And what did -- so your concern or awareness was heightened by

22   that, or triggered, I guess, by that event, the stopping of the vote counting?

23         A     Yes.    It was definitely triggered by that unprecedented event.

24         Q     Okay.    Anything else on election night that caused you to think that

25   the -- that there had been fraud with respect to the election?

1        A        Yes.    I think I had seen some vote counts roll backwards and were --

2        Q        And so -- go ahead.    I'm sorry.    I didn't mean to interrupt.

3        A        There were just all kinds of funky things that were going on, numbers

4    changing rapidly that made no sense.    And voting is supposed to be an accretive

5    process.    There should never be a subtraction from a vote count.

6        Q        And did you see official vote counts that were going backwards or reported

7    results?

8        A        It was reporting on the television.    That was all I was aware of.

9        Q        And did you believe that the reporting on the television, the numbers

10    reported on television were the result of some sort of backwards counting by the election

11    officials or voting machines?

12        A        I wasn't sure what to attribute it to.    I just knew I had not seen that happen

13    before.

14        Q        So, other than votes -- vote counting stopping in certain States and the vote

15    counts going backwards -- anything else that caused you to believe that there had been

16    fraud in the election on election night?

17        A        Not that I can think of as I sit here right now.

18        Q        Did you do anything in that immediate aftermath of the election to

19    investigate whether there had been fraud in the 2020 election?

20            That's not a great question.    And when I say immediate aftermath, I mean in the

21    hours or days following the election.

22        A        Well, I think I stayed up until I couldn't hold my eyes open anymore watching

23    the news.    They kind of ran everybody out of the White House.    I don't remember what

24    time that was.    But I left with everybody else.    I don't even remember where I went

25    right after that.    I know people started calling with concerns.

1        But, no, I can't -- I couldn't begin to tell you.     I mean, it started an interminable

2    number of virtually sleepless days and nights.

3        Q    Do you remember what the first actions you took to try to get to the bottom

4    of whether there had been fraud in the election?

5        A    No.

6        Q    Did you task anyone with trying to find explanations for the anomalies that

7    you had identified?

8        A    I don't recall.

9        Q    Did you talk to Mr. Ramsland in the immediate aftermath of the election,

10   Russell Ramsland?

11       A    I don't recall that either.

12       Q    Do you know Russell Ramsland?

13       A    I do.

14       Q    How do you know him?

15       A    We're friends in Dallas.     Several years ago -- I don't even know how long

16   now -- I went to a presentation that he and Dr. Laura Pressley, I think it is, made about

17   the Dallas election and the issue of computer -- computers being used to change election

18   results.

19       Q    And is that someone you kept up with through --

20       A    Yes.

21       Q    -- the election?

22       A    Yes.    We see each other at different things in Dallas periodically.

23       Q    Do you remember talking to Mr. Ramsland at all in the hours or days after

24   the election about the 2020 election?

25       A    I don't, but it wouldn't surprise me if I did.

1      Q    And is that because you knew that he had concerns about electronic voting?

2      A    I knew he understood aspects of it that I don't have knowledge of.    I knew

3    he had worked in the area.    And he eventually came to write a report that I'm sure you

4    all are aware of for the Antrim County problems.

5      Q    Yeah.    We're going to -- we'll talk about that in a little bit.    But I'm just

6    wondering who -- I know it was a very hectic time and it might be difficult --

7      A    That's the understatement of the century.

8      Q    Yes.    And it might be difficult to sort of pinpoint time and place.    But do

9    you remember how you sort of first dove into the issues in the post-election time frame?

10      A    I do not.

11      Q    Did anyone from the Trump campaign or the White House ask you to get

12    involved in the election challenge effort in the immediate aftermath of the election?

13      A    Definitely not from the campaign.    It would be pure speculation on my part

14    as to how I came to wind up right there.    I have no specific recollection whatsoever.

15      Q    Do you know someone named Josh Merritt?

16      A    I do.

17      Q    How do you know Josh Merritt?

18      A    He wrote a declaration or affidavit for us by the nickname Spyder.    I know

19    he's a cyber person, and I think I've talked to him on the phone a couple of times.    But I

20    couldn't pick him out of a lineup.

21      Q    Do you recall reaching out to Mr. Merritt or asking someone else to reach

22    out to Mr. Merritt on election night to ask him to look into why weird things were

23    happening with the election, with the vote count?

24      A    No, not at all.    That doesn't even sound to me like that would be right.

25      Q    Okay.    Do you know how he became involved in the efforts that led to the

1  affidavit that you submitted under the pseudonym Spyder?

2        A     No, I have no recollection of how he came to be involved.

3        Q     Generally, in the litigation that you worked on, would you talk to or meet

4  with the affiants for whom you submitted declarations to the court?

5        A     No.   Other people did that.   Other lawyers did that or people who

6  understood what they were talking about.

7        Q     So what's the first thing you recall about getting involved after the election?

8  I know I've been trying to sort of probe your memory as best I can about those chaotic

9  days, but what do you remember is the first actions you took in the post-election time

10  frame?

11        A     Oh, boy.   That's a very hard one.   I hadn't thought about it that way at all.

12  It's like asking for your first memory of your mother.

13              Well, I remember a big meeting at the White House.   But I don't know that -- I

14  have no -- I have a bad sense of timelines and time under the best of circumstances, so I

15  don't know whether that's -- you know, where that fits in the chronology of things.

16              I remember being at campaign headquarters very briefly and realizing there were

17  no circumstances under which I could work with the campaign.

18              Nothing else jumps to mind right now.

19        Q     Okay.   In the documents that your counsel produced to us late Thursday

20  night, it looks as if there was an invitation or logistics were in place for you to visit the

21  White House for a meeting on November 7th.   And then, at some point, that appears to

22  have -- the meeting maybe appears to have been canceled, and there was a meeting on

23  the 8th.

24              Does that ring a bell for you?

25        A     I remember seeing those communications.

1    Q    Do you remember there being a meeting planned that didn't go forward and

2    then a follow-up meeting?

3    A    No, I don't remember a meeting planned that didn't go forward, but

4    that's -- there were several of those.

5    Q    Okay.    What do you remember about the first meeting at the White House

6    after the election?

7    A    There were a lot of people.    I remember Rudy was there.    Pat Cipollone

8    was there.    I can't remember if Victoria Toensing and Joe diGenova were there.    It was

9    a pretty -- I would say there were eight or ten people there.    I would imagine

10   Mark Meadows was there, but I have no specific recollection of Mark Meadows being

11   there.    And it was general and chaotic and widespread recognition of something having

12   been very wrong.

13   Q    Do you recall who invited you to that meeting?

14   A    I don't.

15   Q    Do you remember when you were asked to participate in this election

16   challenge work on behalf of the President?

17   A    I was probably asked to be some kind of part of it at that meeting, but I

18   couldn't swear to that.

19   Q    What was your relationship like with Mr. Giuliani at the time of the election?

20   A    At the time of the election, it was fine.

21   Q    Had you worked together on some issues or had some discussions relating to

22   Hunter Biden's laptop prior to the election?

23   A    Yes.

24   Q    And is that primarily how you got to know Mr. Giuliani?

25   A    Oh, we've met a long time ago.    I think we were even baby assistant U.S.

1     attorneys at the same time and may have met at a thing with DOJ.    I used to teach at the

2     Attorney General's Advocacy Institute multiple times a year.    I couldn't tell you where I

3     first met Giuliani.

4           I remember seeing him in the Southampton Film Festival.    I had done a movie on

5     breast cancer awareness or helped do that, and he was hosting one of the parties there.

6     I mean, our paths have crossed many times in many different places.

7         Q    Got it.    Do you remember if, on election night, he asked you whether you

8     would be interested in assisting in the effort to challenge the election?

9         A    I have no recollection of that either.

10         Q    Okay.

11         A    But I wouldn't dispute it, I mean.

12         Q    Yeah.    No, I'm just trying to get a sense of and maybe jog a memory as to

13     how you came to be at this meeting at the White House in the aftermath of the election

14     and whether he might have been the one who invited you or you got invited by

15     somebody else.

16         A    I don't know.

17         Q    Do you recall getting a call from the President and having him ask you to

18     participate in the election challenge effort?

19         A    I don't.

20         Q    Do you recall, at the time that you went to the White House, which I'll

21     represent to you, or you've seen the documents, it looks like possibly on the 7th of

22     November, but certainly on the 8th of November, according to the information that you

23     provided, at that time, had you already gathered any evidence or information with

24     respect to potential fraud in the election?

25         A    I would certainly think I had.

1      Q      Do you have any recollection of what information you had pulled together in

2      those early days after the election?

3      A      No.

4      Q      How about the general nature of it?

5      A      The general nature of it would have been that it was mathematically and

6      statistically impossible to have seen some of the number jumps that we saw.      I

7      remember someone analogizing it to flipping a coin 150,000 times or whatever and

8      having it land on heads every time, that that simply doesn't and cannot happen in the

9      laws of math and physics.

10      I can't think of anything else specific right now.

11      Q      What was the data that you had at your disposal that caused you to believe

12      that it was mathematically and statistically impossible for the election to have proceeded

13      as it did?

14      A      I don't remember whether people had done charts and graphs by then or

15      not, but I remember seeing some screenshots or something of injections or leaps of

16      significant quantities of votes that the guys who understand math and Benford's law and

17      all these other things say can't happen.

18      Q      Do you recall who was telling you -- who these guys were that told you it was

19      statistically and mathematically impossible or that it was similar to flipping a coin 150,000

20      times?

21      A      Well, they were coming from all directions.     I think at one point I calculated

22      there were at least ten different groups of math geniuses who had converged on the

23      same result without even knowing each other existed and were looking at it.     But I don't

24      know who came first or any of that.

25      Q      And you don't remember reaching out for anyone to do analysis in the first

1    days after the election?

2         A    I have no specific recollection of anything I did in the first days after the

3    election.

4         Q    Did you have contacts at that time that you -- or people who you could have

5    reached out for who were these math geniuses or other election experts?

6         A    Well, I mean, I could have reached out to Russ.    But I don't -- I just don't

7    remember doing it.    I could have reached --

8         Q    Did you -- I'm sorry.    I cut you off.

9         A    Yeah.    That's all right.

10        I mean, I could have reached out to people that I met there at the White House

11   that night.    I know I was talking to Mr. Giuliani.    I don't remember who all he was

12   talking to.    Everybody's phones were ringing nonstop.    I think the Lincoln Project had

13   doxxed my phone, so it rang all the time.    You know, it was just pure chaos.

14        Q    Other than Mr. Ramsland, was there anyone that you knew at that time, on

15   November 3rd or 4th, that had any expertise or background in election integrity or

16   election security issues?

17        A    As I sit here right now, I can't think of anybody.    But there were lots of

18   people around talking about all of it.

19        Q    Yeah.    Do you remember going to the White House for the meeting that we

20   were just talking about armed with data or evidence or charts?

21        A    No.

22        Q    Okay.

23        A    I would expect that I did, but I don't remember it.

24        Q    In roughly the same time frame of this White House meeting, I believe you

25   were on television talking about the election being -- having been stolen through

1    Hammer and Scorecard.

2        Do you recall that?

3    A    No.

4    Q    Did you believe after the election that Hammer and Scorecard had been

5    used to manipulate the votes?

6    A    Well, to me, Hammer and Scorecard is simply one person's name for a

7    process.    I don't know exactly what it is.    I mean, I don't know anything about how it

8    works other than what I've read in the patents that I think describe it.

9        So I don't know if it's really called Hammer and Scorecard.    I don't know where it

10    is or who operates it.    But I think the process that is described therein certainly made it

11    possible for computers of some kind somewhere, voting machines or computers inserted

12    in a "man in the middle" attack, as they call it, on voting machines to change the votes.

13    Q    Is it fair to say -- and I don't want to mischaracterize what you've testified

14    to -- but what I'm understanding is that you had information from some math

15    types -- math geniuses, I think you called them -- but you had information from certain

16    folks who told you there were some statistical impossibilities.    You had a concern going

17    into the election that there was going to be some malfeasance.    And you were looking

18    for some explanation to explain or to explain how those improbabilities came to be.

19        Is that a fair assessment of where your mindset was in the week after the

20    election?

21    A    That sounds correct, along with a general very strong desire to know the

22    truth, whatever it was.

23        And I do remember discussing that in particular with the President, that the

24    country needed to know exactly what had happened here.    And if, in fact, Mr. Biden had

25    won, everyone needed to know that, as well as if Mr. Trump had actually won.

1    Everyone needed to know the truth, that the American people who voted were

2    entitled to know the absolute truth of what happened in the election.    And it was

3    obvious we were not getting that.

4         Q    When do you recall having that conversation with the President?

5         A    I don't have a specific recollection of the date of that conversation, but I

6    think it happened more than once.

7         Q    Okay.    So going back to -- and I know you were describing some of the

8    particulars and the people who were there, and then I pulled you into a different

9    direction.    But going back to that first meeting at the White House, you talked about

10   some of the people who were there.

11        What do you remember about the discussion or what was discussed at the

12   meeting?

13        A    Nothing.

14        Q    Okay.    Was there -- were theories or ideas discussed about what might

15   have caused the anomalies that you were identifying?

16        A    I have no specific recollection of the discussion in that meeting.

17        Q    Do you remember anyone giving you the information that you were looking

18   for in terms of explanations for the anomalies that you had seen?

19        A    No.

20        Q    Do you remember any sort of strategies or plan of attack in terms of

21   investigating potential fraud in the election?

22        A    No.

23        Q    Was the President present for the meeting?

24        A    Yes.

25        Q    And you said Mark Meadows might have been?

1          A      I would think he was there, but I have no specific recollection of him being

2      there.

3          Q      Do you recall anything that the President said in that early meeting or that

4      first meeting in November, either 7th or 8th?

5          A      I know he wanted to know the truth, and our general consensus was that the

6      vast majority of people had poured out in support of the President.    The rallies indicated

7      that.    All the information that we had indicated that.

8              And the numbers that we saw on election night simply didn't jibe with common

9      sense or reason in light of everything we'd seen in the run-up to the election.

10         Q      Do you know if any of the members of the President's campaign team were

11      present at that meeting?

12         A      I don't remember.    I didn't know any of them.

13         Q      Do you recall whether anyone spoke up at the meeting about what the exit

14      polls or other information that the campaign had was saying about how the result turned

15      out the way it was?

16         A      No, I don't remember anything about that.

17         Q      Have you ever heard anything about that, about internal polling within the

18      Trump campaign that explained or put some context around the result of the 2020

19      election?

20         A      No.    The campaign didn't share information with me.

21         Q      Have you ever heard any explanation from sort of an electoral or polling

22      analysis as to why the result was what it was in 2020?

23         A      I have no recollection of that.

24         Q      For example, have you ever heard anyone say that the reason that Trump

25      lost a particular State -- say Pennsylvania -- was that he didn't carry particular counties or

1    suburban voters or women or that sort of analysis?

2          A     No.    I don't remember that.

3                I remember something about he won 19 out of 21 or 22 bellwether counties, and

4    that that level of winning of the bellwether counties, it was unprecedented for somebody

5    to lose.    But I don't remember anything you're suggesting.

6          Q     Okay.    Do you remember anything else about this first meeting that you

7    had at the White House?

8          A     No.

9          Q     Do you recall what your marching orders or what your involvement was

10   going to be coming out of that meeting?

11         A     I think, coming out of that meeting, I realized that I was going to have to kind

12   of investigate what I felt like needed to be investigated on my own.    But I can't recall

13   anything specific that led me to that conclusion.

14         Q     Do you remember anything generally?    I mean, why is it that you felt you

15   were in -- let me back up.

16               I assume that the folks in that meeting were of like mind with you in terms of

17   concerns about the election outcome?

18         A     I don't recall.

19         Q     Do you recall anyone at the meeting saying, "Sidney, there is not a problem

20   here, I think we understand what happened and the President lost"?

21         A     No.    I have no recollection of that.

22         Q     Do you remember whether you were sort of a lone voice in terms of raising

23   concerns about the election or there were kindred spirits in the room?

24         A     It wouldn't surprise me to hear that somebody said I was the lone voice of

25   particularly the massive level of the machine fraud.    But I don't recall any specifics of

1    people offering any kind of real explanation of what else could have happened.

2         Q    Was Mr. Giuliani on board with your assessment of the election in terms of

3    the fraud that had taken place?

4         A    I think he was for the most part.

5         Q    Did he speak up in this meeting?

6         A    I'm sure he spoke a lot in that meeting.

7         Q    He tended to dominate conversations in the meetings you attended with

8    him?

9         A    He did.

10        Q    Why is it then, after that meeting, if you were both sort of on the same

11   general wavelength in terms of the fraud, that you felt that you were going to be going it

12   alone in terms of investigating?

13        A    I remember just thinking that -- I had a very specific view of what I think

14   went wrong and what the evidence was showing me went wrong.

15            And the main problem was that it crossed party lines.    I think a lot of Republicans

16   and Republican governors were part of the problem.    I think different people brought

17   Dominion machines into their States for different reasons, and they weren't all good

18   reasons, and some of those people were Republicans.

19            I knew I was going to have to call out both Republicans and Democrats for

20   malfeasance or malpractice or, you know, whatever you want to call it.    But the big

21   problem crosses party lines.

22            And there was no way the campaign or Mr. Giuliani or even the President could be

23   part of what I personally saw needed to be done on behalf of the American people.

24        Q    Okay.    Let me unpack that a little bit.

25            So, first, how is it that you -- what was your very specific view of what had gone

1    wrong at the time of that meeting?

2         A      I can't say it was by the time of that meeting.    I don't know when it became

3    so clear to me.    But it was fairly early on that I realized the problem crossed party lines.

4         And, obviously, when I stood up at the RNC and railed on -- I think it was Governor

5    Kemp -- that was real obvious, it was real obvious to me by that time that it crossed party

6    lines.    But I realized that much earlier, which is why I essentially took my own path.

7         Q      Understood.    And I want to get to that, the part about the party lines and

8    the pushback that you felt.    But first I want to focus, though, on what you think the

9    specific problem was that you had identified.

10        You said you had a specific view of what went wrong.    What did you mean by

11   that?

12        A      Well, the conclusion that I have come to -- again, I can't tell you when it first

13   sort of crystallized -- but is that there was an algorithm in the voting machines.    It may

14   have been in every machine across the country.    It may have been in select machines

15   across the country.    I don't know.    That remains to be seen.

16        But an algorithm essentially gave weighted, for example, this is not a specific, but,

17   for example, could weight a Biden vote at 1.25 and weight a Trump vote at 0.75.

18        And there is a video that's been around for a long time called "Fraction Magic"

19   that you can find on our website probably, at defendingtherepublic.org, that explains that

20   process, and it goes way back.    So people have identified that long before I did.

21        And then, on top of that, I think what happened election night was -- and I've said

22   this publicly -- the turnout for Trump in person on election day was so great that it broke

23   the algorithm in those key States.

24        And this time they had the plan of the ground game backup of the mail-in ballots,

25   many of which we know from the "2000 Mules" documentary were fraudulent and were

1     ballot box stuffed to cover for the machine fraud needed.     And that's why the vote

2     counting had to stop election night in those States and they had to backfill.

1

2     [11:02 a.m.]

3                      BY ▮▮▮▮▮▮▮

4     Q      When did you figure all that out?

5     A      I don't know.

6     Q      And did you do that on your own, or did some expert or person with some

7     knowledge of election security and so forth help you form that opinion in the early days

8     after the campaign?

9     A      I have been digging into it probably nonstop with the exception of sleeping

10    hours and a few eating hours since election night.    And one of the remarkable things I

11    found was the testimony of Clint Curtis in 2004 before the House Judiciary Committee in

12    Ohio about the 2000 -- I think it was the 2000 or the 2004 election.

13            Curtis is a republican who testified in front of Jerry Nadler and Maxine Waters and

14    whoever else was on that special House Committee that sat in special seating in Ohio,

15    that he had been hired by the republican head of the Senate I think, or the House, in

16    Florida to write an algorithm to change votes for Bush in the 2004 election in Florida.

17            And, you know, everybody listening to it then was absolutely flabbergasted, but

18    he said he did it.    And the company he worked for on top of all that had a relationship to

19    China, and had had a Chinese spy working for it.

20            So, you know, then I look at Smartmatic and it goes back to being founded in

21    Venezuela in 1977 by three Venezuelans that come out of nowhere, and then all of the

22    sudden have a multimillion dollar contact with Venezuela to literally rig elections in

23    Venezuela.    They did it for Chavez.

24            They created the software, which is kind of like Hammer and Scorecard.    Let's

25    just call it Hammer Scorecard because those are the names we've heard to call the same

1    thing by, but that can control an election machine.    And they got the machines from

2    Olivetti, the gambling casino company supplier out of Italy, and then made them -- did

3    whatever they needed to do electronically to make them run the elections in Venezuela.

4            And a witness came forward who had been in Venezuela sitting at Hugo Chavez'

5    right hand for the briefings and discussion of starting it up, through being in what they

6    call the fishbowl to see how it works, and he saw the votes change on election night to

7    make sure Chavez won.

8            And that company, Smartmatic, is still helping with U.S. elections today.    In fact,

9    there's video of the vice president of Smartmatic talking to the elections assistants

10   commission or -- whatever the "EAC" stands for, right before the 2020 election on how

11   important it is to be able to put last minute patches into our voting system prior to an

12   election, which wouldn't be EAC certified.

13           And in that patch, they can put the algorithm to make the votes come out

14   however they want on whatever the election they want it to come out on, any of them,

15   any candidate, any precinct, any whatever, from President on down.

16           And I find that absolutely horrifying as an American citizen, and something that

17   should never have been allowed to happen.    You can go back and look at Carolyn

18   Maloney's letter to Treasury Secretary Snow I think back in 2006 complaining about

19   Venezuela's influence in our election process, and it's still there.

20           I mean, there's document after document.    I think we produced to you

21   something like 20,000 documents.    And our filings in the four cases, we had -- I don't

22   know -- probably 1,500 or more pages of affidavits and expert reports, and statistical

23   analysis that show this election was not free and fair.    It was controlled by somebody

24   other than the American people who cast their votes.

25           And I don't care who the President is.    I want to know exactly how long this crap

1    has been going on and who is responsible for it, and they need to be eliminated from any

2    role in this country whatsoever.

3            Q    And did you give some version of that sort of explanation at this White

4    House meeting?

5            A    I have no idea.

6            Q    Okay.    But something at the White House meeting led you to believe that

7    you were going to be sort of having to go it on your own, essentially, to establish or prove

8    what you believed happened.    Is that fair to say?

9            A    It was the fact that I was going to call out whoever it was.    I was going to

10    tell the truth, regardless of whether it hit Republicans upside the head or Democrats.    I

11    didn't care about political parties.    I didn't care who thought they were hot stuff.    I

12    didn't care whose job I was fixing to annihilate.    It just didn't matter to me at all.    The

13    chips were gonna fall where the chips were gonna fall, and politicians have a real problem

14    with that.

15            Q    So in the aftermath of that meeting, did you set out, sort of, essentially on

16    your own to try to pull together the evidence to establish what you believed happened?

17            A    Exactly.

18            Q    And did you set up base in Washington?

19            A    Temporarily, because I thought there were some people I was going to be

20    able to work with and in a sense I still tried to work with some of the other folks.    Like, if

21    I got some information that was important, I would send it to Mr. Giuliani or to anybody

22    else that I thought should know it because I knew there were other people working on

23    different things, and taking different tacks, and I didn't know exactly what those were, in

24    part because they wouldn't say.

25            But to the extent what I found was important, I shared it with other people as best

1    I could.    But still, I knew, you know, I was gonna be on my own calling out whatever I

2    found the evidence to show.

3          Q    Did you have office space in Washington at that time?

4          A    No.

5          Q    Did you -- did anyone provide you with a place where you could work?

6          A    No.    I rented a hotel suite at the Weston Hotel.    I think it was the Weston

7    in Arlington.

8          Q    And were other attorneys or individuals who were working on the election

9    challenge efforts also working out of the Weston in Arlington?

10         A    The only ones that I knew were there at the time were Phil Kline and his

11   group.    I think it was called the Amistad project or something.    In fact, I'd gone over

12   there understanding that we were going to collaborate in some fashion only to be

13   essentially thrown out of his office when I went to say hello, I'm here, how can I help.

14         Q    Why were you thrown out of the office, if you know?

15         A    He said they were going on their own direction, and unless I was willing to

16   take orders from him, I wasn't welcome.

17         Q    My understanding is that Mr. Kline and the Amistad group had rooms on a

18   different floor from where other attorneys were working in the Weston; is that correct?

19         A    I know they had set up a fairly significant camp with offices and conference

20   rooms, and I don't know what all.    I saw those briefly until I was told to leave.    But

21   that's all I know about that.    That was my last interaction with Mr. Kline that I recall.

22         Q    In the space where you were working, were there other attorneys also

23   working in connection with the election challenge efforts?

24         A    There were -- well, let's see, Emily Newman and Julie Haller came over one

25   day and volunteered.    And Howard Kline Hendler, who I think had originally come down

1    with Giuliani.    Although, I don't know that for sure.    But anyway, he was around, and

2    he had volunteered.    And I think we were the only attorneys looking at filing the cases

3    for the electors and the other party chairs.

4          Q    Was Mr. Giuliani working out of the Weston as well?

5          A    I don't -- the last time I saw Giuliani, he was working out of the Mandarin

6    Oriental.    To my knowledge, he was not working out of the Weston.

7          Q    I'm not talking about the last time you saw him.    I was talking about maybe

8    in the early stages, before the Mandarin, was he working out of the Weston?

9          A    Not to my knowledge.

10         Q    Was Mr. Kerik at the Weston?

11         A    I don't remember -- I don't remember whether Bernie was at the Weston.    I

12   know he was at the Mandarin Oriental at one point.    But I don't remember whether he

13   was at the Weston or not.

14         Q    How about Mike Trimarco?    Was he working out of the Weston?

15         A    I don't know where Mike Trimarco was working out of.    I can tell you he

16   kept showing up in my work area at the Weston, and I had to keep asking him to leave.

17         Q    Why was he showing up, if you know?

18         A    I don't know.

19         Q    Why did you ask him to leave?

20         A    Because he wasn't a lawyer, and I wasn't having him do anything, and I

21   didn't know why he was there.    He was like this sweet puppy dog that kept showing up,

22   but I had to keep asking him to leave.

23              I didn't want people sitting around in my work space listening to what we were

24   talking about or anything else.    In fact, my ideal workday is a room -- is when I get -- the

25   phone doesn't ring all day, and I'm sitting in my office and I get to read and write.    And I

1     haven't had one of those since I took the Flynn case.

2          Q     Was Mr. Trimarco paying for rooms at the Weston for people to work?

3          A     I don't know what Mr. Trimarco was doing.

4          Q     Were you paying for your set of room?

5          A     I know I took the front desk a credit card for my room.

6          Q     Okay.    And other than Ms. Newman, Julie -- I'm sorry.    I didn't get her last

7     name.    You said Holler?

8          A     Haller, H-A-L-L-E-R.

9          Q     And Howard Kline Hendler.    Were there any other attorneys working in

10    your space or where you were working at the Weston?

11         A     I can't think of any others.

12         Q     And did you say you were mostly working on putting together litigation for

13    the clients you had mentioned earlier; the electors and the folks involved with various

14    political organizations?

15         A     Yes.

16         Q     Okay.

17         A     Basically, I was looking for whatever the evidence showed.

18         Q     Were you working with any -- did you interact with any lawyers who had

19    been hired by the Trump campaign or who were working for the Trump campaign?

20         A     I don't think so.

21         Q     Did you ever meet someone named Matt Morgan?

22         A     I've heard the name.

23         Q     Did you work with him at all?

24         A     Not that I recall.

25         Q     Or Justin Clark?

1       A   That name rings a bell, but I don't remember working with him either.

2       Q   It is fair --

3       A   I really didn't work with anybody in the campaign.   I might have sent them

4   information.   They might have given me some information.   I don't know.   But I could

5   not legitimately represent that I, quote, "worked" with anybody in the campaign.

6       Q   Okay.   So is it fair to say you weren't coordinating strategy from anyone

7   from the campaign?

8       A   That's correct.

9       Q   You had your cases.   You were trying to work up your cases.   That's what

10   you were focused on?

11       A   Yes.

12       Q   Was there an understanding with the other people who you knew were

13   working on the election effort on behalf of the campaign or the President that you were

14   gonna focus on one particular set of issues and maybe they were pursuing others?

15       A   I couldn't begin to tell you what they thought or understood.

16       Q   Okay.   Let me pause right there to see if anyone -- I've been going a while

17   on my own here -- anyone else who is on the call has questions.

18       ██████   Good morning.   I just have a couple quick questions.

19          BY ████████

20       Q   Hi.   Good morning, Ms. Powell.   My name's ████████   I'm senior

21   investigative counsel.

22       A   Good Morning.   You're too young to be senior investigative counsel.

23       Q   I think you're gonna actually make me blush, ma'am.

24       I just wanted to ask a couple questions about the funding ██████ pointed out.

25   I think you mentioned a couple of other attorneys.

1            Did you happen to know or have any conversations with anyone regarding who

2    was funding their post-election litigation efforts, the lawyers that you mentioned earlier?

3            A    Everybody was a volunteer when they showed up.   There came a point in

4    time where money came in to support our effort, and I got them all paid from that.

5            Q    When you say them, could you just explain who you mean?   We just want

6    to keep the line straight of which individuals we're talking about.

7            A    Right.   I think it was, I know I paid bills from Howard and Emily and Julie.   I

8    can't remember whether there were any other lawyers.   At least not, you know,

9    physically there.   At some point Julie's brother, Peter, pitched in to help, but I didn't

10   meet him for a very long time.   I'm not even sure I knew he was helping then, and --

11           Q    Just for clarity -- oh, I'm so sorry.   I didn't mean to cut you off.   Go ahead.

12   Ma'am.

13           A    Right.   And also Brandon Johnson at some point pitched in and I paid bills

14   from him.

15           Q    And when you say you paid those, can you clarify from what entity you were

16   paying those from?

17           A    From my law firm.

18           Q    Is that Sidney Powell, LLC?

19           A    P.C.

20           Q    P.C?

21           A    Yeah.

22           Q    Okay.   And did you ever -- we'll come to the other organizations later

23   actually.

24           So to the best of your recollection, the funds that you paid those individuals all

25   came out of your Sidney Powell, P.C. account?

1          A      Yes.

2          Q      Okay.    And did you ever have any conversations with Mr. Giuliani regarding

3    how he was getting paid?

4          A      I have a very vague recollection of him discussing or mentioning the

5    campaign, I think, was supposed to pay him.    But it was, you know, something in

6    passing.    I don't remember any big conversation about it.

7          Q      And we can come back to that because I don't want to get too far off from

8    where ▇▇▇▇▇▇ left off.    I just wanted to follow up on the individuals you mentioned so

9    far, if you knew that.    So I appreciate that.

10         A      Sure.

11                BY ▇▇▇▇▇▇▇▇

12         Q      Were any other lawyers on the work you were doing, maybe folks who

13   weren't in Washington, DC, in the early stages after the election?

14         A      I can't think of anybody else right now.

15         Q      How about Lin Woods?    Was Lin Woods helping you with the work that you

16   were doing in early November?

17         A      I don't think so.    I don't think he got involved until a bit later.

18         Q      And I think we're gonna talk about this, but later in November, you went

19   down to his property, down in Tomotley?

20         A      Yes.

21         Q      Had you been to the Tomotley property before that?

22         A      I went once in November on a one-day trip.    But that was the first time.

23         Q      My understanding is that there was a meeting in August before the election

24   related to the election at Tomotley.    Were you present for that?

25         A      I have no recollection of that at all.

1          Q       Okay.    Did you work with -- at any time during the course of your election

2    challenge work, did you work with an attorney by the name of Cleta Mitchell?

3          A       I know I talked to her on the phone once or twice.    I think she was

4    stationed in Georgia.

5          Q       Did you coordinate efforts at all?

6          A       I don't know that I'd call it coordinating efforts.    I think we shared some

7    information, but I don't remember having very much interaction with Cleta.    I always

8    thought highly of her.

9          Q       Did you ever meet a lawyer by the name of John Eastman?

10         A       John Eastman?    I met him at an airport recently if he's the one I'm thinking

11    about.

12         Q       In the timeframe -- in the 2020 or very early 2021 timeframe, did you

13    interact with Mr. Eastman?

14         A       If I did, it might have been on a large group phone call, but I don't have any

15    specific recollection of interacting with Mr. Eastman either.

16         Q       And I'm including any interactions; email or other communications, not just

17    conversation or face-to-face meeting?

18         A       Well, yeah.    There could have very well been -- there were scads of people

19    on different emails.

20         Q       Got it.    But you don't recall a specific email correspondence that you had

21    with Mr. Eastman?

22         A       No.    I don't recall any specifics.

23         Q       Have you ever heard of attorney by Kenneth Chesebro?

24         A       That doesn't even ring a bell.

25         Q       Have you heard of an attorney by the name of Jeff, or Jeffrey Clark?

1        A      The name is familiar.

2        Q      So Mr. Clark worked at the Department of Justice.

3        Is that -- does that ring a bell?

4        A      Okay.

5        Q      Is that the person you're thinking of?

6        A      I don't know.

7        Q      Do you recall ever talking about election law issues or election challenge

8        issues with Jeffrey Clark?

9        A      No.   I have no recollection of that.

10       Q      Let me ask you about some non-lawyers you may have worked with or

11       interacted with in your post-election, sort of, efforts with regards to the election.

12       Did you ever interact with Steve Bannon regarding the 2020 election.    We talked

13       about the podcast appearance.    But outside of any appearances that you may have had

14       on his show, did you ever talk with or interact with Mr. Bannon regarding the challenges

15       to the 2020 election?

16       A      I may very well have, but again, I don't specifically remember that.

17       Q      Do you know Alexandra Preate?

18       A      I do.

19       Q      What's your relationship with Ms. Preate?

20       A      We have an attorney/client relationship.   We were friends.   She was my

21       publicist for my book "License to Lie, Exposing Corruption in the Department of Justice,"

22       which is a true legal thriller and reads like a John Grisham novel, but names names.

23       Q      Sounds like it's right off the blurb.    Maybe Ms. Preate even came up with

24       that?

25       A      No, I did.

1      Q    Did you talk with her at all about the 2020 election?

2      A    I'm sure I did, but I don't have any specific recollection of that either.

3      Q    Do you recall her ever acting as an intermediary between you and

4  Mr. Bannon to pass information back and forth regarding the efforts that you were

5  making to challenge the 2020 election?

6      A    I have no recollection of that.    I know she worked for Steve Bannon, but I

7  mean, I can call Steve Bannon myself, so I don't know.

8      Q    What about Peter Navarro?    Did you have interactions with Mr. Navarro in

9  connection with your election challenge work?

10      A    Yes.    I would say it was more indirectly.    There was a young member, I

11  think of his team, that was very helpful in collecting information.

12      Q    Who was the person from his team?

13      A    Christis McCreatus.    He's a double PhD.    He looks like he's about 12 years

14  old.

15      Q    What did you understand Mr. McCreatus' connection to Mr. Navarro to be?

16      A    That they were colleagues in some sense, but I don't know the exact

17  relationship.

18      Q    Did Mr. Navarro put you in touch with Mr. McCreatus?

19      A    I don't remember.

20      Q    Do you remember how you got to -- how you were connected with

21  Mr. McCreatus?

22      A    Nope.

23      Q    Did you work with any of the other -- any other folks who worked for

24  Mr. Navarro?    And I could give you a few names if none come to mind.

25      A    Yeah.    Shoot me some names, that might help.

1        Q    Garrett Ziegler?

2        A    Yes.   I interacted with him some.

3        Q    Tell me about your interactions with Mr. Ziegler?

4        A    The only one I remember was him -- I think he was one of the young men

5  that waived us in the night of December 18th.

6        Q    How about when you were at the Weston?    Did you ever have interactions

7  with Mr. Ziegler at the Weston?

8        A    I don't remember seeing Mr. Ziegler at the Weston.

9        Q    I've heard it said that he would come -- he was working at the White House

10  at the time, but at night after he had gotten done with his day job, sometimes late into

11  the night, 10, 11, midnight, he'd come by the Weston?

12        A    I don't remember him working with me at all then.

13        Q    Okay.    How about Joanna Miller, also worked with Mr. Navarro, is that a

14  name you recognize?

15        A    No.

16        Q    Hannah Robertson?

17        A    No.

18        Q    And this has nothing to do with Mr -- well, moving away from Mr. Navarro,

19  did you ever have any interactions with Roger Stone regarding your election challenge

20  work?

21        A    Not that I recall.

22        Q    Do you know Mr. Stone?

23        A    I don't think we've ever met in person.   I think I've had a couple of phone

24  conversations with him that would probably be attorney/client privileged.

25        Q    Now, I know -- speaking of attorney/client privilege, I know you have an

1    attorney/client relationship or did with Mr. Flynn, Mike Flynn?

2         A    Yes.    Correct.

3         Q    And I absolutely don't want to invade that or know anything about your

4    representation of him or the matter that you handled for him, but in connection with the

5    election challenge efforts, did you interact with Mr. Flynn?

6         A    Yes.

7         Q    Tell me what his role was, if any, in assisting in your work?

8         A    I would call it logistics, and I think he -- I think he is the one that kind of put

9    together the team that was trying to vet, filter, whatever, the stuff that was flying at us.

10        Q    Okay.    So -- and when you say logistics, what do you mean?

11        A    Well, I mean, like, when I first got to Tomotley, I needed printers.    He went

12   out and got me printers.    He would occasionally crack open the door to my office and

13   say is there anything you need, that kind of thing.    And I'm sure I saw him -- I saw him

14   every day that we were both at Tomotley, but I was essentially holed up in an office trying

15   to work in my seclusion, and he was out doing whatever he was doing.

16        Q    Did you ever talk strategy with Mr. Flynn in terms of the election challenge

17   strategy, not the attorney/client matters that you were handling for him?

18        A    I don't have any recollection of that other than I might have told him I

19   wanted to file four suits in four jurisdictions, and at least three -- three to five was the

20   goal, in my head anyway, and that they were going to challenge the massive fraud.

21        Q    We'll talk about this a little bit later, but I believe you were involved at some

22   point in trying to get an executive order signed that would allow for the seizure and

23   inspection of voting machines; is that correct?

24        A    We were looking at the possibility, and I drafted the foreign interference

25   findings if I remember correctly or at least had a hand in writing those, to support the use

1    of Executive Order 13848 on cyber security to secure the voting machines hopefully in

2    three to five cities where the voting irregularities were the worst, and then have them

3    imaged by a bipartisan professional group that understood what they were doing.    We

4    even suggested the use of it being videoed if I remember correctly so that we could get

5    the evidence of whatever happened and lay all this to rest.

6          And one of the things I really appreciated about -- most of this was discussed on

7    the December 18th, that meeting is one I have more recollection of than any others

8    because it was the most pointed and the most substantive, and we wanted to get the

9    evidence to lay whatever the results were to rest for the American People.    And one of

10   the things I most appreciated about the President that night was that he flat out said, you

11   know, hey, if it shows Biden won, I will walk out of here head held high knowing we did

12   everything we could do, and if he didn't, then, you know, we had to do something to

13   straighten it out.

14          Q    So in connection with that, those efforts, just generally what you just

15   described, was that focused on or directed towards your litigation or some sort of

16   broader objective in terms of getting to the truth with respect to the election?

17          A    I guess it could have been multipurpose because, again, you know, my

18   primary goal through all of it was to get the truth, whatever that is.

19          Q    Understood.    Okay.

20          Because when I was asking you about strategy with Mr. Flynn, your answers sort

21   of went towards the litigation or that's how I sort of perceived it, that, you know, you may

22   have talked about this number of lawsuits and that number of lawsuits.

23          And I'm wondering whether there was a broader strategy outside of the confines

24   of those cases that you were pursuing and that maybe Mr. Flynn assisted with you.

25          Does that question make sense?

1       A       I'm not sure, but I think the answer is I don't think so.    I mean, I didn't have

2    a broader strategy than getting the information I needed for the litigation other than like I

3    said, my primary goal was to get to the truth.    Litigation was a means of getting to the

4    truth I had hoped.    I mean, that's the way our court should have functioned.

5       Q       Yeah.    How about Phil Waldron.    Did you work with Phil Waldron in

6    connection with your election challenge efforts?

7       A       Yes.

8       Q       How did you meet Phil Waldron?

9       A       I don't remember how and where he first showed up either.    I know he

10   works closely with Russ.    I don't remember where I first met him.    I know he was also

11   looking at logistics for, like, for example, if we could get access to the machines, he knew

12   or my understanding was he knew people that would know how to analyze them, you

13   know, reputable, unimpeachable, military, nonpartisan, bipartisan, whatever you want to

14   call it, but professionals who would know how to look at whatever it was and make sense

15   out of it.

16      Q       Mr.  Waldron, Colonel Waldron was also working with Mr. Giuliani; is that

17   right?

18      A       Yes.    I think he was working primarily with Mr. Giuliani, but I talked to him

19   at different times.

20      Q       I see.    Okay.    You anticipated my next question.    And we'll come back to

21   some of the specifics of the things you worked with Mr. Waldron.    I'm just trying to sort

22   of understand who the folks were who were involved or assisting.

23          How about Seth Keshel?    Is that somebody you worked with?

24      A       Yes.    Definitely worked with Seth Keshel.    In fact, he was part of the crew

25   that was at Tomotley.

1        Q     How did you get connected with Mr. Keshel?

2        A     I don't know that either.

3        Q     What was his role in your efforts?

4        A     His primary focus, as I understand it, was -- I don't know what to call it.    I

5 think he looked at voter registration and voter registration trends, and he had a map and

6 could look at numbers through across countries and states and come to certain

7 conclusions from that.    I think we produced to you some of the charts and analysis and

8 affidavits he did.

9        Q     Is Carissa Keshel his wife?

10       A     She was his wife.    She is not now.

11       Q     Okay.    Did she work with you as well?

12       A     She did.

13       Q     In what capacity?

14       A     I would say -- at Tomotley, I think she was talking to witnesses, helping draft

15 affidavits, vetting people, funneling information, culling information.    She's extremely

16 bright and capable.    One of the best human beings I've ever met.

17       Q     Is she a lawyer?

18       A     No.    But she should have gone to law school.    She would definitely be a

19 good one.    She's a registered nurse, among other things.    She's just, you know, one of

20 those extremely multitalented bright capable people.

21       Q     Are you still working with Ms. Keshel?

22       A     Yes.

23       Q     Just a couple more names.    Ivan Rakland.    Is that someone you worked

24 with or interacted with?

25       A     Ivan Rakland?

1          Q     Yes.

2          A     I had some interactions with Ivan, but I would not say I worked with him.

3          Q     What were the nature of your interactions?

4          A     Well, I went to political party at his house one time somewhere.   I don't

5    remember whether it was before the election or after.   I guess it would have been

6    before for somebody that was running for Congress in Virginia.   And I know he knew

7    General Flynn, and I know he wanted to help.   But I didn't incorporate Ivan as far as I

8    know.   There have been any number of people that said they worked with me or for me

9    that didn't really work with me or for me.

10         Q     Do you know who --

11         A     I mean I think they thought they were trying to help me.   I don't mean to

12   say anything bad about them.   There were lots of people that were showing up and

13   wanted to help, but I couldn't -- there was no way to bring in everybody that was showing

14   up.

15         Q     Understood.   Who was the core group that you worked with?

16               We talked about some of the people who were sort of coming and going.   But

17   sort of through that nine or 10-week period, who was the core group that you would say

18   that you worked with?

19         A     I would say the core group -- well, there were kind of two.   There was the

20   group that wound up staying in Washington when I went to Tomotley.   And that was

21   Howard, and Julie and Emily.   They took the role primarily in drafting all the pleadings.

22   There was the group at Tomotley that included Seth Keshel, Carissa Keshel, Lin Woods, of

23   course, me, Jim Pinrose -- I'm trying to visualize the room they were all sitting in and tell

24   you who was sitting there.   Sharon whose last name I don't know.   That's all I can think

25   of right now.

1          Q     Okay.   How about Patrick Burn?   How did he figure into the group?

2          A     Patrick showed up at campaign headquarters one day when I happened to

3    be there because that office space was largely empty, as you might imagine, and he had

4    the cyber -- he had guys that understood the cyber part of it.   And they wound up being

5    helpful and providing an affidavit from that angle of it.

6          Q     You mentioned campaign headquarters.   Was that also in Arlington?

7          A     I think so.

8          Q     And did you have meetings there?

9          You said it was largely empty, but did you have meetings with campaign staff in

10   the time shortly after the election?

11         A     I had one very short meeting with some campaign folks right after the

12   election.   That was kind of along in the timeframe where I realized it wasn't going to

13   work for me to do anything with campaign people because they were politicians.   And

14   then we did use that empty space some later, but very briefly.   It was too much hubbub

15   and mess going on there for me to get work done.

16         Q     What else do you -- tell me what you can remember about that meeting that

17   you just eluded to where you realized they were politicians and they weren't really going

18   to be of assistance to you?

19         A     I don't remember much about it other than it was very short.   And I mean,

20   they didn't even want to look at me when I walked in the room.

21         Q     Were they -- were you able to at least share your perspective and your views

22   on things?

23         A     I don't recall being able to do that.

24         Q     Had you been invited to that meeting?

25         A     Only by Mr. Giuliani, and he wasn't much more welcome there than I was.

1        Q    I see.    So Mr. Giuliani asked you to or invited you to come to this meeting,

2    but you got the sense pretty quickly that you were not welcome there?

3        A    Yeah.    I was definitely persona non grata.

4        Q    Do you have any idea what that was based on?

5        A    Well, I mean, part of it was I was the only female in the room.    And part of

6    it was that they know I wasn't impressed with them and didn't bow and scrape to them

7    and was gonna follow the truth and the law wherever it led, including on any Republicans

8    that might have been in that room or any other room.

9        Q    Okay.    Do you remember -- can you identify any of the folks that you're

10    referring to as them, the people who were, sort of, on this other side of this sort of

11    interaction?

12        A    I remember Bill Stepien being in there because that's the only time I think I

13    saw him.    I couldn't tell you who the others were.

14        Q    Was Jason Miller there?    Do you know that name?

15        A    He might have been.    I don't know.

16        Q    You mentioned some meetings with Pat Cipollone.    Would he have been at

17    that meeting?

18        A    No.    White House counsel was not there.

19            ▮▮▮▮▮▮▮▮    Was Jared Kushner there?

20        The Witness.    Yes.    Jared was there.

21            BY ▮▮▮▮▮▮

22        Q    Anything else you remember about that meeting other than not feeling at all

23    welcome or appreciated?

24        A    No.    Well, the only other thing I remember is they all got up and walked out

25    essentially.    It was a real short meeting.

1        Q    All right.   You have something on that?

2             BY █████████████

3        Q    Earlier you said that one of the reasons you felt like you were weren't

4    welcome there was that the people in that meeting knew that you weren't impressed by

5    them.

6        Why was that?   Why weren't you impressed by them?

7        A    My impression was that they didn't want to do anything, that they had

8    thrown the President under the bus, that they had told him they were prepared for

9    whatever post-litigation activity was needed, and they hadn't done squat.   And they

10    knew they were gonna lose, and they were moving on to their careers on K Street or

11    whatever big deals they'd made.

12        Q    Did they convey that to the President?

13        A    I don't know what they conveyed to the President.

14        ██████████   Any other questions on this topic?   We'll move on.

15    Ms. Powell we've been going for a little bit.   Over an hour and a half.   Do you

16    want to take a short break?

17    Ms. <u>Murphy.</u>   Can you hear me?

18        ██████████   Ms. Murphy?

19    Ms. <u>Murphy.</u>   Can you hear me?

20        ██████████   We can hear you, but very faintly.

21    Ms. <u>Murphy.</u>   Is that any better?

22        ██████████   Much better.

23        BY MS. MURPHY:

24        Q    Okay.   I wanted to go back to what Ms. Powell just said.   She said that

25    these people knew they were -- they had lost and were moving on to their K Street jobs.

1          Why do you think these people thought they had lost?

2     A     I think they -- in retrospect, I think they knew they were gonna lose.

3     Q     They knew they were gonna lose, but you didn't believe the President was

4  going to lose; is that correct?

5     A     I don't think he did lose.

6     Q     So the schism -- the difference between you and this group of people is that

7  they believed he was going to lose, but you did not belive that he had lost?

8     A     I would call it more of they were acting in their self interest as opposed to

9  the interest of the country or the voters.    It was a very self-interested bunch.

10     Q     They were self interested because they were accepting a loss that you didn't

11  believe was a real loss, or -- can you explain a little bit more why you think they acted in a

12  self-interested way?

13     A     They were all looking at their next job, which they probably lined up before

14  the end of the campaign.    I think more than one person in a position of power knew how

15  this deal was going to come down.    If I remember correctly, Ms.    Clinton even tweeted,

16  oh it's gonna be so bad they might even have to stop the vote count on election night.

17  There was a plan to do what happened in this election, and it wasn't following the will of

18  the voters.

19     Q     And you believe that plan was executed by some of these people who were

20  Republicans as well as who else?

21     A     I don't know that those people in the room had any part in executing the

22  plan, but I think they had realized that what was going to come down.    And I definitely

23  think some Republicans had a role in getting rid of President Trump.

24     Ms. Murphy.    Great.    Thank you so much, Ms. Powell, for clarifying that for me,

25  with that I yield back.

1      The <u>Witness.</u>   Thank you.

2      ██████████   Ms. Powell, you want to take a short break?

3      The <u>Witness.</u>   Sure.   Thanks.

4      [Recess.]

1

2      [12:00 p.m.]

3                      BY ████████

4      Q      Back on the record.

5              Ms. Powell, I want to ask about your interactions, if any, with Members of

6      Congress in connection with the -- with your election challenge efforts.

7              Did you talk to any Members of Congress in between, say, the election and first

8      week of January regarding the work you were doing with respect to the election?

9      A      Yes.

10      Mr. Tobin.   ████   before she answers any further, I just want to remind counsel,

11      if you knew this, but she did represent a couple of -- she did represent Representative

12      Gohmert in connection with a case and had conversations with a couple other Members

13      about being plaintiffs.   And so I just want to caution the witness to remember that and

14      not give way to any attorney/client information, which I'm sure she will.

15              The Witness.   Thanks.

16                      BY ████████

17      Q      Great.   Thank you.

18      Yes.   Ms. Powell, can you identify the Members you've had interactions with

19      between November 3rd and January 6th with respect to the election challenge efforts?

20      A      Let me start with the ones that are attorney/client privileged.   I think that

21      would be Andy Biggs, Louie Gohmert, Marjorie Taylor Greene, and Matt Gaetz.   The one

22      meeting I remember in connection with the election was at the request of Senator Lee

23      who asked me to come meet with whoever wanted to show up to listen to what I was

24      seeing and finding at that point.   I couldn't tell ya when the meeting was, and I certainly

25      don't know who was there.   It was a room full of people.

1    Q    Let me -- can I just try and get a general timeframe and I may know the

2    meeting you're talking about.

3         Would that have been in sort of early to mid November?

4    A    That sounds about right.    I think it was before we filed any of the suits.    It

5    was while I was in DC, and it was at that building that's up behind Congress, kind of

6    maybe on the same street as the Supreme Court, but I don't remember the name of the

7    building either.    It like a nice house, but it's been made into a building -- I mean an office

8    space.

9    Q    And Mike Lee organized the meeting or invited you to the meeting?

10   A    Yes.    He invited me to the meeting.

11   Q    How many Senators were there?

12   A    I have no idea.    It was a room full of people.

13   Q    Do you know if it was House members as well as Senators?

14   A    It might have been.    I don't know.

15   Q    Was Ron Johnson there?

16   A    I couldn't tell you.

17   Q    Lindsey Graham?

18   A    I don't think so.

19   Q    I think Mr. -- Senator Johnson has indicated in some other documents that

20   we've seen that there was a small group of Senators that met with you around the week

21   of November 8th.

22        Do you think that would be the same meeting we're talking about -- or the week

23   of November 8th.    Did I say the 8th?    Not the 8th itself, but around that week?

24   A    That would sound about right.

25   Q    Did you have any other meeting with Senator Johnson that you can recall?

1      A    I don't have a specific recollection of him being at that meeting but he could

2    very well have been.

3      Q    Okay.    Have you had -- let's talk about Senator Lee.

4    Other than that meeting, have you had any other discussions or meetings with

5    Senator Lee regarding the election challenge efforts?

6      A    I don't remember any other meeting.    I might have spoken with him.

7      Q    More than once?

8      A    I have no idea.

9      Q    If he said that he spoke to you several times regarding your claims or

10    theories with respect to the election, would that jive with your memory?

11      A    I certainly wouldn't dispute it.

12      Q    Did you have any interactions with Scott Perry?

13      A    Yes.    I think I did speak to him.    I know I've spoken to him in person.    I

14    don't remember whether it was in this timeframe or some other timeframe, and I don't

15    remember the topic.

16    I guess by way of background, I should tell you that I've been to the Hill a number

17    of times.    I've talked with a lot of them about different things related to Flynn.    I've

18    talked to them about criminal justice reform.    I supported the act -- whatever the

19    second step act was or first step act to, you know, promote criminal justice reform.    I've

20    been on the criminal justice reform kick since I wrote "License to Lie," and realize that we

21    over criminalize, over incarcerate, and that falls predominantly on the minority

22    communities when we do that, and there's nothing good about it.    I've had many

23    conversations with them about -- with Senators and Congressman in general about

24    multiple issues other the last 5 or 6 years.

25      Q    Understood.    I'm focused -- or I'm really interested only in your

1    conversations with Members regarding the challenges to the 2020 election.

2            Do you remember talking to Scott Perry about that topic at any time?

3        A    No.   But it wouldn't surprise me if I did.

4        Q    You mentioned four Members with whom you had attorney/client

5    communications.

6            Would those communications relate to the same -- to the same topic of potential

7    election challenges?

8        A    Yes and no.

9        Q    So yes and no because it's compound in that I asked you about several

10    different Members?

11        A    Yes.

12        Q    Okay.   The objection is sustained and I will be -- so with respect to

13    Mr. Gohmert, you did represent him in litigation relating to the election, correct?

14        A    Yes.

15        Q    And --

16        A    And Louie's a friend too, so.

17        Q    Okay.   And is it your view -- and I guess I'm maybe even asking you Dave,

18    you, on this, that you're not able to share with us any conversations you've had with

19    Mr. Gohmert about the election in light of the fact that you represented him in a piece of

20    litigation?

21            Mr. Tobin.   No.   I don't think we're saying that, and I think Sidney can probably

22    parse this out.   But she did represent him as a plaintiff in that lawsuit.   So I just want to

23    preserve the privilege with respect to that.   But we don't want to prevent her from

24    answering questions about anything else that's not -- it's really that scope --

25            The Witness.   Frankly, I don't have any specific recollection of the conversation

1    anyway.    It would have been about that lawsuit.

2                           BY █████████

3          Q      Okay.

4          Do you know Connie Hair?

5          A      Yes.

6          Q      How do you know Ms. Hair?

7          A      She's a friend, and she works with Louie.

8          Q      Did you interact with her at all with respect to claims of election fraud of the

9    2020 election?

10         A      Yes.    I'd forgotten about her completely.    I think she actually was helping

11   collect some information.

12         Q      And I think she sent you some affidavits from time to time; is that correct?

13         A      That's probably correct.

14         Q      What conversations do you remember with Ms. Hair about the issues you

15   were pursuing?

16         A      Again, I don't have specific recollection of any conversations.

17         Q      Do you know if she shared your view of the -- of -- as you described it, your

18   view of what went wrong in the election?

19         A      I don't recall.    I know she knew something went wrong, but I don't know

20   whether she shared my view of what went wrong.    I don't recall even expressing my

21   view of what went wrong to her.    I was always trying to stay off the phone.

22         Q      Okay.    Did you ever -- and maybe the same sentiment of wanting to be left

23   alone to do all your work that you had will answer my next question.

24         But were you ever invited by Ms. Hair to speak to a group or like-minded

25   individuals regarding your concerns or claims of election fraud?

1      A    That's entirely possible.

2      Q    Did you ever speak with a group called ground swell?

3      A    That's the one I always forget the name of it.    Is that Ginni Thomas' group?

4      Q    Yes.

5      A    Yes.    Yes.

6      Q    Did you speak with --

7      A    I'm sorry, what?

8      Q    In the time after the election, did you speak to any ground swell gathering?

9      A    I probably did.

10      Q    Do you remember when that was?

11      A    No.

12      Q    Do you remember who asked you to speak in front of the ground swell

13  group?

14      A    No.    That's another group that I've spoken to periodically in Flynn and on

15  other issues.

16      Q    Do you know Ms. Thomas?

17      A    Yes.

18      Q    Did you have any conversations with Ms. Thomas about your concerns or

19  your views on what went wrong in the 2020 election?

20      A    I don't recall a specific conversation.

21      Q    Do you recall any general interactions with her on that topic?

22      A    Well, if I spoke to the group during that timeframe, I would have shared my

23  concerns about everything.    I'm pretty open in general with the world about what my

24  views are to anybody that wants to listen.

25      Q    Outside of the ground -- any ground swell meeting or videoconference, have

1       you had any interactions with Ginni Thomas regarding the 2020 election?

2               A       Not that I recall.

3               Q       Do you know someone by the name of Barbara Ledeen?

4               A       Yes.

5               Q       Have you spoken to Ms. Ledeen about the 2020 election?

6               A       Again, I may very well have.   I've known her for a long time.   We talk

7       about a lot of issues.   It's entirely possible.

8               Q       Yes but no recollection of any specific conversation?

9               A       No.

10              Q       Your interactions with Mr. Biggs -- and he's one of the individuals who you

11      said there was attorney/client -- there might be attorney/client communications.

12              Did you have non-privileged communications with him regarding the 2020

13      election?

14              A       I don't recall.

15              Q       How about Ms. Taylor Greene, any non-privileged communications with her

16      regarding the 2020 election?

17              A       Again, I don't recall.

18              Q       Have you ever been in a meeting at which either Mr. Biggs or Ms. Taylor

19      Greene was present in which the 2020 election was discussed?

20              A       I don't know.   I don't know whether they were at that big meeting with

21      Senator Lee or whether there was any other meeting.   I know there was supposed to be

22      a meeting at the White House, and I think there was a meeting at the White House with a

23      bunch of Congress people, but I was excluded from that.

24              Q       I think we're going to talk about that one in a bit.

25              Was that the December 21st meeting at the White House?

1          A     Probably.

2          Q     I think we have some emails from you about -- well, let me try and put it in

3     some context so maybe it will refresh your recollection.

4                My understanding based on your documents and some other evidence we have is

5     that on December 20th, you and others were -- you were invited to the White House, you

6     went to the White House, and then you were blocked from seeing the President?

7          A     That sounds right.   There were a number of times something like that

8     happened.

9          Q     Oh, it happened more than once?

10         A     Oh, yeah.   Uh-huh.   Yeah.

11         Q     Do you recall it happening on successive days?

12         A     Yes.

13         Q     And was one of the interactions there in which you were blocked, would that

14    be the meeting you're referring to or thinking of where Members of Congress were

15    supposed to be present?

16         A     Yes.

17         Q     Okay.   And you thought you were going to that meeting, and you were not

18    permitted to attend; is that correct?

19         A     Yes.

20         Q     Why is it that you were -- did you ever find out why you were not permitted

21    after you had been invited to that meeting on the 21st?

22         A     No.

23         Q     How did it -- I think we've seen in your documents WAVES authorization for

24    the 21st, and maybe communications with White House ushers or someone else, telling

25    you you were cleared.

1        Is that -- was that the case you were cleared to attend and then subsequently, you

2  were told you were not invited?

3        A    Yes.   I was cleared to come into the White House, and then I was not

4  allowed to go into the meeting with the Congress people.

5        Q    Who told you you couldn't join the meeting?

6        A    Mark Meadows steered me off in another direction.

7        Q    And did he specifically tell you that you were dis-invited from that meeting?

8        A    Essentially, yes.   I don't remember the exact words, but it was very clear.

9        Q    Okay.    Tell me what you remember about that interaction.

10  Were you -- how -- in proximity of the meeting, when the meeting is about to

11  start, how did he come to interact with you, just what do you remember about that

12  interaction?

13        A    It was -- well, it was -- I remember sitting in the waiting area of the -- I get

14  my wings mixed up too.    But anyway, I remember sitting in the waiting area, and I think I

15  spoke to Louie Gohmert and one or two other Congressman, just chitchat.    And then

16  Mark's assistant comes out and asked me to come back that direction.    And then

17  everybody else went the other way, and I was excluded from the meeting.

1

2    [12:15 p.m.]

3                  BY ███████

4       Q    So did you get the name of Mr. Meadows' assistant?    Do you know who

5    that was?

6       A    No.

7       Q    Okay.    Was it a woman?

8       A    Yes.

9       Q    Okay.    So she came and said, "Come this way," and she led you to

10   someplace within the White House compound?

11      A    Yes.

12      Q    And was it a -- did she park you in a conference room, or where did you go,

13   or where did you end up?

14      A    I might have talked to Mark then.    I don't remember whether I -- that's a

15   time when I spoke to Mark or not.

16      Q    Okay.    But she escorted you away from where you were waiting to some

17   other place?

18      A    Yes.

19      Q    And, while you were in that other place, Mr. Meadows came to speak with

20   you?

21      A    I can't remember whether I spoke to Mark at that time or not.    I just

22   remember being livid about being excluded from the meeting.

23      Q    For the second time in 2 days?

24      A    Well, I think -- I think the part --

25      Q    [Inaudible.]

1       A      -- I think the prior time I tried to see the President and was kept from seeing

2    him.    There was one time when they got -- when somebody put a "Y" in my name, put in

3    my name -- that Mark, I think, had put in my name is as S-y-d-n-e-y, when the President

4    was expecting to see me, and it's S-i-, and they wouldn't let me through the gate.

5           I stood at the gate for 40 minutes while the President was sitting there waiting for

6    me because they couldn't get my name straight, and that was a time obviously when they

7    certainly knew how to spell my name.    I'd been there multiple times before.

8           And then there was another time where the President -- somebody had me told

9    that he had a family meeting when the President was sitting there waiting for me the

10   whole hour and calls the next day and says:    Why didn't you show up?

11          And I said:    Well, I did, but I was told that you were tied up on a family matter.

12      Q      Do you --

13      A      One of the things that was very obvious and very upsetting to me as a citizen

14   of the United States of America is that the President of the United States couldn't get

15   what he wanted in his own house.

16      Q      Focusing -- and I want to go through each of those instances, but focusing on

17   this December 21st incident, who was it that invited you to the meeting in the first place?

18      A      I don't remember.

19      Q      Was it the President directly?

20      A      I don't remember.

21      Q      Were there instances in which the President specifically reached out to you

22   to set something up and then his aides blocked you from -- or someone blocked you from

23   actually going forward with the meeting?

24      A      Yes, siree.

25      Q      Okay.    And do you think that happened -- that was the case on this

1    December 21st meeting?

2        A   I don't know.

3        Q   Do you remember a specific instance?   I know you've just given an

4    example, but do you remember when that was?

5        A   No.

6        Q   The instance where the President asked to meet with you, you went to try to

7    meet with him, and you were prevented from seeing him?

8        A   No, I don't remember which one that was.

9    I think there were at least three times when he was expecting me, and I was not

10   allowed to go through.

11       Q   Okay.   Take a look at exhibit 46.   We'll pull it up on the screen for you.

12   Give us one moment.   Okay.   Let me know if you can see that okay.   Ms. Powell, are

13   you able to see it?

14       A   Can you make it bigger?   I'm reminded of George Washington's comment

15   that he's grown old and gray in the service of his country.   I've grown old, gray, and

16   blind.

17       Q   Is that any better?

18       A   I think I can read it.

19       Q   Okay.   So we're at the very top of the email -- or the first -- the latest in

20   time email is December 21st at 10:14 a.m.

21       A   I think that's -- that looks like it would've been the one where the

22   Congressmen were there.

23       Q   If we scroll down a little bit to the first-in-time email which is dated

24   December 20th at 9:51 p.m. -- do you see that?

25       A   Yes.

1        Q    So this seems to describe an incident where you came to the White House to

2 provide information to and brief the President and that you were blocked.   You said you

3 were, again, blocked from seeing the President.   Do you see that?

4        A    Yeah.   Yep, yep, yep.

5        Q    Okay.   So this wasn't the first time that happened, it sounds like, December

6 20th?

7        A    Right.

8        Q    In the beginning part of that second sentence in the first paragraph, it says:

9 I am acting on clear instructions directly from the President.

10      A    Yep.

11      Q    What did you mean by that?

12      A    I mean, he wanted me to keep him informed of what I was finding.

13      Q    Did he specifically invite you to come to the White House in order to brief

14 him on what you were finding?

15      A    I don't know whether he invited me or whether I told him I needed to come,

16 but either way, he was expecting me.

17      Q    Okay.   After you were blocked on the 20th -- and I see you reached out to

18 Molly Michael to tell her that it was imperative that you see the President face-to-face

19 tomorrow -- was it after that that you were invited to this December 21st meeting if you

20 recall?

21      A    That must've been what happened, but, no, I don't have a specific

22 recollection.

23      Q    So, if we scroll up a little bit, you'll see, after your email to Ms. Michael,

24 there's an email back to you from Mark Meadows at 10:04, so not long after you sent

25 Ms. Michael --

1          A     Right.

2          Q     -- an email.   And you see Mr. Meadows says:   I was not aware that a

3     meeting had been set up with POTUS --

4          A     Yeah.    That was kind of the point of the meeting, I think.

5          Q     What do you mean?

6          A     I mean, the President wanted to talk to me by himself.    I don't think he felt

7     like he needed his hand held by Mark Meadows all the time.

8          Q     Did he tell you that, the President?

9          A     No.

10          Q     So why do you say that was the point of the meeting, that Mr. Meadows

11     would not know about it?

12          A     Because it was supposed to be just me and the President.

13          Q     And the President said, "I want to meet with you alone"?    How do you

14     know it was just supposed to be the two of you?

15          A     Maybe I asked to talk to him by myself.    I don't -- I don't remember the

16     specifics, but I was expecting it to be just the two of us.

17          Q     Do you ever remember a conversation in which the President shared with

18     you that he wanted to talk with you without others present?

19          A     I don't remember him saying that.    I think I said that.

20          Q     So did you feel that others were sort of blocking -- and I don't mean blocking

21     in the sense that we've been talking about but somehow inhibiting the flow of

22     information from you to the President?

23          A     Oh, definitely.

24          Q     And did you share with the President that you didn't think he was getting

25     your unvarnished or complete information because of people around him?

1          A      Yes.

2          Q      How did he respond when you said that?

3          A      I don't remember his specific response other than he was -- well, like, for

4    example, the night of the 18th, I can give you that example because the night of the 18th,

5    I was showing him things he hadn't seen before, and he was pissed.

6          Q      Yeah.    And definitely we're going to talk about the 18th.    I'm just

7    wondering if you ever had a private conversation with him in which you shared your

8    frustration that you weren't able to communicate, you know, directly, and how he

9    responded to that.

10         A      I don't have a recollection of a private conversation with that.    I mean,

11   it's -- I can't remember if I ever got to talk to him privately.

12         Q      Yeah.    Well, and I guess that's what I -- I think it's -- I understand

13   completely the way you're describing your view of the interactions and why it was

14   important to you to have some alone time with the President.    I think you -- am I -- is

15   that fair to say that you felt it was important for you to have alone time with the

16   President?

17         A      Yes.

18         Q      Okay.    And I'm just wondering whether he ever acknowledged that that

19   was -- that would be helpful for him too.

20         A      I can't -- I just don't have a specific recollection of that.    Other than the

21   18th.

22         Q      How about on the --

23         Okay.    And how about on the flip side?    So, in other words, you said, "I need to

24   have some private time," and he said:    That's just not the way it works, I've got people

25   who are here, and they need to be here and --

1       A     Oh, no, he never said that.    No, he never said that.

2       Q     Okay.    So you don't recall any conversation in which he expressed a view

3   one way or another as to whether your -- as to your desire to have sort of some private

4   time?

5       A     Well, while I can't remember any specific words, my impression was he

6   certainly fine with that, he was -- he was, you know, comfortable with me and trusted

7   me.    That much was very clear.    But I don't remember specific words.

8       Q     Okay.    And so we got into this line of discussion -- and it's helpful, I

9   appreciate your walking me through that -- we got into this when we were looking at this

10  10:04 email from Mr. Meadows and you said that that was kind of the point, was to

11  maybe have a meeting without him present.

12          So I want to go back to -- I want to go back to the email.    He said that he wasn't

13  aware of the meeting, that you had requested another meeting since your meeting 2 days

14  ago, which is the December 18th meeting, I presume, that sort of you've alluded to a

15  couple times?

16      A     Right.

17      Q     And he says he wasn't aware of you being blocked a previous time.    Then

18  he says:    Call me in the a.m.    Do you know if you called him the next morning?

19      A     I don't know.

20      Q     At 10:14, you sent the first email in this chain that we looked at for a

21  moment.    Do you recall whether you had had a discussion with Mr. Meadows before

22  sending that email -- that prompted the email?

23      A     I don't remember.    Somehow I knew about a meeting with Rudy and the

24  President about the machines and the general issues obviously, but I don't remember

25  how I came by that.

1      Q      Do you remember what the issue was that was creating the urgency for you

2    to meet with the President face-to-face?

3      A      It was whatever the status of the evidence was at that time with respect to

4    the machine fraud and getting access to the machines to -- to image them.   I mean, time

5    was going by, and I don't know whether Dominion had already come out with its Trusted

6    Build problem -- program by then or not.

7           But, for example, in Georgia, they were already trying to wipe the machines and,

8    quote, get them ready for another election.   So there was evidence at risk of being

9    destroyed, and frankly everywhere there was any evidence at all by any voting machine

10    company.

11          So my concern was that we needed to get lawful access to machines and have a

12    professional, nonpartisan or bipartisan group do them -- do the images while they're

13    being videotaped, so there could be no question about the integrity of the process, and

14    collect the evidence.

15      Q      I note for the record that Mr. Schiff has joined the deposition.

16          Ms. Powell, the reason I'm curious on this is that you had had a very lengthy

17    meeting with the President face-to-face on the night of the -- or well into the night on the

18    18th, correct?

19      A      Correct.

20      Q      And that was a Friday night, right?

21      A      Right.

22      Q      And then on --

23      A      Well, I'll take your word for it; it was a Friday night.   I don't know.   It all

24    ran together.

25      Q      Yeah.   Well, my memory's not that good, but I'm looking at the email that

1    says Monday, December 21st, and I did some quick math there and got to Friday the

2    18th.

3          A      Awesome.

4          Q      So, on the 20th, so on Sunday, you said that you needed to see the President

5    as soon as possible face-to-face.    And I'm just wondering if there was something that

6    you can recall that happened in between late Friday night and Sunday that caused this

7    urgency that you needed to see the President again.

8          A      Well, I know on Friday he had asked me to be special counsel to address the

9    election issues and to collect evidence, and he was extremely frustrated with the lack of, I

10   would call it, law enforcement by any of the government agencies that are supposed to

11   act to protect the rule of law in our Republic.

12          And I don't remember what the status of the evidence was at that particular day,

13   but I know that we needed, if we were going to access the machines, time was a-wasting,

14   and we needed to get after it.

15          Q      And so, on Monday morning, on the 21st, you said to Mr. Meadows:    It's

16   imperative I be included in the meetings scheduled today with you, Rudy, and with the

17   President, about the machines and any of these issues.

18          And do you think the issues were different on Monday morning that you had

19   discussed on Friday night?

20          A      I don't remember what happened in that timeframe.

21          Q      Okay.

22          A      I do have a vague recollection of, you know, Rudy and people going with him

23   to Michigan to access the Antrim County machines and there being some kind of debacle

24   in the first instance with that.

25          I can't recall whether they had to go back or not, but Rudy was off, you know, in a

1    couple of different directions trying to access the machines.    And I was concerned that it

2    needed to be a process that was completely transparent and preserved so that there

3    could be no question about it and that the people doing it have military qualifications or

4    credentials and approved by both sides, however you want to put that, but, anyway,

5    unimpeachable credentials, and perform the examination in a recorded, transparent

6    process.    And I don't know how Rudy and people were doing that.

7          Q      Okay.    Well, and I keep saying we're going to come back to this December

8    18th meeting, and let's talk about that for a moment now.    There's a lot to cover in that

9    meeting.    I understand it went for quite some time.    But I want to, I'm going to come at

10   this sort of a little bit backwards, from the end.

11         When you left the White House on the night of the 18th, do you understand that

12   there was sort of a plan or strategy in place; had the issues that you had come to talk

13   about been resolved?

14         A      Yes and no.

15         Q      Okay.    Why do you say that?

16         A      I was clear on what the President wanted, but -- he wanted the same thing I

17   wanted; he wanted the truth.    Whether it meant he needed to walk to the helicopter, as

18   he put it, with his head held high and know that he had lost fair and square, or whether

19   he needed to fight for the preservation of the Republic in what I would call a

20   Lincoln-esque fashion.

21         So -- but when I left, I knew from what Cipollone and Herschmann, and whoever

22   the third guy from White House Counsel's office was that was leaving that day, had said, I

23   mean, they flat out told the President he could name me anything he wanted to name me

24   and no one was going to pay any attention to it.

25         Q      Okay.    And so how did the -- so how were things left when you -- when the

1    meeting broke up?

2         A     So it was left that, from my perspective, nothing was really resolved.    I

3    mean, I made a call to Mark Meadows the next morning, saying:    Hey, I'd like my key

4    and my White House pass.

5              And his response was:    Well, that's just not going to happen.

6              And that was pretty much the end of that conversation.

7              But I knew at the same time that the President still had his concerns, and as a

8    citizen and an American, I was fricking outraged and appalled that anyone could tell the

9    President of the United States that what he directed was not going to happen, or that he

10   could do that and no one would pay any attention to it.

11        Q     And I appreciate your indulging me that sort of talk about the end of the

12   meeting before we've really talked about the meeting itself.    But have you just -- does

13   that explain, what you've just said now, does that perhaps explain why you were so

14   adamant about getting a face-to-face meeting with the President, that you walked out of

15   the December 18th meeting thinking something was going to happen?

16        A     No, I didn't -- no, I didn't walk out thinking it was going to happen.

17        Q     Well, what about getting your badge and your key to the White House, did

18   you think that was going to happen?

19        A     No.    No.

20        Q     Okay.    So, when you called Mr. Meadows and you asked for the badge and

21   the keys, you knew what his response was going to be?

22        A     Pretty much, yeah.

23        Q     Why did you ask, just to sort of tweak him a little bit?

24        A     Yep.

25        Q     Okay.

1      A    Carry it through to its conclusion.

2      Q    I see.   So that was not an about-face, you know, the fact that you were

3  given that response on the morning of the 19th?   You didn't perceive that as an

4  about-face?

5      A    No.

6      Q    Okay.   All right.   I was just trying to help maybe prod a memory about why

7  the urgency over the weekend to see the President.   Any of that, none of that jogs a

8  memory for you?

9      A    No.

10      Q    Okay.   So let's go back and talk about the December 18th meet sort of from

11  the outset.   You went with General Flynn, Patrick Byrne, and Emily Newman.   Is that

12  correct?

13      A    Yes.

14      Q    Who's idea was it to go to the White House that evening?

15      A    I don't remember.

16      Q    Were you invited?

17      A    No.

18      Q    What was your --

19      A    Well, I don't remember that either actually.

20      Q    Well, you weren't invited by the President?

21      A    Yeah, I don't think -- I don't think that evening was a, per se, invited meeting.

22      Q    The President wasn't expecting to see you that night.   Is that fair to say?

23      A    I think that's correct.

24      Q    So -- and you don't remember who among the four of you had the idea to go

25  to the White House unannounced?

1        A      No.

2        [Reporter interrupts briefly for technical issue.]

3              BY███████████

4        Q      Okay.    So, Ms. Powell, I think my question was whether, asking you again

5        whether you had a recollection of whose idea it was to go unannounced, and you said

6        you don't.

7        A      Yeah, I don't.

8        Q      What was the plan for the meeting?    Did you have one?    What were you

9        hoping to accomplish by going to the White House?

10       A      All I remember -- I remember that I had Executive Order 13848 with me, and

11       I had the CISA finding of foreign interference -- the CISA, slash, FBI finding of foreign

12       interference in the election by Iran.    And I wanted the President to know that he had the

13       option, under Executive Order 13848, and the CISA finding, and whatever other

14       information I had in my possession at the time, to use that cybersecurity order to trigger

15       its application and whatever authority he needed to secure the voting machines in several

16       locations and have them inspected by a professional, nonpartisan, bipartisan group of

17       experts in a transparent fashion to obtain whatever evidence was on those machines to

18       resolve the issue hopefully, you know, finally put the whole thing to bed, whichever way

19       it came out.

20             And my suggestion was also to get machines in a couple of places where we did

21       not think there was anything wrong, if there were any such places, but the places that

22       seemed to be the most correct by the analysis of the mathematicians, the statisticians,

23       the people that do that kind of thing, so that we would have a benchmark and a

24       comparison.

25       Q      And what was -- did you send the materials to the President or through

1    Molly Michael prior to -- the materials that you had in hand that night, had you sent those

2    over previously?

3        A    I don't know.

4        Q    What was Mr. -- or General Flynn's role, or why was he with you at that

5    meeting that night?

6        A    I don't remember.

7        Q    How about Patrick Byrne, how did he get --

8        A    He invited himself.    He inserted -- he and Emily -- Emily apparently knew

9    the people that could let us in, and I think that's the first time I met Garrett Ziegler,

10   because she knew Garrett, and there was another young man too.    And Patrick invited

11   himself.

12       Q    Okay.    You've already said you didn't know who came up with this idea, but

13   did you believe that it was going to work, that you were going to be able to get to see the

14   President without an appointment?

15       A    I had no idea.

16       Q    In fact, you did get to see the President without an appointment.

17       A    We did.

18       Q    Mr. Ziegler and someone else helped you get into the White House?

19       A    Yes.

20       Q    And then did you just make your way to the Oval Office?

21       A    Yes.

22       Q    And then why don't you tell me about your initial discussions with the

23   President after you saw him.

24       A    Well, I showed him Executive Order 13848, and I showed him the CISA/FBI

25   finding of foreign interference in the election originally made on I think it was October

1    30th or the 31st and then updated as of the date of the election, finding that Iran had

2    already exercised significant interference in the election activities and was a persistent, I

3    think they called it a persistent foreign threat actor or something, whatever their

4    standard language is, showed him the terms of the executive order and let him read it,

5    the same with the CISA finding.

6          Whatever other documents I had with me I started through those with him to

7    show him what evidence had been collected so far, and that's about, I think, as far as I got

8    before Molly apparently had -- or somebody had notified the world that we were there,

9    which caused massive consternation among the staff of the White House Counsel's Office

10    and probably Mr. Meadows and Mr. Giuliani too, to know that I had access to the

11    President without their supervision.   And so they all came running.

12        Q    How much time did you have alone with the President -- and I say

13    alone -- you had other people with you, but --

14        A    Right.

15        Q    -- from his aides before the crowd came running?

16        A    Probably no more than 10 or 15 minutes.

17        Q    Was -- in that --

18        A    I bet Pat Cipollone set a new land speed record.

19        Q    In the short period of time that you had with the President, did he seem

20    receptive to the presentation that you were making?

21        A    He was very interested in hearing particularly about the CISA finding and the

22    terms of 13848 that apparently nobody else had bothered to inform him of.

23        Q    And I want to -- I know the meeting lasted a very long time, and I don't want

24    to go through all the particulars of it.   It's been very well reported -- or actually let me

25    just ask you that.   Have you read any of the reporting on that meeting?

1        A    I know there was an Axios article on it a long time ago that I disagreed with it

2  on a number of points, but now I couldn't tell you what they were.    I thought it was -- it

3  was erroneous in a number of respects.

4            And then I heard that Patrick Byrne has done some sort of video about all of it.   I

5  have not watched that or read a transcript of it.

6        Q    Okay.   I thought we might short-circuit some of this by asking you where

7  that reporting is wrong, but it sounds like it's wrong a lot and you're not sure or you can't

8  remember in which respects.

9        A    Right.   I haven't -- I haven't read it since it first came out and I went:   Oh,

10  jeez.

11       Q    Okay.

12       A    And I thought it very interesting that it didn't even mention Emily Newman's

13  name.

14       Q    Okay.    So, after Mr. Cipollone and others -- Mr. Meadows -- well, was

15  Mr. Meadows on site that night?

16       A    I don't remember whether he came or whether he called.

17       Q    Yeah.

18       A    I know Rudy came running, and I think Cipollone got there first.   I think

19  Mark may have just called.   I don't remember.

20       Q    Well, let me -- my understanding is that both Mr. Meadows and Mr. Giuliani

21  called into the meeting and that later they both came.

22       A    Okay.

23       Q    Does that sound right?

24       A    That's entirely possible.   I would not dispute it.

25       Q    And that Mr. Giuliani might not have arrived until the meeting had already

1    moved up to the residence?

2          A     I don't remember that part.    I remember being alone with Giuliani and

3    Mike Flynn in kind of a -- another room for a bit, and maybe Patrick Byrne was in there

4    too, where we were trying to get Rudy up to speed on the CISA finding and executive

5    order.

6          Q     Did the meeting progress from the Oval Office up to the residence at some

7    point?

8          A     It did.    But I have no recollection of what happened up in residence.    I

9    don't even remember going up there that night.

10         Q     Okay.    So, if I asked you how long you think you were up there, that's not

11   going to be helpful?    You're not going to be able to answer that?

12         A     No.

13         Q     Do you remember there were meatballs served?

14         A     There are always meatballs and those little hotdogs served when he's there.

15         Q     Okay.    Do you remember what time approximately you left the White

16   House compound?

17         A     No.

18         Q     Was it close to midnight?

19         A     That sounds about right.

20         Q     When you left, was anyone -- did you leave anybody behind?    Was your

21   group the last group to leave this meeting, if you remember?

22         A     I don't remember.    The only part of leaving I remember is that Rudy and

23   Mark Meadows went out one door, and I went out another.    And I don't know whether I

24   even went out with Flynn and Patrick Byrne and Emily or not.

25         Q     And I guess you don't know whether Mr. Meadows and/or Mr. Giuliani went

1    back after you left?

2        A    I do not know.    That wouldn't surprise me.

3        Q    Okay.    But from your perspective, they left at or around the same time you

4    did, you just can't say whether they returned?

5        A    Right.

6        Q    Was anybody else left behind -- Mr. Philbin -- or Mr. Cipollone, Mr. Lyons,

7    and the other folks who had been there earlier, were they still in the residence when you

8    left?

9        A    I have no recollection.

10       Q    Okay.

11       A    I do know I caused quite a stir that night.

12       Q    Okay.    And I know this is how we sort of -- we started with this, about what

13    the takeaway was.    Did you get any closure on any of the issues that you had come to

14    talk to the President about by the time you left late at night on the 18th?

15       A    Any closure?

16       Q    Or even guidance or indication of where things stood.

17       A    I don't know how to answer that.    I knew -- I knew, although he had said he

18    wanted me to be special counsel and he had said he gave me a security clearance, I mean,

19    it was real clear from the body language and what everybody else was saying in the room,

20    and that was, frankly, in the Oval Office, that that just wasn't going to happen, like Mark

21    Meadows confirmed for me the next morning when I, like I said, just ran it to ground.

22        So I don't know that there was -- that I would consider there was anything

23    unresolved except we still had the same problem of needing evidence and him having a

24    decision to make on behalf of the country.

25        I mean, one of the things I have a very specific recollection of -- and I think I did

1    this on the phone once as well as in person -- was actually yelling at the President that it

2    wasn't about him, it was about the Republic of the United States of America.

3            Q     Okay.    So I understand why the question I posed was sort of challenging in

4    that closure, right, there was some statements made, but they weren't necessarily going

5    to be operationalized, and so that might sort of cause some -- seems like it caused you

6    think about where, you know, how you would say things were left after the meeting.    Is

7    that fair to say?

8            A     Well, again, I don't know how to characterize it other than what I said.

9            Q     Okay.    Yes, and I just garbled things by trying to clarify.    So let me just ask

10   a different question.

11          On the special counsel piece, did you go in to the meeting that night thinking that

12   was something you were going to ask for or suggest?

13          A     Not that I recall.

14          Q     How did that come up?

15          A     I don't remember.    It might've been something that we had talked about as

16   we thought that would be a solution.    It's not a job I would say I wanted, but I would've

17   been willing to do it.

18          Q     And when you say "we had talked about it," do you mean among yourself,

19   General Flynn, Mr. Byrne, and Ms. Newman?

20          A     Yes.

21          Q     Okay.    And, on that issue, it sounds like the President said he wanted to do

22   it.    I think there was a question raised about whether you had the necessary security

23   clearance, and the President said at the meeting:    I hereby grant her that clearance.

24          A     Well, first, he asked Pat Cipollone if he had the authority to name me special

25   counsel, and he said yes.    And then he asked him if he had the authority to give me

1    whatever security clearance I needed, and Pat Cipollone said yes.

2            And then the President said:    Okay, you know, I'm naming her that, and I'm

3    giving her security clearance.

4            And then shortly before we left and it totally blew up was when Cipollone and/or

5    Herschmann and whoever the other young man was, said:    You can name her whatever

6    you want to name her, and no one's going to pay any attention to it.

7    Q      How did he respond -- how did the President respond to that?

8    A      Something like:    You see what I deal with.    I deal with this all the time.

9    Q      He said that to you?

10   A      He said it to the whole room.

11   Q      Okay.    And what did you understand him to mean by that?

12   A      That he wasn't getting the legal counsel he needed or the support from his

13   staff that he should've had in any way, shape, or form.

14   Q      And was the President's comment just sort of left hanging out there, did

15   someone respond, or did he say anything further on it?

16   A      I don't remember whether he said anything further or not, but Cipollone and

17   Herschmann and whoever the other guy was showed nothing but contempt and disdain

18   of the President.    They walked in and out of the meeting at will.    They would come in

19   and say something and he would be asking a question or talking, and they'd turn around

20   and walk out of the room and have their huddle and come back 10 or 15 minutes later.

21           I mean, if it had been me sitting in his chair, I would've fired all of them that night

22   and had them escorted out of the building.

23   Q      So we've been talking about the special counsel piece of it.    How were

24   things left with respect to the findings and the executive order that you had gone in

25   talking to the President about?

1       A      I think I just left them all there.    I think I left -- I think I left a copy of

2    whatever I'd taken for him there.

3       Q      Did the President indicate that he was prepared to issue the findings that

4    you were suggesting or requesting?

5       A      I don't remember.    I don't think we got that far.

6       Q      Was --

7       A      And he wouldn't have done anything without White House counsel

8    reviewing it.    That wasn't the point.    The point was that somebody needed to tell him

9    what all his options were.    He was entitled, as the leader of the free world, to know

10   what the law actually was and what his own FBI and Homeland Security Department had

11   found with respect to the election already, without even knowing any of the things we

12   had collected since election night.

13      Q      And I think in the -- I'm going to jump out of the meeting for a second, but

14   I'm going to come back.    I think in the materials that you provided, you sent some of the

15   documentation to Mr. Meadows in the days following that -- following the meeting.    Is

16   that right?

17      A      That's entirely possible if not likely, and if you have it, and then I did it.

18      Q      Yeah.    Take a look at -- let's pull up exhibit 41, and this is a -- we don't have

19   it up yet, but I'll tell you, it looks as if this is the first in a series of emails -- or the first of

20   the exhibits in a series of emails with Mr. Meadows on the night of the 19th.

21             So the meeting ended probably close to midnight on the 18th, and this is the

22   next -- the next night.

23      A      Yep.

24      Q      So the first in this -- the first email in time in this chain is at 6:49 p.m. from

25   you to Mark Meadows -- well, it says Mark and Rudy.    I assume that's Mark Meadows

1    and Rudy Giuliani?

2         A    Yes.

3         Q    And do you remember this email?

4         A    Not really, no, but --

5         Q    Do you remember sending Mr. Giuliani and Mr. Meadows some of the

6    background materials that you had shared with the President the night before?

7         A    Yes.

8         Q    And Mr. Meadows responded at 8:44 that he had read every document, and

9    he gave his --

10        A    I --

11        Q    Do you see that?

12        A    Right.

13        Q    It says:   I have ready.

14    I assume he means "I have read" --

15        A    Right.

16        Q    -- every document.    And he gave you his assessment of those documents.

17    Do you remember getting that response from Mr. Meadows?

18        A    I don't have an independent recollection of it as I sit here, but obviously I

19    did.

20        Q    Well, do you remember -- just to sort of paraphrase his response, it's that he

21    thinks it's a giant leap to see actual foreign interference from the materials that you

22    presented.    Do you remember him responding in that way, sort of pouring cold water on

23    your argument?

24        A    Oh, yeah, I remember his -- his denial of -- yeah.

25        Q    And then it looks like you responded to him at 11 o'clock that night, saying,

1    "Yes, there are more," because I think he asked:   We need witnesses that can show that

2    actual interference with the voting process through machines.

3         A    I remember that one of the things Mark said at some point was you can't

4    show an actual vote was flipped, which I found at the time to be a remarkable assertion,

5    because -- because you don't have to have the gun to see the body lying on the floor,

6    bleeding out with five bullet holes in it, was killed by a gun.

7         It's -- I mean, I was a Federal prosecutor for 10 years.   I represented the United

8    States of America in more than 350 Federal appeals.   We had more evidence that this

9    election was stolen than most people are sitting in prison right now on the basis of.

10        It's -- the fact that people are just saying there's no evidence or it didn't happen is

11    an abject refusal to look at reality with any objectivity and study the evidence.   And,

12    frankly, it indicates to me some level at which they are either too -- too uninformed or

13    too corrupt to be serving in public office.

14        As I said at the beginning, this crosses party lines.   It goes back to the year 2000

15    when apparently the Republicans came up with this creative way of using computers to

16    affect voting outcome, and then the Democrats caught on in time to use it with

17    Dominion.

18        And now nobody wants to upset the applecart; they want to control the applecart.

19    And, as a citizen of the United States of America, I find that more than offensive.

20        Q    Okay.   So let me step away from this exchange with Mr. Meadows for a

21    second and explore with you a little bit more about what you think happened with

22    respect to the machines.   Can we do that?

23        A    Sure.

24        Q    So I know I was asking you earlier about what you knew and when you knew

25    it in sort of that early phase.   For this questioning, I'm curious as to, as you sit here

1    today, okay, so with all of the information that you were able to gather over the course of

2    your investigation and since, do you believe that foreign actors compromised voting

3    machines and manipulated votes in connection with the 2020 election?

4            A       I think it is a strong possibility.

5            Q       Foreign actors.    I'm sorry.    I thought you were done.    I apologize.

6            A       Yeah, well, I thought I was too, and then I thought, you know, it could've

7    been more indirect.    I mean, there's apparently $600 million invested from China into

8    the group that owns Dominion, shortly before the election.

9            All the parts are made in China of the Dominion machines.    They could've been

10   hacked from anywhere in the world.    They were specifically designed to leave ports

11   open.

12           If you look at their manuals and their operating instructions, you can see that

13   anyone can log in from anywhere.    Because ports are left open, remote access is not a

14   problem.

15           We know Dominion has an operation in Serbia.    In fact, a strong component of

16   their computer algorithms and information are done in Serbia.    We know that in

17   election 2016, the Serbia group ran the control center and help center for our election.

18           Yeah, there is foreign activity all over the place with respect to our election.

19           Dominion is actually a Canadian company with substantial operations in London

20   and, of course, Serbia.

21           Smartmatic and the whole Venezuela connection, that is all still there.

22           It's a serious problem for the integrity of our elections that's been documented by

23   Democrats, including Carolyn Maloney, Elizabeth Warren, Amy Klobuchar and the entire

24   HBO documentary called "Kill Chain," not to mention Harri Hursti's work in "Hacking

25   Democracy."    It's everywhere.

1       And the fact that people have known about it on both sides of the aisle for this

2  long tells me it's an even bigger problem than I thought it was when I first got into this

3  and that the corruption is more widespread than I originally imagined.

4       Q      So which foreign actor do you believe interfered with or manipulated votes

5  in connection with the 2020 election?

6       A      I'm not saying -- I'm not saying that somebody in China sat there and

7  changed votes.    I don't know whether that happened or not.    But I do know by now

8  that the machines are designed to enable someone to do that, and I know that people on

9  both sides of the aisle, in Congress and in other places in our government, have known

10  that for 20 years and haven't done jack shit about it.

11       Q      In which States do you believe votes were manipulated?

12       A      I think it's entirely possible that an algorithm was run in machines across the

13  country to lower the obvious nature of any massive deviation.    The massive deviations

14  were in the swing States that shut down the night of the election, where you see a vote

15  spike of a hundred thousand or more votes, all of a sudden, in the middle of the night,

16  when nobody's even supposed to be counting.

17       That does not happen.    That is mathematically impossible.    If you look at the

18  videos by Dr. Frank, he explains how he has calculated what the algorithm was for each

19  State.    They apparently went in and injected false voters into the voter database, which

20  is part of the government-funded patent that I found, that allows them to do that, and

21  then mined from that to inject votes as needed to run, like, a thermostat what they

22  wanted to do to create the outcome they wanted of the election.

23       And, again, as I mentioned earlier, I found the patent for that.

24       So all this business of "oh, it can't happen" is total bullshit.    It's patented.    And

25  our Department of Defense holds the patent.    So, if you guys really want to do an

1   investigation of something, you probably ought to look into the Defense Department also

2   and the CIA and see what they've done with all this.    Because we're not the only country

3   that's had this problem.

4          Q     So, when you said that they were able to inject votes, who's the "they"?

5   Who --

6          A     I don't know.    I would love to find that out.    It is on my list of missions to

7   do before I die.

8          Q     And when Mr. Meadows, in the email we were just looking at, was asking

9   you for what's your, sort of, best evidence that votes were actually switched, did you

10  provide him with what your best evidence was at that point?

11         A     There came a point in time when I stopped giving Mr. Meadows any

12  information because I wasn't sure what was being done with it.

13         Q     So was there information -- was there more compelling evidence that you

14  had regarding actual votes being switched than what you gave to Mr. Meadows?

15         A     I don't remember what all I gave to Mr. Meadows.

16         Q     You --

17         A     But at some point I simply stopped trying to see the President.    It was -- or

18  trying to talk to any of them, and I think it was around about that time.

19         Q     There were other folks, in the course of your work post-election, who were

20  asking you for, sort of, proof of the things that you were claiming.    Is that fair to say?

21         A     Sure.

22         Q     Mike Lee, did he ask you for proof of what you were claiming?

23         A     I don't remember, but I wouldn't dispute it.

24         Q     And did you provide Senator Lee with the best evidence that you had to

25  support your claims?

1        A       I don't remember what I gave Mike Lee.

2        Q       I guess a better way or a different way to put it -- and folks have said this

3    about their interactions with you, and I want to get your response on this -- that you said

4    there was certain information you had that you could not share with them.    Is that

5    something -- is that true?    Did you ever say that to anyone, that there was information

6    that you possessed but that you were not comfortable or not willing to share?

7        A       Yes.

8        Q       And to whom did you say that?

9        A       Well, the only one I remember saying it to was Tucker Carlson.

10       Q       Okay.    And why is it that you were not willing to share information that you

11   had with Tucker Carlson?

12       A       We had filed lawsuits, and there's a proper way to go about sharing

13   information when you're in litigation, and there are improper ways to go about it.

14               And there also came a time when I became concerned about the welfare of some

15   of our witnesses.    In fact, the young man from Venezuela reported that he had been

16   hassled, and he's reporting and has reported being even more hassled after an article

17   came out on him recently in one of the publications.

18       Q       Got it.    You mentioned Harri Hursti a moment ago.    Do you believe he's a

19   credible expert in this field?

20       A       Harri Hursti's done a lot of work in this field.

21       Q       Have you talked with him about any of the claims that you have with respect

22   to the 2020 election?

23       A       No -- well, I think -- I think I've had a conversation with Harri, but, no, I did

24   not consult him as an expert on this.    He did an affidavit in Curling v.    Raffensperger

25   that we used which reminds me that, you know, Judge Totenberg is the only Federal

1    judge in the country who's actually heard any of these witnesses testify about problems

2    with the Dominion machine, and that resulted in her 145-page decision that came out 3

3    weeks before the election that's essentially a scathing indictment of the Dominion

4    machines.     It was just too close to the election for her to issue an injunction.

5          We also got a temporary restraining order from Judge Batten in Atlanta that

6    secured first all the machines in Georgia for potential inspection, and then the second

7    one he entered secured machines in three counties for inspection.

8        Q    Mr. -- or Professor Hursti signed on to a statement that I'm sure you're

9    aware of, from election security scientists that said:     To our collective knowledge, no

10    credible evidence has been put forward that supports the conclusion that the 2020

11    election outcome in any State has been altered through technical compromise.

12        Are you aware of that expert statement?

13        A    No.     But it kind of reminds me of the statement of the 41 intelligence

14    officials that said there was no problem with the Hunter Biden laptop too, wasn't it?

15        Q    So did you ever talk to Mr. Hursti -- or Professor Hursti about his view that

16    there had not been -- there was no evidence to support the conclusion that the election

17    outcome in any State had been altered through technical compromise?

18        A    No, I haven't.

19        Q    How about Alex Halderman, do you know him?     Are you familiar with

20    Professor Halderman?

21        A    Yes.

22        Q    Do you think he's got credentials and expertise in his field of election

23    security plus -- and vulnerabilities involving election machines?

24        A    I think he does.

25        Q    Are you familiar with his position on what happened in the 2020 election or

1     what did not happen in the 2020 election, with respect to foreign interference?

2          A     No.     But it wouldn't surprise me if it isn't identical to Mr. Hursti's.

3          Q     Have you talked to any election security expert who has shared your view

4     that there was foreign interference and technical compromise of voting machines in the

5     2020 election?

6          A     Yeah, I think so.

7          Q     Who's that?

8          A     I think that's a work product privilege.

9          Q     Did you put forward any expert -- so just to be clear, you're aware of

10    expert -- an expert conclusion that supports your view of the election, but you're not able

11    to share it?

12         Mr. Tobin.     Just object to the form in terms of, I don't know that you all are

13    talking about the same -- what the meaning of expert is, but go ahead.

14         The Witness.     You know, we have a number of expert reports that we made

15    public that are attached as affidavits in reports to our filings.     Those are the only ones

16    that I could discuss right now.

17              BY ▉▉▉▉▉▉

18         Q     Is there some other expert, without disclosing the contents of it, is there

19    some other expert report or affidavit or declaration that you have that supports the

20    claims of foreign interference that you have not filed in court?

21         A     It depends on how you define foreign interference, for one thing, and I don't

22    think I can answer that.

23         Q     So -- well, we started this by -- I shared with you the statement of scientists.

24    There are 56 election security scientists who signed on to the statement -- or excuse

25    me -- 59 that I read to you earlier, and you said that you thought that Professor

1 Halderman, who also signed that statement had similar views to Professor Hursti.

2   And I asked you whether you had consulted any experts who had a contrary view,

3 and that's what I'm getting at, whether you have an expert report, declaration, or

4 affidavit from an expert in the field who has a contrary view to the statement I read you.

5   Mr. <u>Tobin.</u> Same objection as before. Go ahead.

6   The <u>Witness.</u> Yeah, and I'm not sure all the expert reports we've collected at this

7 point. So I really -- I really can't answer that. I don't have knowledge of everything

8 that's been done at this point.

9   BY █████████

10  Q Do you also believe that domestic actors manipulated voting machines to

11 change the results of the 2020 election?

12  A Well, again, you know, people can parse words over these things, like,

13 manipulated. I think the important point for you to understand is that the machines are

14 designed to allow that to happen, that there can be mass adjudication of ballots.

15   For example, I think it's Fulton County, Georgia, where the, quote, adjudication

16 rate, a patent designed and held by Eric Coomer, among others, was 94 percent, which

17 means that someone other than the person who cast the ballot decided the votes in 94

18 percent of the votes cast in Fulton County. There was no way to individually review and

19 adjudicate those votes in the time allotted, so there had to be mass adjudication of them.

20  Q Could I stop you? Could I stop you, or do you have something else --

21  A Yeah.

22  Q -- you wanted to say on that?

23  A No. Go ahead.

24  Q So upon what do you base the statement that in Fulton County the

25 adjudication rate was 94 percent?

1          A       I saw a report to that effect somewhere.

2          Q       What does that mean?    What does "adjudication" mean in this context?

3          A       It means that -- well, for example, the Dominion machines -- the county,

4   okay, let's just -- and this is hypothetical -- the county person that sets up the county's

5   operation of the machines, whoever does that for Dominion can set it up to ignore all the

6   first line of the ballot.    They can set it up to ignore all the signatures.    They can put

7   something in the QR code to reject everything marked for Trump.

8                  I mean, there are any number of ways, based on the design of these machines,

9   that you can see even reading their own manuals, that allow them to kick out votes for

10  whatever reason.

11                 And, if the machine kicks the vote out, then it goes into what's called an

12  adjudication file, where somebody else decides what the vote's going to be.    And my

13  understanding from one of the reports I read -- and I don't remember which one -- was

14  that the adjudication rate for Fulton County was, like, 94 percent.    There should never

15  be an adjudication rate, frankly, of more than 1 percent.    That should've rendered

16  Fulton County just -- that should've rendered the Georgia results, frankly, invalid.

17         Q       So, based on this information that you're referring to, your understanding is

18  that 94 percent, almost all of the votes in Fulton County were sent to adjudication, and

19  some individual had to decide who that vote should be for?

20         A       Exactly.

21         Q       And what's your understanding as to who did that?    Which individual was

22  adjudicating 94 percent of the ballots in Fulton County?

23         A       I do not know.

24         Q       Okay.    And did this happen in other counties around the country?

25         A       I would imagine it did, but I don't know or recall specifically.

1        Q       So is it your belief that local election officials were part of this conspiracy to

2   adjudicate ballots in a nefarious fashion in the 2020 election?

3        A       Not necessarily.    Dominion had people in virtually all of its locations

4   running the election, as I understand it.    I mean, we're still in -- I mean, we're just

5   starting discovery with Dominion.

6        Q       Okay.

7        A       So I hope to have a lot more information on these issues as time goes on,

8   but we know, for example, that, I think, Coomer was in Chicago; Nick Ikonomakis was in

9   Detroit where there were massive problems.    I don't remember who all was elsewhere.

10       I think there was actually a Nigerian running one of the elections, a Nigerian

11  citizen running one of the elections for Dominion in Georgia, and I -- I don't really

12  understand how that happens, but --

1

2      [1:15 p.m.]

3                    BY ████████████

4      Q      Okay.    And is it your understanding that -- what is your understanding of

5      whether a hand recount would reveal this mass adjudication scheme that you've

6      described?

7      A      Well, okay.    A hand recount is not -- only a signature recount would -- of

8      every ballot -- would truly reveal the correct vote count.

9             For example, if you -- say you're counting dollars, hundred-dollar bills.    Think of a

10     vote as a hundred-dollar bill.    You run the same dollar bills, real or counterfeit, through

11     the same counting machine, it's going to come up with the same count.

12            If you run them through a machine that's designed to kick out the counterfeit

13     ones for adjudication, it's going to do the same for that, too.

14            Only a signature audit of the actual, real paper ballots would give you the correct

15     count of the vote.    And one of the problems that Judge Totenberg noted in her lengthy

16     decision was the Dominion ballots are actually decided on the basis of a QR code, and the

17     QR code is not readable by a human being.

18            And that is a huge problem, because they can make the QR code say or do

19     whatever they want it to do regardless of what is written by the voter on the paper.

20     Q      But is it your understanding that the paper ballot, the hand-marked ballot, or

21     even a machine-marked ballot, but the ballot that comes out of the machine, that if those

22     are counted, wouldn't that reflect the actual votes that the voters intended to cast as

23     opposed to whatever happened in some adjudication process?

24     A      Georgia did not count all of their ballots.    They did not do a full signature

25     audit of their ballots.    In fact, Governor Kemp and Loeffler and Perdue all called for a

1    signature audit of their ballots, and then their young intern, aide, friend, 20-year-old

2    Harrison Deal, was blown up in a car on December 4th, I think.    And, by December 7th

3    and 9th, three of our four cases were dismissed, and no signature audit was ever held

4    anywhere.

5         Q    Does a signature audit relate to the ballots that were cast with the machines

6    or only for absentee or mail-in ballots?

7         A    I think it relates to both.

8         Q    Okay.    Let me pivot a bit here, but still talking about machines.

9         Did Rudy Giuliani have the same perspective on potential tampering of voting

10   machines as you did?

11        A    My understanding from his public remarks is that he did.    I really didn't talk

12   to Rudy a whole lot.

13        Q    Did you feel that the two of you saw eye to eye on the issue of the potential

14   foreign interference in the election?

15        A    On foreign interference, particularly the Venezuelan component, not

16   necessarily.

17        Q    Now, in his public statements he did seem to echo a lot of the same

18   concerns that you were raising, but you're saying privately not so much?

19        A    Privately not so much.

20        Q    Tell me about your private conversations on those issues.

21        A    Oh, well, I just -- he just didn't seem to want to talk about it.

22        Q    Did he ever tell you that he didn't agree with you or that he didn't believe it?

23        A    I don't remember him telling me he didn't believe it.    I just remember him

24   not wanting to be part of any discussion on it.    And then I realized sometime in there

25   that he had a big Venezuelan client that he had been representing in Miami on, I think,

1    drug and money laundering charges.

2        Q    It seemed that Mr. Giuliani and his team spent a lot of time trying to get

3    access to voting machines.    Is that your recollection or understanding?

4        A    Yes.

5        Q    And were your efforts in parallel in that regard, or were you sort of

6    approaching this from a different angle in terms of how to get access to the voting

7    machines?

8        A    I'm not sure how to answer that.    I was aware of what he was -- well, I

9    knew he was trying to do it.    I didn't know the details of how he was going about it.    I

10   think I was asked to pay expenses of some of those trips in some way, some of the teams

11   of cyber people that were going to look at them.    I didn't have any role in really setting

12   them up or making sure how they were done that I remember.

13       Q    What did you understand he was trying to do in these various places that he

14   was traveling to?

15       A    Well, I can only think of, right now, of Michigan, which I think resulted in the

16   Antrim report.    And I think maybe there was an effort by some people to get something

17   out of Georgia, and I don't know what happened with that, and I don't remember

18   whether that was Rudy or other folks.

19       Q    I think you referred -- you mentioned that there were some problems with

20   the efforts in Michigan.    You might have called it a debacle.

21       A    Yes.

22       Q    What's your understanding, or what were you referring to in terms of

23   problems?

24       A    Wasted trips and wasted money when things weren't ready on the ground

25   for people to do what they were supposed to do.

1    Q    Now, they eventually -- well, someone eventually inspected 22 machines in

2    Antrim County.    Is that right?

3    A    I didn't remember that it was 22.

4    Q    But someone inspected machines in Antrim County.    You're aware of that?

5    A    Yes.    We got the Antrim County report.

6    Q    And do you know how it is that they were able to get access -- whoever did

7    the inspection was able to get access to those machines?

8    A    I don't know the details of it.

9    Q    You know there was a court order?

10   A    Now that you mention it, I remember hearing that.

11   Q    But you didn't play any part in getting that court order?

12   A    Not that I recall.

13   Q    Did you play any part in arranging or coordinating the analysis of the

14   machines after the order was entered?

15   A    I don't think so.

16   Q    Do you know who did, who did the inspection of the machines?

17   A    I think Russ Ramsland, Phil Waldron, maybe Conan and Todd, whose last

18   names I don't remember.    I don't remember.

19   Q    Conan Hayes and Todd Sanders?

20   A    Yes.    Yes.    I don't know whether they worked on that one or not.    I know

21   they worked on some of them.

22   Q    Which -- what other machines do you understand Mr. Hayes and

23   Mr. Sanders inspected besides Antrim County?

24   A    I thought I heard something about maybe a machine in California.    I don't

25   know whether anyone ever got access to that or not.    And I know somebody was trying

1    to get access to some machines in Georgia, and I don't know what happened with that.

2          Q      Do you know whether Mr. Hayes imaged certain hardware in Coffee County,

3    Georgia, in November of 2020?

4          A      I don't recall.

5          Q      Do you know anything about Coffee County?

6          A      I know that it was one of the big problems, and I think we got an affidavit

7    from a woman by the name of Misty Martin who worked there.

8          Q      But you don't know if Mr. Hayes or anyone acting with him accessed those

9    machines?

10         A      I remember them trying to.    I don't remember whether they did or not.

11         Q      In Georgia -- and I think we have some correspondence from you on this -- is

12   it correct that Mr. Giuliani, at the December 18th meeting that we keep coming back to

13   or going in and out of, that Mr. Giuliani said at that meeting that he had a plan to get

14   access to machines in Georgia?

15         A      I think that's correct.    I think he did.

16         Q      And was he -- did that come up in the context of sort of this discussion, we'll

17   call it, about the executive order and your seeking Presidential authorization to seize

18   voting machines?

19         A      I'm sorry.    Would you repeat that?

20         Q      Yeah.    You went to the White House to talk to the President about

21   executive order and Presidential findings that would allow the seizure and analysis of

22   voting machines, correct?

23         A      Correct.

24         Q      And there was quite a bit of discussion while you were at the White House

25   for several hours about that topic.    Is that fair to say?

1       A    Yes.

2       Q    And in the context or in the course of that discussion, did Mr. Giuliani at any

3    point say that he had another plan or a different plan to get access to machines and he

4    was going to do it voluntarily in Georgia?

5       A    Now that you mention it, yes, I think that's correct.

6       Q    Do you remember anything else about that plan or what he shared about

7    how he was going to go about that?

8       A    No.    I didn't even remember that till you mentioned it.

9       Q    Okay.    This was a -- I mean, getting access to the machines was a big deal

10   for you, wasn't it?

11      A    Yes.    I mean, that's -- given the level of proof that people are demanding of

12   what obviously happened here, yes.

13      Q    I mean, would you say the biggest deal?    Like, a lot of your energy went

14   into trying to get access to machines.    Is that fair to say?

15      A    Only early on.

16      Q    Okay.    At what point did that taper off?

17      A    When it was obvious we weren't going to get access to the machines.    I

18   mean, I really stopped working from that perspective on December 18th, I think.    Maybe

19   the 21st.    I don't -- that part, I don't remember.    Yeah.    I guess, since I wanted in that

20   information -- I wanted in that meeting with Giuliani and the President about machines,

21   then, yes, I was still interested in it on the 21st.

22      But I don't think I even spoke to the President after the 18th, not that I remember

23   anyway, and I certainly wasn't working with Giuliani on it.    We had our lawsuits that we

24   were filing, had filed, and needed to get to the Supreme Court.    So we were pretty much

25   heads down working on Supreme Court briefs.

1    Q    Got it.    But if on December 18th Mr. Giuliani had said, "Hey, I've got a plan

2  to get access to machines," that would have been of interest to you, I imagine.

3    A    Well, I didn't trust Mr. Giuliani's plan to get access to the machines.    They

4  were always talking about getting access to the machines, and it was taking forever, and

5  it didn't pan out.    And I don't know what happened.

6    Q    Right.    And, in fact, I think -- if I can put my hands on it quickly, we'll bring it

7  up.    Yeah.    Exhibit 49.    If we can pull that up.

8        I think your lack of confidence was correct --

9    A    Yeah.

10    Q    -- that he could get access to those machines, right --

11    A    Yep.

12    Q    -- as far as you know?

13    A    Yep.

14    Q    Okay.    I'm just wondering whether he shared any details about how it was

15  that he was going to get -- how he was going to pull that off and get voluntary access to

16  voting machines, if he shared any of that at that meeting.

17    A    He may very well have shared some of that at the meeting, but he wasn't

18  inclined to share anything with me, so --

19    Q    Go down a little bit on that.

20    A    Yeah.    Right.    Yeah.    That's a good one.

21    Q    Right.    So you see that, where, on the 22nd, you said --

22    A    Yep.

23    Q    -- "Georgia machine access promised in meeting Friday night to happen

24  Sunday has not come through."

25    A    Yeah.    Exactly.    Okay.    Yep.    Thanks.

1      Q     Did you ever have -- you're welcome -- did you ever have any conversations

2    with Mr. Giuliani about, "Hey, you know, you said this was going to happen and it didn't,"

3    or any follow up with him on that?

4      A     I probably did.

5      Q     No recollection of anything in particular?

6      A     Well, the one thing that just came to mind, and I don't know when this was,

7    but it was a conversation in Mark Meadows' office with Rudy and Katherine Friess and

8    Mr. Meadows, and I think Mr. Waldron, that was the epitome of devolution into name

9    calling and misogynistic behavior from Mr. Giuliani toward me.

10     Q     Well, what else -- and I'm sorry to make you recount sort of that sort of

11   offensive type of conduct or statement.

12     A     No.    No.    No.

13     Q     But can you share some more specifics about the conversation and, you

14   know, the parts that you considered troubling?

15     A     Oh, I can't even remember what I said in the meeting.    I do remember

16   Mr. Giuliani just absolutely lashing out about me being unfit to practice law, called me

17   several names.    And, I mean, he just went on and on and on.

18          And Katherine Friess was sitting there.    I trust her as far as I could throw her.

19   And I think Phil Waldron was in that meeting, too.

20     Q     And this was in the White House?

21     A     Yeah, it was in Mark Meadows' office.

22     Q     Do you remember what prompted the outburst from Mr. Giuliani?

23     A     No.

24     Q     And it seems you were -- you may have had slightly different approaches,

25   but weren't you both trying to get to the same spot?

1          A    You would have thought that, but I'm not sure we were.

2          Q    Why do you say that?

3          A    Well, again, I mean, Rudy was inexplicably antagonistic to me.    And any

4    mention of foreign interference in particular set him off, irrationally so.    It irrationally

5    set him off.

6          Q    And did that change over time in terms of his hostility towards the foreign

7    interference claims?

8          A    I don't know.    I mean, we just went completely separate ways.    I had

9    nothing -- I don't think I even spoke to him again after that meeting on the 21st.

10         Q    Okay.    Now, you --

11         A    Or whenever.    I don't know whether that one was the 21st or not.    But

12    whenever that meeting was, I never spoke to Rudy again.

13         Q    So I believe that Mr. Waldron was in a meeting with Mr. Meadows -- not to

14    the exclusion of others, but Mr. Waldron -- and I can show you a document in a

15    minute -- was in a meeting with Mr. Meadows on the 21st.

16              The 21st is also the day, I believe, if I'm getting my months correct, that you were

17    excluded from a meeting that we talked about earlier.

18         A    I think you're right.    That may have been -- okay, that may have been that

19    meeting then.    That may have been the time that, when I saw Mark, we went into that

20    meeting with Rudy and Katherine and Phil Waldron in Mark Meadows' office.

21              And that was the last time I had anything to do with any of them.    If that's the

22    right date and that's the right meeting --

23         Q    Why don't we see if we can pull that up.

24         A    -- that's the last time I had anything to do with any of them, I think.

25         Q    Okay.    I think -- let me -- I think it's worth for a moment --

1        Mr. <u>Tobin.</u>    While you get this exhibit, I'd like -- could we take a break for lunch

2    after this exhibit?    We've been going for about an hour and a half.

3        The <u>Witness.</u>    My eyes are giving me a fit.

4        Mr. <u>Tobin.</u>    And I can tell that -- yeah -- that Sidney is getting a little tired.

5        ████    Yeah.    Give me 30 seconds to see if I can find it just so we don't lose

6    the thread here, and then I will -- then we'll take a break.

7        Mr. <u>Coburn.</u>    Appreciate it, ████

8        Also, just a question in terms of if you folks have a sense of how late you think

9    you're likely to go today?

10        ████    Let me get to that in a moment.

11        Mr. <u>Coburn.</u>    Sure thing.

12        [Discussion off the record.]

13        ████    Okay.    I think we found it.    Just give us a second.    ████ will pull

14    it up.    This is exhibit 67.

15        If we can zoom in.

16            BY ████

17        Q    So the timing or the date, I was right.    Even a broken clock is right twice a

18    day.

19        One quick question I want to ask you about the email at the top.    Do you know

20    who ████, whose email that is?

21        A    Oh, yeah.    That's me.

22        Q    Oh, okay.    And then do you know who ████ is?

23        A    No.

24        Q    Okay.    I'll represent to you that's Mr. Giuliani's email.

25        A    Okay.    Oh, yeah, yeah, yeah.    Yep.    Okay.    Got it.

1    Q    And ████████ is Mark Meadows, to my understanding.

2    A    Okay.

3    Q    Okay.    So we --

4    A    Hold up.    We haven't checked that Hushmail address.

5    Q    Okay.    I'll take that up with counsel after -- on a break here.

6    A    Yeah.    Well, that's my fault, because I forgot.    We had that one primarily

7    on Flynn, and I wasn't thinking about that one.

8    Q    Okay.    And then the last person I'll identify for you -- and I think it's clear

9    from the email -- is this ████████, I believe to be Mr. Waldron, and you can

10    see where Mr. Waldron has signed the email.    Not signed it, but, you know, being from.

11    A    Yeah.    I do see that.    I don't have any recollection of that being him.

12    Q    Okay.    So just to sort of close the loop on this before I give you a break, it

13    appears from this email on the 22nd that there was a conversation in Mr. Meadows'

14    office the day before.

15    Does that tie some of these pieces together for you?

16    A    Yes.    Yes.    That has to be that meeting.    That was the shit show meeting

17    with Rudy going bonkers.

18    Q    And that's also the meeting that was sort of in lieu of, for lack of a better

19    term, the meeting you thought you were going to attend that included Members of

20    Congress.

21    A    Exactly.

22    ████████    Okay.    With that, let's go off the record.

23    [Recess.]

24    ████████    We're back on the record.

25    Ms. Powell, I'm going to --

1          The <u>Witness.</u>    Yes.

2          ███████    You've met ███████ who had some questions for you earlier.

3          The <u>Witness.</u>    Sure.

4          ███████    And I'm going to let her start the questioning before we jump back

5    into the stuff that we were talking about.

6          The <u>Witness.</u>    Okay.

7          ███████    Hi.    Good afternoon, Ms. Powell.    Thank you so much for your

8    patience with all this.

9          The <u>Witness.</u>    Oh, sure.    No problem.

10          BY ███████

11          Q    And I just wanted to ask you some questions.    My focus is more on some of

12    the financial aspects of our investigation.    Some of what I'm going to be asking you -- as

13    you know, there is a lot of public reporting, and so some of that is just following up and --

14          A    Yeah.    I don't have $70 million.    I sure wish I did.

15          Q    Well, and as you can imagine, some of the things that come out in public

16    reporting are not always accurate.

17          A    I've kind of noticed that.

18          Q    So it's my job to follow up on what is and what isn't.

19          So I just wanted to ask you, are you familiar with somebody named Julie Fancelli?

20    She may also go by Julia Fancelli.

21          A    I think General Flynn introduced me to her, and I've spoken to her once or

22    twice, but we've never met.

23          Q    Do you happen to remember when General Flynn introduced you to her?

24          A    No.    It would have been -- I mean, I think it would have been in November

25    or December.    I mean, not -- and didn't introduce me in person, just told me the name

1    and gave me the phone number.    And I think I've spoken to her on the phone.

2            Q      And, just to clarify, when you say November or December, are we talking

3    about 2020?

4            A      Yes.

5            Q      Okay.    And do you remember the context of why General Flynn was

6    introducing you to her?

7            A      My understanding was she is part of the family that owns Publix and that she

8    was a patriot and might be interested in supporting Defending the Republic.

9            Q      And did she come to support Defend [sic] the Republic?

10           A      Not that I know of.

11           Q      Okay.    And if we could put up exhibit, I believe, 68.

12                  So, Ms. Powell, this is a check from Julia Fancelli Living Trust.    And I don't know if

13   it's -- I don't know if the text is as small for you as it is for me, but we may need to zoom

14   in a bit.

15           A      Oh, no.    I can see that.    Okay.    So it looks like she did make a significant

16   contribution to my PC.

17           Q      And it looks like the date might be -- and I'm apologizing, my eyes are quite

18   bad as well -- it looks like November 30th, 2020?

19           A      Yes.

20           Q      And this -- would you have said this was after General Flynn introduced you,

21   I'm assuming?

22           A      I would assume so.

23           Q      And can you remember anything about this donation or how the donation

24   came about?

25           A      No.

1        Q     Do you remember having any conversations with Ms. Fancelli?

2        A     Not in that time frame.

3        Q     Do you remember anyone at Sidney Powell, PC, or are you aware of anyone

4    at Sidney Powell, PC, or Defending the Republic Election Integrity Fund having any

5    conversations with Ms. Fancelli or any of her representatives?

6        A     I have no idea.

7        Q     So right now you have no idea how $100,000 from Ms. Fancelli came to be

8    donated to Sidney Powell, PC.

9        A     That's correct.

10       Q     Okay.   I wanted to ask you if you could clarify.   The payment is to Sidney

11   Powell, PC, which I think earlier you said was your law firm?

12       A     Yes.

13       Q     But if you look on the memo line, it says:   Contribution Defending the

14   Republic Election Integrity Fund.

15       A     Yes.

16       Q     Can you explain what that entity is and how it's separate from Sidney Powell,

17   PC?

18       A     It wasn't -- Defending the Republic Election Integrity Fund was not a

19   separate entity.   It was an account I set up at Morgan Stanley equivalent to a client trust

20   fund for anybody that wanted to donate to helping fund the election efforts, to make it to

21   my PC, but to segregate it into that trust fund.

22       Q     And sitting here, do you know what that $100,000 was for given that it was

23   made to the PC or given the memo for the contribution?

24       A     I mean, my understanding is was that it was for us to fund whatever we

25   needed to do in our work on figuring out what happened in the election.

1      Q      And where did you get that understanding from or who did you get that

2  understanding from?

3      A      Well, I mean, just the fact that it says Defending the Republic Election

4  Integrity Fund.

5      Q      Okay.   So just from the name?

6      A      Yes.

7      Q      Okay.

8      A      I don't recall any specific conversation about any donations that came in

9  during that time.

10     Q      Okay.   So there has been some public reporting about different entities,

11  and I was kind of hoping that you could help us understand what's what.   So --

12     A      I will do my best.   It's a cluster.

13     Q      So here it says Defending the Republic Election Integrity Fund, and I think a

14  moment ago you said that was a Morgan Stanley client trust fundesque entity.

15     A      Yes.

16     Q      But to your knowledge, is it a 501(c)(4)?

17     A      No.

18     Q      Is it a PAC?

19     A      No.   It's just the way -- like, for example, whenever I have a client with a

20  significant problem, I will get them to post a retainer, and I put it in a separate account

21  with -- and, for my internal purposes, I put their name on it.

22         So there was an account created at Morgan Stanley.   And for internal purposes, I

23  don't think the Morgan Stanley account read that.   I couldn't tell you what the Morgan

24  Stanley account read.   But whatever that account number was, I called it the Defending

25  the Republic Election Integrity Fund so I would know that's what that money was for.

1          Q      Okay.    So there was public reporting that in November 2020 you

2    established something called the Legal Defense Fund for the American Republic, and that

3    was alleged to be a 501(c)(4) nonprofit.

4              Is that true?    Do you remember that?

5          A      Yeah.    That's where the real cluster comes in, okay?

6          Q      Talk me through that.

7          A      Yeah.    A person by the name of Robert Matheson, I understood,

8    volunteered to help me set up Defending the Republic.    Instead of setting up Defending

9    the Republic, he set up this LD something.

10             And when I figured all that out and that he was going to charge an exorbitant

11   amount of money also when I thought it was all volunteer, because at that point we were

12   all volunteers, I had a conniption fit and started pulling it all away from him as fast as I

13   could do that.    And it took some doing to get that done and made a hell of a mess in the

14   process.

15         Q      And do you remember when you started the pulling away from him process?

16         A      No.

17         Q      Do you believe it was after January 6th or before January 6th?

18         A      Oh, January 6th of -- yeah.    Oh, it was before January 6th.

19         Q      Okay.

20         A      It was probably -- I mean, I think the reason I went ahead and set up the

21   Election Integrity Fund by then was because I was aware of some kind of problem.    I

22   don't know whether it was that he had wanted money or whether it was me realizing he

23   had set up a different entity or what.    But I'm pretty sure that by the time I set up the

24   Election Integrity Fund at Morgan Stanley I knew we had some level of problem with the

25   way that was all done to begin with.

1          Q    Okay.   So it would have been sometime in November 2020 that the -- I'm

2    just going to call it the LD Fund for short since you --

3          A    Yeah.

4          Q    -- used that LD just to keep it straight.

5          A    Right.

6          Q    LD, whenever it gets set up, by the time this check at least is written and

7    there is a Republican election integrity fund account that you're using, you've already

8    started pulling that back from Matheson?

9          A    Yes, or trying to, yeah.

10         Q    That's very helpful.

11         So there's also an entity, I believe, called Restore the Republic, and this is a

12    super-PAC that you were alleged to have created in January 2021.

13         Do you know anything about that?

14         A    That one never got off the ground.

15         Q    Okay.   And so it's established -- and is that -- there was not a single SEC

16    filing for that.   So do you remember any activity being involved with Restore the

17    Republic?

18         A    I think somebody might have filed something to start it, but we dropped that

19    one.

20         Q    Okay.

21         A    And as far as I know, nobody ever wrote a check to it for anything.

22         Q    Okay.   And not including any discussions that you had with attorneys, but

23    do you remember having any discussions with anyone about establishing Restore the

24    Republic?

25         A    I'm sure I did or it wouldn't have been created, but I don't remember now

1    who that was.    I would assume the documents show whoever filed it, but I couldn't tell

2    you who among us did that.

3        Q    But to the best of your recollection, whoever filed that paperwork, that's

4    who was involved in creating that with you?

5        A    Yes.

6        Q    Okay.    And then there was also, I believe, Defending the Republic in

7    November, I believe -- was this November 2020 or November 2021?

8        A    December 1 of 2020 we incorporated Defending the Republic, Inc., which is

9    what we have now.

10        Q    Okay.    And you anticipated my next question, which is my understanding is

11    that it is both a 501(c)(4) and a PAC by the same name.    Is that right?

12        A    There are two separate entities.    One is -- Defending the Republic, Inc. is a

13    501(c)(4), and that's the primary organization.    And then there is Defending the Republic

14    PAC -- I'm not sure whether there is an Inc. with that or not -- that is the PAC.

15        Q    Okay.    And I ask this -- assume no -- some of us are not that politically

16    astute or experienced in this area --

17        A    Well, count me in the bunch.    Go ahead and spit it out.

18        Q    Explain to me the need for the two separate 501(c)(4) and the PAC.

19    Mr. Tobin.    Just object to the extent it calls for a legal conclusion.

20    The Witness.    Yeah.    I was going to say --

21    Mr. Tobin.    Give it your best understanding.

22    The Witness.    Right.    Yeah.    I mean, I was told --

23    ██████████    He anticipated my clarifier, so I appreciate that.

24    The Witness.    Right.    Yeah.    I was told a PAC can do different things than a

25    (c)(4).    My goal originally was to have a (c)(3), frankly, and a PAC.    But through some of

1    the other machinations and confusions, we wound up with a (c)(4) and the PAC.

2                    BY █████████

3             Q    And I just want to understand.    Is it your understanding that when we're

4    talking about Defending the Republic, either the 501(c)(4) or the PAC, is that the same

5    entity as the one that's on the memo line, Defending the Republic Election Integrity

6    Fund?

7             A    No.

8             Q    Okay.    Can you explain the differences of that for me?

9             A    Well, the money that went into the Defending the Republic Election Integrity

10   Fund ultimately went to Defending the Republic, Inc.    But it's not -- Defending the

11   Republic Election Integrity Fund was not an entity.

12            Q    It's just the name on the account?

13            A    Right.

14            Q    Okay.    And then that account would make payments to Defending the

15   Republic?

16            A    That account, all at once, every dime that went into that account went into

17   that account at Morgan Stanley, and then, in one fell swoop, months later, was

18   transferred into Defending the Republic, Inc.

19            Q    And when you say Inc., because I believe they are both Inc., is it the (c)(4)

20   Inc. or the PAC Inc.?

21            A    The (c)(4).    When I say Inc. I mean the (c)(4).

22            Q    Okay.    That's super helpful.

23            A    Otherwise, I'll call it the PAC.

24            Q    Okay.    And then my understanding is the initial board of directors for the

25   Inc. included General Flynn, Lin Wood, and I believe Patrick Byrne.

1         A      But Lin Wood was never supposed to be on the board for Defending the

2    Republic.    There was a snafu at my own lawyer's firm in Dallas.    We were talking about

3    two different entities at the same time and they wound up putting, I think, Lin Wood and

4    Brannon Castleberry on Defending the Republic instead of the other one they were

5    supposed to have put it on.    But as soon as I saw that, which was I think the following

6    Monday, we got that corrected.

7         Q      Okay.

8         A      And Lin Wood was never asked to or should have been -- and neither should

9    have Brannon -- on either -- on that filing.

10        Q      What was the entity Wood and Castleberry were supposed to be on?

11        A      One called Kraken-Wood.

12        Q      And is Kraken-Wood all one word or is that two separate words, Kraken and

13   then Wood?

14        A      It's hyphenated.

15        Q      Okay.    And was that an LLC, a PC, or what was that supposed to be?

16        A      I don't remember how that was incorporated.    It was supposed to be a

17   news aggregation business, and we put up a website called Kraken-Wood, and we started

18   putting interesting news articles on it.    And I think we opened a Twitter account, and it

19   got shut down pretty quick.

20        Q      Okay.    And so just going back a moment, so General Flynn was supposed to

21   be on the initial board of directors for Defending the Republic.    Wood was not.

22               Was there anyone else -- oh, sorry.    I didn't mean to cut you off.    I think you

23   were going to confirm that I got that right.

24        A      Yeah, that's right.

25        Q      And was there anyone else who was supposed to be on the board with you

1    and General Flynn for Defending the Republic?

2         A    I think it was Joe Flynn.    Joe and Mike and me were going to do Defending

3    the Republic to begin with.

4         Q    And Joe Flynn is General Flynn's brother?

5         A    Yes.

6         Q    Okay.    And was -- do you remember if it's correct that Patrick Byrne was

7    going to be the CEO?

8         A    That was later.

9         Q    Okay.    Can you tell me about that?

10        A    Gosh.    I don't remember when all that came into play.    I think it was into

11   the next year.

12        Q    So if it helps, I, for obvious reasons, tend to use January 6th just as a date

13   placeholder, before or after.    People can remember things that way.

14        A    Right.

15        Q    Do you think it was after January 6th, 2021?

16        A    Yeah.    I think it was probably even into February maybe.

17        Q    Okay.    And what were the discussions?    Why did Mr. Byrne want to

18   become CEO of Defending the Republic?

19        A    Well, he believed in the cause, he said.    And he had experience

20   as -- running a company, which I've never done other than my little bitty teeny-weeny PC.

21   And it was -- you know, there was a lot on my plate, and there was concern that it would

22   be -- you know, or wise counsel, whatever you want to call it -- it would be really good to

23   have somebody kind of stand up the business aspect for me so I could do my lawyering

24   like I like to do it.    And so he volunteered to do that.

25        I don't know whether General Flynn had encouraged him to do that or what.

1    But, anyway, it was kind of presented as an option, and I thought, well, hey, that would

2    be great.    I'd love to have somebody take half this load off of me, especially the part I

3    don't know exactly how to do.

4            And, you know, we needed to get solicitation licenses.    We needed to get all

5    kinds of crap legally and physically done that a new startup needs to do, and that was

6    supposedly his area of expertise.

7            Q    So there was reporting that they all left the organization in about April 2021.

8            A    Oh, yeah.

9            Q    Well, so it was correct that they left?

10           A    Yep.

11           Q    And was the timing of that correct, in or about April 2021?    Does that

12    sound right?

13           A    Yeah.    It was April 9th to be exact, although I think most of them decided to

14    leave on April 7th.    I got notice of it after close of business the night of April 9th, after

15    they had all walked out.

16           Q    So it sounds like there was a "there" there.    Can you just walk me through,

17    like, what happened with that?

18           A    Gosh.    Where do I start with that?

19           Q    I'll start you with there was public reporting that suggested that they left

20    because you had refused to allow it to be audited, which I feel you would say is incorrect.

21           A    Yeah.    Yeah.    You're right about that.    Yes.    Definitely.

22           No.    They had supposed to have gotten auditors and lawyers and licenses and all

23    of that stuff, and those things had not happened.

24           It is true that I did not give them access to one of the bank accounts, although I

25    had intended to give that to the CFO.    I was deathly ill during the time, and I don't use

1   that word lightly.   And they knew I was really sick, and it would seem to me that they

2   took some advantage of that to pay themselves significant, quote, "moving bonuses," end

3   quote, and spend a lot of money that didn't need to be spent, and then walked out and

4   took all the equipment with them while I couldn't lift my head off the bed.

5          Q    So a moment ago, I think you knew where I was going, or at least we may

6   have read the same article that said that Defending the Republic had raised more than

7   14 million as of December 2021.   I think you were going to dispute that number.   But

8   sitting here today, do you know how much Defending the Republic had raised?

9          Mr. Tobin.   ███████ before -- I'm sorry.   This is David Tobin.   So just before

10  she answers, can I have a moment to consult with counsel about some issues coming out

11  of this line of questioning?

12          ███████   Oh, sure.

13          Mr. Tobin.   All right.   Thank you.

14          [Discussion off the record.]

15          Mr. Tobin.   Okay.   Can you hear me?

16          ███████   Yes.   Can you hear me?

17          Mr. Tobin.   All right.   Thank you.

18          So the reason I stopped is a couple of reasons.

19          One is this wasn't really an area that was within the scope of the subpoena, so

20  Ms. Powell isn't prepared to talk about these issues, is number one.

21          Number two, there are some other proceedings going on that might be implicated

22  by this line of questioning.   And my request is that -- and we don't want to interfere with

23  anything that you're asking.   We really don't.   We want you to get the answers to all

24  your questions.

25          However, this is an area where I feel like we need to have an opportunity perhaps

1    to talk with you all before going further down this road, and we would like to offer to do

2    that and request to do that rather than going down this road, because, number one,

3    Ms. Powell isn't really prepared to talk about these issues.

4           Obviously, she's got some pretty good grasp of the facts from all over the place,

5    but this is an area that is, because of other proceedings, that we're -- we would like to

6    discuss with you before we go too far down this road.

7           So that would be our request, and I know Barry had some thoughts on this, too.

8           Mr. Coburn.   I appreciate it very much, Dave.

9           Just add a brief footnote to what Dave just said.   This is not something where

10   we're kind of attempting to formalize anything or kind of in any way adversarialize this

11   process.   Our intention is precisely the opposite.

12          There are just some things that are underway concurrent with the January 6th

13   congressional investigation of which you may not be fully aware that impact on this line

14   of questioning, which we may very well be able to make a proffer to you all and just kind

15   of, you know, kind of together, in a conciliated way, agree just to bypass this particular

16   area.

17          ███████        Sure.   And, just to be clear, I've gotten a little off track.   There were

18   mostly questions that I just wanted to ask about fundraising that was conducted after the

19   election and then some of the expenses that were paid regarding, like, post-election, I'll

20   say, like, litigation-slash-audit expenses that I think Defending the Republic did.

21          But I do want to be respectful, because I know we all -- none of us knew the 4 p.m.

22   cutoff, and so we are all being cognizant of that.

23          I think what I would say is, at the end of every deposition, they're usually recessed

24   subject to call of the chair.   So why don't we kind of table the discussion, and maybe

25   there is a chance -- we can discuss whether it makes sense to come back and do all of this

1    at a different time, or if, to your point, there are areas where we need to proffer, and

2    totally respect that.

3         So if that's the case, I'm just looking to see if there is anything that -- let me just

4    say the one thing -- we'll go back, and I'll just clear up a couple of things.    We'll hold all

5    of that for that discussion.

6                    ███████████

7         Q    I think earlier -- let's just go back to a question that ████████ raised earlier.

8    And, Ms. Powell, I think, in response, you had said that you had conversations with

9    Mr. Giuliani regarding who was or was not paying him, and we kind of tabled that for a

10   moment.    And I just wanted to see if you remembered those discussions.

11        A    The only discussion I remember is knowing that he was doing an

12   engagement letter.    I'd only -- I don't remember the exact amount, and I think I

13   understood he was supposed to be paid by the campaign.

14        Q    And did you ever hear of anyone having conversations about lawyers that

15   said they would volunteer and then later asked to be paid or reimbursed by the

16   campaign?

17        A    I'm sorry.    Run that by one more time.

18        Q    Initially, I think you said earlier that you guys were all doing this as

19   volunteers.    Did you ever hear of any lawyers -- or nonlawyers -- who said that they

20   would do election-related assistance to the campaign for free or as a volunteer and then

21   later requested funds for their activities?

22        A    It seems like there might have been some.

23        With respect to the people that were working directly with me, once I saw the

24   hours that they were working I told them, when money was donated, I wanted to make

25   sure they got paid, because they were working absolutely obscene hours.    And two of

1    them had quit their jobs to come help me.    So I told them that I wanted them to be paid.

2            That's all I remember about that part.    And I paid them.

3        Q    And if those payments were related to Defending the Republic, we can

4    include that in the conversations that we can have about that entity in the future.

5            Did you have any conversations with Mr. Kerik about whether he had been paid or

6    had been told he would be paid?

7        A    Not that I recall.

8        Q    Okay.    And sitting here, I understand you said earlier that you didn't have a

9    lot of relationships with any of the lawyers for the campaign, but did you ever have any

10   conversations with an attorney named Alex Cannon?

11       A    I don't remember that name at all.

12       Q    Okay.    And did you ever hear of anyone, any of the lawyers or the

13   nonlawyers who assisted with some of the post-election issues, did you ever hear of them

14   getting paid by the Save America PAC or any of the other Trump-related entities?

15       A    I don't have any knowledge of any of that.

16       Q    Okay.

17            ██████    All right.    Then I will turn the questioning over to ██████

18   And, Mr. Tobin and Coburn, I'll get with ██████ to have that subsequent

19   conversation with you about the stickier issues that you touched on.

20       Mr. Coburn.    We're very grateful to you for approaching it that way.

21       Mr. Tobin.    Yes.    Very much appreciate it.

22       The Witness.    If I could add one more thing, ██████    We have been fully

23   audited, and all the money that went to Defending the Republic has been accounted for,

24   and our auditors haven't seen any problem that I'm aware of.

25            ██████    Understand.    And we can have further conversations about that, and

1    we can have those offline.    I want to be very cognizant of the time limitations.

2          The Witness.    Thank you.

3          ███████        And so appreciate the clarification.

4          The Witness.    Sure.

5          Mr. Coburn.    Thank you.

6                BY ███████

7          Q    Ms. Powell, I want to pick up where we left off before our short break.    And

8    we were talking about Mr. Giuliani's sort of approach to some of these foreign

9    interference claims.    And I thought you said that maybe his view might have differed

10   from yours at some point.

11         I want to read to you -- and you wouldn't have been aware of this, you're not

12   copied on it -- but in November, on November 14th, Mr. Giuliani, in a call with Trump

13   campaign officials and lawyers, and suggested messaging strategy, said -- and this is

14   November 14th, so pretty early on in the post-election time frame -- his proposed

15   strategy was to call Dems crooks and to go hard on Dominion-slash-Smartmatic, bringing

16   up Chavez and Maduro, and that we have the airplane receipts that the company owners

17   flew to Venezuela in 2011, all of this to show how crooked the process was.

18   Additionally, Dominion's CEO as an antifa donor as we continue to look for anomalous

19   results.

20         Recognizing that you -- I don't believe you were on that call.    Am I correct you

21   weren't on the call in which he made those statements?

22         A    No, I definitely wasn't on that call, and I didn't know all that information.

23   I'm glad to have it now, though.    Thanks.

24         Q    Well, I was going to ask you where you think Mr. Giuliani got that

25   information.

1          A      I don't know.

2          Q      And November 14th, by that time, do you think you would have shared with

3    Mr. Giuliani what you knew about the Venezuela connection to Smartmatic and

4    Dominion?

5          A      I would have shared, whenever I got it, the redacted affidavit of the young

6    man we spoke to from Venezuela.    I think I would have.

7          Q      Mr. Salazar?

8          A      Yes.    Thank you.

9          Q      And do you -- does the -- I take it from your prior answer that it's no, that

10   your answer to this one will be no -- but were you aware of the fact that Mr. Giuliani had

11   or claimed to have airplane receipts that company owners flew to Venezuela in 2011?

12         A      Nope.    I have no recollection of ever hearing that before.

13         Q      Or that the Dominion CEO was an antifa donor?

14         A      Nope.    That's news to me, too.

15         Q      Okay.

16         A      Appreciate the information, though.

17         Q      Well, I can't vouch for it.    Just that he said it.

18         A      Okay.    All right.    We'll vet it before we use it.

19         Q      On the vetting issue, this is why they say -- well, on the vetting issue, what

20   efforts did you make to -- I know the information was pouring in to you and others in the

21   time after the election.    Is that a fair characterization, that information from the outside,

22   from third parties, was coming in in a fairly sort of haphazard but frequent manner?

23         A      I would call it a tsunami.

24         Q      Tsunami.    I think you called it a deluge in some -- in maybe other prior

25   testimony.

1       A       Could be.

2       Q       What were you doing to try to absorb that information and vet it before you

3   used it in your litigation?

4       A       Oh, well, we had a group of attorneys.    I think I mentioned the ones that

5   were out in the field that were collecting information.

6               Then we had the group of people at Tomotley who were filtering or vetting most

7   everything that I understand was coming to me.    So, you know, they were trying to run

8   things to ground and figure out what was right and what wasn't.

9               I mean, I was certainly cognizant of the fact that people were affirmatively trying

10  to give us disinformation, send us down rabbit trails, waste resources, waste time, waste

11  money.    I mean, it was an unprecedented, in my little legal practice, experience in

12  dishonesty.

13      Q       How were you able to or what steps did you or your team take to try to

14  separate the information from the disinformation?

15      A       Trying to verify it by more than one source, at a minimum, and just seeing if

16  it made sense in the whole scheme of information that we were getting.

17          Mr. Tobin.    ███    before you ask your question, I'm sorry to do this.    Very

18  quickly, could I just have a quick break to talk about a potential privilege issue?

19          ███         To talk about what?    I'm sorry?

20          Mr. Tobin.    A potential privilege issue.

21          ███         Okay.

22          Mr. Tobin.    Yeah.    Just for a moment.

23          ███         Okay.

24      [Discussion off the record.]

25          Mr. Tobin.    We're back on.    Thank you.

1          I don't want to interrupt.    I just want to state on the record, number one, this is

2    the subject of obviously a separate lawsuit -- some of this is subject of a separate lawsuit

3    from Dominion.

4          And I want to just ask the witness to be careful, one, to not respond with any

5    questions that would reveal work product privileged material, and, two, to make sure you

6    respond with information that you know or knew at the time, and not things that you've

7    learned as a part of the discovery process in the litigation.

8          The Witness.    Okay.

9          Mr. Tobin.   If that's possible.

10         The Witness.    Okay.

11         Mr. Tobin.    And, again, ███████ I apologize for interrupting.    I just don't want

12   to put her at risk of waiving something right now in this case, or in this inquiry.

13         ███████████ Understood.

14               BY ██████████

15    Q     So are you able to answer generally what you -- I think maybe you did

16   answer the question, that generally you would try to make sure that there was some

17   corroboration for the information you were getting?

18    A     Right.    Yeah.    I mean, it's always been important to me for 44 years of law

19   practice to not tell a court anything that I didn't have reason to think was true -- or not

20   saying anything about anybody I don't think is true, for whatever reason.

21    Q     Were there claims that -- actually, let me go back.    I know what I was going

22   to ask you before we took a short break.

23         You attributed some of the disinformation you were getting to people who were

24   trying to send you down bad paths or have you waste time.    Am I characterizing your

25   prior answer correctly?

1        A      Yes.

2        Q      Did you also think that there might be people who are patriots, to use a term

3    you've used, or had their hearts in the right place and were pulling in the right direction

4    but who might be embellishing or exaggerating --

5        A      Sure.

6        Q      -- in order to try to help the cause?

7        A      Sure.

8        Q      And I guess whether or not it was someone -- I guess the motivation doesn't

9    really matter.    But did you come to believe or determine that there were certain

10    allegations that were coming your way that were not well-founded?

11        A      That I didn't have sufficient confidence in to proceed to spend any more

12    time on them, yes.

13        Q      And were there some that you spent time on, you thought that were worth

14    pursuing, and that, at some point, you came to the conclusion that they turned out not to

15    be accurate and you abandoned those?

16        A      Yes.    Or weren't solid enough to continue to try to figure out, or we didn't

17    need them to do what we needed to do.

18        Q      All right.    Can you think of an example that you're comfortable sharing?

19    And I don't want to invade your work product or any of the issues that Mr. Tobin raised.

20    But are you comfortable sharing an example where you originally thought an allegation

21    was solid and you got further into it and determined that it just was not, that it was not

22    true?

23        A      Or that we couldn't -- or it made no sense to try to carry it on any further.

24        Q      Well, I was thinking -- I'm focused on the not true part.

25        A      The not true part --

1     Q     I could see there are a lot of reasons for litigation purposes you cast

2     something to the side.     But I'm talking about one where you thought you could count on

3     this, and it turns out the witness was not being credible or was not being truthful.

4     A     Yes, but I'm not sure it wouldn't involve work product.

5     Q     Okay.     Did you ever come to learn that a claim that you had made

6     publicly -- either on television, in a podcast, or in court -- that that claim was -- that it was

7     false?

8     A     Yes.

9     Q     Can you give -- are you comfortable giving an example along those lines?

10    A     Yes.     There are a couple that come to mind.

11    One is I said that we had a video of the president of Dominion, I think, saying

12    something about a million votes being changed.     We actually have the video, but it was

13    the president of Smartmatic talking about it, not the president of Dominion.

14    And I was also under a misunderstanding that Joe Oltmann had a tape of

15    Eric Coomer saying whatever it is he said he said on an antifa call, and there was no tape.

16    Q     Okay.     And we can stay away from -- and I think you've testified to that

17    previously in the deposition in the Coomer case -- but we can put that, the Coomer and

18    Dominion's piece to the side because I know there is litigation.     I don't want to run afoul

19    of your attorney's admonition on that.

20    How about other examples that don't involve Dominion per se?

21    A     Those are the only two that come to mind right now.     The video was being

22    culled by the wrong person.     That was definitely a mistake on my part.

1      [2:41 p.m.]

2                    BY █████████

3      Q      I think there's some examples, some reported examples of some of the

4  declarations not being entirely accurate, like Josh Merritt?

5      A      Yeah.    There were some apparently mistakes in the declarations, but I

6  didn't write any of those declarations.

7      Q      Okay.    And then Torri Marslinman, was there some issue with her

8  declaration as well?

9      A      I think I've heard that there was some issues with her declaration.    I don't

10  even know that I ever read her declaration.

11      Q      Okay.

12      A      And I don't think I ever talked to her.    If I did, I don't remember it.

13      Q      Of the non -- is it fair to say that the majority of your focus in the election

14  challenge investigations you were doing was on voting machines, in some way it related

15  to voting machines?

16      A      Yes.

17      Q      But you did have some allegations that you developed or learned about that

18  were different or separate from voting machine claims; is that correct?

19      A      Yes.    We made equal protection challenges and Bush versus Gore

20  challenges in all of our lawsuits.    There was also a disparity in the way the elections were

21  conducted and the laws that the legislatures had passed, pursuant to which they were to

22  be conducted.    That was a whole problematic area that we should have obtained relief

23  on, and ballots counted after the close of business, and things like that.

24      Q      I'm focused specifically on election fraud issues.    I understand that there

25  are all sorts of what I'll call procedural, and I don't mean to sort of denigrate the issues of

1    the claims, but I'm talking about claims of fraud, of fake ballots -- yeah, fake ballots or

2    dead people voting, things like that.

3            Were those claims that you pursued?

4            A    I -- that was not my focus particularly.    There was one report I think we got

5    of ballots in a plane or something, and I don't recall pursuing that or if we did pursue it, it

6    didn't satisfy my criteria.

7            Can you be more specific?

8            Q    Well, I'm actually being general on purpose to try and understand if there

9    were claims that -- outside of voting machine issues or interference with voting machines,

10   if there are claims of voter fraud that you found compelling.

11           And if so, which those might be?    So I don't have anything in particular in mind.

12   I'm just wondering if any of the claims raised -- for example, Mr. Giuliani raised a lot of

13   claims about fake ballots, about dead people voting, about felons voting, about more

14   votes than voters, those sorts of things, and I'm wondering if those were issues that you

15   were pursuing as examples?

16           A    Not really.    I don't remember reading his complaints.    My focus was on

17   the more massive level of the machine fraud.

18           Q    Okay.    And so would you say -- is it fair to say that in the

19   November/December timeframe, the most compelling evidence that you were aware of

20   that the election had been stolen related to the voting machines?

21           A    Based on the data I was seeing and the scientific and statistical analysis of

22   that data, yes.

23           Q    And when I say voting machines, I mean, sort of, the issues we've been

24   talking about earlier today or that you raised earlier today with malign actors, whether

25   foreign or domestic, somehow manipulating votes within voting machines?

1       A    The entire schematic of how the machines can be manipulated or

2    programmed, yes.

3       Q    And as you sit here today, are you aware of any other non-manipulate -- you

4    know, claims that don't relate to the manipulation of voting machines?

5            Any other claims that you believe changed the outcome of the election?

6       A    Yeah.    2000 Mules.

7       Q    Okay.    And on that, you're referring to the Dinesh D'Souza movie that just

8    came out --

9       A    Yeah.

10      Q    -- regarding people dropping off ballots at drop boxes?

11      A    Yes.

12      Q    Okay.    And what's your understanding of what was happening there and

13    how that changed the outcome of the election?

14      A    Well, I haven't gotten to watch it yet, but we know there was a significant

15    problem with the drop boxes, massive drops being made by multiple individuals of

16    multiple ballots after hours election night.

17            We had already had reports of massive quantities of absolutely pristine, unfolded

18    ballots.    And I think there's an affidavit you've been provided of Scott Hall talking about

19    the perfectly marked ballots in stacks in Georgia.

20            There's also the video of the women in Georgia taking the suitcases of pristine

21    ballots out from under the table after the alleged water leak that supposedly required an

22    evacuation that happened to have been a toilet problem in another building, but they ran

23    off everybody in the middle of the night in Georgia, and that corresponds to a massive

24    spike in Biden votes at the same time when they weren't supposed to be counting votes.

25            She was seen on video running the same stack of ballots through the machine

1    multiple times, which isn't supposed to be done either.

2         What else?    We had reports of the truckload of ballots in Pennsylvania being

3    hauled, and then going missing, reports that the fraudulent ballots had been put in

4    through a postal warehouse center somewhere in New York and then shipped around.

5         Q    So you've mentioned those as reports, the last two, the truckload of ballots

6    in Pennsylvania and the fraudulent ballots from the postal center in New York.

7         Did you ever investigate either of those claims?

8         A    I think that comes into work product.

9         Q    Did you ever develop any compelling evidence to support those claims?

10        A    I'm not finished.

11        Q    Oh, you mean you're still investigating?

12        A    Yup.

13        Q    Okay.    Have you ever presented a court with any evidence to support

14    either the claims of truckloads ballots in Pennsylvania or fraudulent ballots from the

15    postal center in New York?

16        A    I don't remember.

17        Q    Okay.    I've asked you a few different times about this in slightly different

18    ways, but did you ever have any discussions with Mr. Giuliani about what he considered

19    to be the most compelling evidence of fraud that he had uncovered?

20        A    No.

21        Q    Did you have an understanding as to what he believed the most compelling

22    evidence of fraud to be?

23        A    No.    I don't think I've spoken to Mr. Giuliani since December 21st, and that

24    wasn't a conversation about evidence.

25        Q    Well, but before December 21st, did you ever have a conversation with him

1    in which he said this is what I think -- this is the key piece, this is what's going to turn the

2    tide for us?

3          A    Not that I remember.

4          Q    After December 21st, did you have any interactions with Mr. Giuliani after

5    his outburst at the White House?

6          A    I'm pretty sure the answer to that's no.

7          Q    Do you know what he was working on -- did you still have ways to sort of

8    keep track of what he was working on between December 21st and early January?

9          A    I made no effort to do that.

10         Q    You did stay in touch with the President, at least at some level, after

11   December 21st; is that correct?

12         A    I don't think -- other than maybe one phone call to say hello, how are ya, I

13   don't think I talked to him after then.

14         Q    Okay.    Do you -- you still have cases pending?

15         A    Yes.

16         Q    And you still continue to work those cases?

17         A    Yes.

18         Q    But no further interactions or substantive interactions with the White

19   House?

20         A    I don't remember any.

21         Q    Okay.    There's a -- I think we saw reference to December 28th -- let me see

22   if I can find it.    Exhibit 50.    This is not inconsistent with what you said.    I just want to

23   sort of nail this down.

24         Exhibit 50 is an email -- it will be up in a second, from you to Molly Michael on

25   December 28th, saying, "POTUS -- subject line is, "POTUS," and then it says, "is expecting

1    my call this afternoon.    Is he available now."

2         Do you remember what you might have been trying to reach the President on in

3    this timeframe?

4         A    No.

5         Mr. Tobin.    ██████    just to if it's possible, I know we forgot to redact Ms. Powell's

6    phone number from that exhibit.    If it goes into the record or the report, if it's possible

7    to redact it, we'd appreciate.    Thank you.

8         The Witness.    While we're on that subject, Mr. Schiff who is on your committee,

9    publicized my home address, doxed my home address some time during the Flynn case,

10   and I'd like to make sure that doesn't happen again.

11        ██████    I understand.

12        BY ██████

13        Q    On this email, do you remember reaching out to the President or having a

14   call scheduled with the President in late December?

15        A    No, I don't.    I think I talked to him then.

16        Q    So -- because --

17        A    It's possible because I remember talking to him.    He'd just come off the golf

18   course one time.    I said hi to him.    And it could have been then if he was at Mar-a-Lago

19   in Florida for Christmas, it could have been then.    I just said -- it was a very short

20   conversation, you know, just thinking of ya, hope you're holding up.

21        Q    Okay.    Because it looks as if -- and again, I may be reading too much into

22   this email, that you had had some interaction with the President prior to this email such

23   that you thought he'd be expecting your call?

24        A    Well, I certainly agree it reads like that, but I don't remember how or what

25   that would have been.

1       Q    Okay.   If we look at Exhibit 52?

2       A    Oh, god.   Yeah.

3       Q    Text message from Tommi Collins.   Can you just tell us who Tommi Collins

4  is?

5       A    She is a very well-meaning patriotic lady from somewhere in the Midwest

6  who talks a lot.

7       Q    And she says in this text message, have you spoke -- I assume she means

8  spoken to POTUS, are you still being blocked, if so I may have a way to help him -- help

9  get him a message from you.

10      Does this -- do you remember talking to Ms. Collins about your inability to reach

11  the President?

12       A    No, not specifically.   I remember telling her as politely as I could that he

13  had my phone number, and Mark Meadows had my phone number, and if he wanted to

14  talk to me, he would call me.

15       Q    Okay.

16       A    It was not my habit to ping the President.

17       Q    I want to go back to something you talked about a little earlier before our

18  short lunch break.   It's Exhibit 49.   And I asked you a few questions about this already.

19  We've come back to it a couple of times.

20      This was this December 22nd timeframe, and I want to just ask a couple more

21  questions about two of these emails.   We'll stat in the middle.   There's the middle

22  email, which was -- it looks like you got some information from a person Bert Ameche,

23  and you, on December 22nd, passed it along to Rudy.   It says, "to investigate as I have

24  no authority."

25      Do you see that?   See where I'm reading.   A little bit from there.   You see at

1      the very top of the screen?

2            A     Yup.    Yup.    Yup.

3            Q     Now, this is -- in the context, this is after this, sort of, blow up on -- in the

4      White House on the 21st, where Mr. Giuliani kind of lashed out, and then you were not

5      allowed to participate in the meeting with the Members, right?

6            A     Right.

7            Q     And so the next day, you get this information it looks like and you just

8      forward it to -- yes.    You forward it to Mr. Giuliani, though it's not clear from this email

9      to whom you sent your message?

10           A     Okay.

11           Q     Right?   Are you able to -- can you tell us?    It says passing info for Rudy.

12                 Do you have any idea who that email was sent to?

13           A     It doesn't show who it was sent to?

14           Q     No.    You can see how it just has -- we got it from the top email, and

15     sometimes the forwarded message doesn't have all the data.    You see that?

16           A     Yes.    But I would think it went to -- I would think it went to those people.

17     I think the only way it cuts it off is if you're sending it to the same people.    I'm not sure.

18     But I would think it went to those people.

19           Q     Okay.    And you say here, "as I have no authority."

20                 What did you mean by that?

21           A     I mean, I wasn't special counsel.    I'm just a citizen trying to do her job as a

22     lawyer.    I had no authority.

23           Q     Got it.    You also say in that same email, that -- please be advised -- or, "also

24     be advised Michigan trip was not set up properly on ground with locals.    Team is there

25     with no access."

1          What was the Michigan trip at this point, in mid or late December, that you're

2    referring to?

3          A     Apparently, they were still trying to get machines in Michigan and somebody

4    called me or -- I guess called me and said there's a problem, we can't get the machines.

5    Nobody knows anything about anything.    It was a shit show.

6          Q     Okay.    But this is not a project that you were pursuing, this is -- you were

7    being asked to pay for it, but you weren't organizing that inspection?

8          A     Right.

9          Q     Okay.    The top email in the chain, we talked about some of this about,

10    "wasting time on one wild goose chase and stalling tactics, Katherine and Rudy in

11    particular have wasted weeks in resources."

12          And then you go onto criticize or make reference to Katherine as a former CIA,

13    being affiliated with McChrystal.

14          Is that Katherine Frees you're referring to?

15          A     Yes.

16          Q     What was the point you were trying to make with respect to Ms. Frees?

17          A     I am convinced as we go along more and more that there is a significant

18    element of our wonderful intelligence community that has a role in this problem, and had

19    a longstanding role in this problem.    Became more convinced of that when I found the

20    Department of Defense funded patents for predetermining the outcome of an election

21    and allowing realtime monitoring of an election and the injection of undetectable false

22    voters in the voter database.

23          And I think they have a very strong interest in protecting their ability to alter

24    elections at will, wherever around the world they want to do that, including here.

25          Q     And did you -- I think you said earlier, you said I wouldn't trust Katherine

1    Frees as far as I could though her.

2         Is that what you're referring to, that you felt she had divided loyalties or maybe

3    was not entirely trustworthy with respect to the mission of what you were working on?

4         A    That's exactly what I'm referring to.

5         Q    How did that manifest itself?

6         A    In too many problems, too many unnecessary problems, too much time

7    wasted, too much money wasted, things that should have been handled differently.    At

8    first, I thought she was extremely competent and absolutely terrific to step in and start

9    taking care of some things.    And then it got worse and worse and worse, and it was

10   nothing but a problem.    And on top of that she was trying to -- well, never mind.

11        Q    What were you gonna say?

12        A    She was throwing herself at men.

13        Q    Men who were working on the investigation or that you were working with?

14        A    Yes.

15        Q    I see.    Did -- I'm not as interested in that piece of it as the other.

16        What were the problems -- was it with the same issue of accessing machines that

17   you've referred to a few times?

18        A    Yes.    As I understood it, it was trips -- making trips that weren't ready to be

19   made, people on the ground not being ready to receive the trips, the order not having

20   been entered.    I don't remember, and didn't have firsthand knowledge of any of the

21   details.    But it looked like one problem after the other with being able to inspect the

22   machines and she seemed to be the common denominator.    It was everything she and

23   Rudy were trying to do was taking way too much time and not producing results.

24        Q    Okay.    Switching gears slightly, have you ever heard the time hunting

25   license used in relation to the seizure or inspection of voting machines?

1       A       Yes.

2       Q       When's the first time you heard that term?

3       A       Somewhere in the middle of all this.

4       Q       Who used that term the first time you heard it?

5       A       Probably one of the cyber guys.

6       Q       Was it Mr.  Ramsland and Mr. Waldron?

7       A       I don't know whether it was one of them or Conan or Todd, or you know,

8       somebody who understands that whole world.

9       Q       What do you understand a hunting license to be in this context?

10      A       The equivalence of a lawfully issued search warrant that allows somebody to

11      look into the cyber stuff on a machine.

12      Q       Were you ever present at a meeting in which Mr. Waldron and

13      Mr.  Ramsland said that they needed to get hunting licenses so they can inspect voting

14      machines?

15      A       I think so.

16      Q       Do you remember where that meeting took place?

17      A       No.

18      Q       We've heard that it was early on, maybe even the Weston or before you

19      went down to Tomotley.

20              Does that sound familiar?

21      A       I don't think it was at the Weston.    I don't even remember Mr. Waldron

22      coming over to the Weston, but that doesn't mean that he didn't.

23      Q       In that timeframe, you know before --

24      A       Yeah.   I think it was in the timeframe, certainly before I made the long trip

25      to Tomotley.

1     Q   And do you recall them asking for particular number?   We've heard 8 to 10.

2     Do you remember anything like that, they asked for a particular number of

3     hunting licenses?

4     A   No, I don't remember anything but one.

5     Q   Okay.   Do you recall the issue of hunting licenses coming up in any of your

6     meetings at the White House?

7     A   The term might have been used in that meeting with Mark Meadows.

8     Q   On the 21st, the one where Mr. Giuliani was yelling?

9     A   Yes.

10     Q   How about on the 18th, when you were there with Mr. Flynn and Mr. Burn

11     and Ms. Newman?

12     A   It might have come up then.

13     Q   Come up in -- do you remember what respect it came up or how extensive

14     the discussion was about hunting licenses?

15     A   It wouldn't have been very extensive, because like I said, my focus and whole

16     reason for the meeting was to show him 13848 and make sure he knew about the CISA

17     FBI finding.   And Phil Waldron wasn't at that meeting.   So I'm not sure it came up on

18     the 18th.

19     Q   Was Waldron and Ramsland the only folks you ever heard use that term?

20     A   No.   I heard Conan and Todd and if there were any other cyber guys around

21     that I'm not thinking of right now.   It was always anybody talking about the cyber stuff

22     that would mention the term hunting license.

23     Q   In your mind, did the hunting license -- how, if at all, did it correspond or

24     relate to the 13848 order that you were focused on?

25     A   Well, I would think that since 13848 gave the President virtually every

1    emergency power anybody would need to do anything, it would give him the emergency

2    authority to issue that search warrant equivalent or tell the right person to issue that

3    search warrant equivalent.    But again, that's not my area of expertise.

4         Q    Understood.    On the 13848 issue, did you have any role in drafting a

5    proposed executive order or findings for the President?

6         A    I'm pretty sure I had a role in writing the findings of foreign interference.    I

7    have racked my brain and searched my computer for any evidence that I wrote the

8    original executive order.    But I don't think I did.

9         Q    One moment.

10        Take a lock at -- let's pull up 39, Exhibit 39.

11        Now, this isn't gonna show you or tell you whether you wrote it, but have you

12   seen this document before?

13        A    Yeah.    I've read it, and that's what I used to try to figure out if I had actually

14   drafted it.    I know it's got portions of things I've said and I think things I wrote in it.    I

15   don't remember whether I wrote the whole thing or not.    I don't think I did.    But

16   doesn't bother me if I did.

17        Q    Do you know someone known Christina Bobb?

18        A    I do.

19        Q    Do you know if Ms. Bobb had any role in drafting this document?

20        A    I think that's distinct possibility, but I'm not sure if she did.

21        Q    Why do you think it's a distinct possibility?

22        A    Because I remember talking to her about it.    And now that I think about it, I

23   remember her being in a meeting at the Trump Hotel with Phil Waldron when we

24   discussed the possibility of doing this.

25        Q    And when was that meeting in relation to the date on here, December 16th?

1        A    That's probably around that time.

2        Q    In the first paragraph of this document -- I might need to zoom in.    I don't

3  know if you can make it out.    It's decent size.

4        There's reference on the third line, there's reference to national security

5  presidential memoranda 13 and 21, do you see that?

6        A    Yes.

7        Q    Do you know what those are?

8        A    No.

9        Q    Do you know who included that information in this document?    You said

10  you wrote parts of this or you thought you had a hand in writing parts of it.

11        Did you have any hand in writing that sentence or that portion of that sentence?

12        A    I don't think so.    The only part of that I recognize is -- that I remember

13  having significant familiarity with is 13848.

14        Q    Okay.

15        Let's look at 44.    We'll start with 44, and then we'll do -- we'll start with 44.

16        So this -- there's two documents in here.    One is entitled -- looks like maybe two

17  separate documents.

18        One is talking points and outline, executive order 13848.

19        A    Yes.

20        Q    And then there's a document called timeline foreign interference in 2020

21  U.S. election.

22        A    Yes.

23        Q    Did you draft either of these documents?

24        A    I probably drafted both of them.

25        Q    Okay.    And what was the context in which you drafted these documents?

1         A      Me prepping myself to talk to the President to figure out what went on, to

2  figure out what authority he had to do anything about it or who did, to outline the basis

3  for it.

4         Q      Were these talking points --

5         A      I think I posted these on my website.

6         Q      You may have, and that may be where we got them.

7         Were these documents you brought with you to aid your discussion with the

8  President on the 18th?

9         A      It could be.   I mean, I would have -- if I had them by then, I would guess I

10  took them with me.

11        Q      And then take a look at Exhibit 48.   This is going back to your point before

12  of trying to find documents on your system.

13        I believe this may have -- you may have drafted this document?

14        A      Yeah.   I'd bet money I drafted that one.

15        Q      Okay.   If we can scroll all the way to the top.   Is it cut off?

16        I cant' see from here -- oh, there is it.   That shows a draft date of December

17  22nd.

18        A      Right.

19        Q      Does that sound right to you, that you would have been working on this

20  document?   Now, this is the day after that December 21st meeting we were talking

21  about.

22        A      It could have been that I simply changed something that date and it changed

23  the draft date.   I would have thought I started drafting that well before the 22nd.

24        Q      Well, I'm -- what intrigued me was not the start date, but the finish date,

25  that you would still be working on this after that meeting where things were sort of

1      sounds like maybe wrapping up on this issue for you.

2          A      I could have been working on this months after he left even.

3          Q      Okay.

4          A      Because it's an outline of what I've found to be foreign interference in the

5      election.

6          Q      Got it.   Okay.   We can take that one down.

7          A      And you know, in a general way, as long as he was still in the White House,

8      he had authority to do that.   I mean, he had power as President to do that.

9          Q      But you don't recall ever revisiting that issue with him after the 21st?

10         A      No, I don't.

11         Q      Okay.   Have you ever spoken to John Ratcliffe?

12         A      Yes.

13         Q      How do you know Mr. Ratcliffe?

14         A      We've known each other for years.   He's from northern Texas.   I see him

15     at meetings in Dallas frequently.

16         Q      Did you speak with him in this timeframe, November, December of 2020?

17         A      I'm pretty sure I did.

18         Q      Was he director of national intelligence at the time?

19         A      Yes.

20         Q      Did you talk with him about the issues we've been talking about regarding

21     seizure of voting machines?

22         A      I don't have a specific recollection of what I talked to him about either.   I

23     probably said what in hell is going on, and y'all better be doing something about it.   I

24     probably chewed his ass.

25         Q      Do you remember what he said in response?

1      A    No.

2      Q    Did you -- do you remember engaging in any sort of substantive way with

3  him about the President has this authority, this is what I found in terms of foreign

4  interference, presuming DNI Ratcliffe would have information on the topics that were of

5  profound interest to you?

6      A    I'm sure he had information, but there's no way he was going to give it to

7  me.    It was more likely I was unloading on him whatever I knew so if he deemed it

8  appropriate could take it and do something with it since he had more authority than I did

9  to do something.

10     Q    Did he ever say, don't worry, Ms. Powell, or Sidney, we're on this, or I talked

11  to the President, or anything like that?

12     A    I don't remember anything like that.    In fact, the only thing I remember is

13  him saying he, you know, there's -- he listened.    He couldn't tell me anything.

14     Q    Sounds like you had maybe a fragment of a memory there on something

15  else?

16     A    Well, just that he said I can't tell you anything.

17     Q    Okay.

18     A    But I don't think I even asked him.

19     Q    Do you know someone by the name of Brian Kennedy?

20     A    Is he a lawyer?

21     Q    I think he is.

22     A    I think I met -- I'm not sure it was Brian.    I think I met a lawyer by the name

23  of Brian Kennedy at some point.

24     Q    I'm asking specifically in connection with some of the issues we've been

25  talking about, about --

1        A      Yes.     I mean in the context of all this stuff, yes.    I think he was a friend of

2    Newman's.

3        Q      Sorry.    A good friend of Ms. Newman's?

4        A      If he's the person I'm thinking about, he was a friend of Emily Newman.

5        Q      So we've seen -- and I don't think I have it in materials here -- some

6    communications between Mr. Kennedy, who I believe worked at the -- or was affiliated

7    with the Claremont Institute in California and John Eastman who also has an affiliation

8    there.

9               Does that connection mean anything to you, the two of them together?

10       A      No.

11       Q      And he -- Mr. Eastman and Mr. Kennedy are -- traded some correspondence

12   about Mr. Kennedy suggesting the use of cyber hunt and incident response teams to seize

13   Dominion hardware and software for analysis by the intel community.

14              Are you familiar with the HIRT teams and how they might be used in this space?

15       A      No.    I don't think I knew we had those.

16       Q      Do you --

17       A      Sounds like a good idea though.

18       Q      Do you know someone by the name of Rich Higgins?

19       A      Yes.    I did know Rich Higgins.

20       Q      Did you ever talk to Mr. Higgins about any of the issues we've been talking

21   about?

22       A      I don't think so.    Mr. Higgins was very sick and died.

23       Q      Oh, I'm sorry.    Was he formally in the intel community?

24       A      Yeah.

25       Q      Oh, okay.    I'm going to move on to another topic.

1          But before I do, ▮▮▮ any questions?

2                    ▮▮▮▮▮▮▮   Go ahead.

3                    BY ▮▮▮▮▮▮

4     Q     Okay.    We're getting near the end, Ms. Powell, and I'm going to try really

5     hard to help you make your flight?

6     A     Oh, thank you.

7     Q     So the -- I know you've described it as a matter of national security.    So

8     maybe that's the answer, that this is separate from any litigation that you were pursuing

9     or separate from any other sort of efforts to challenge the election.

10          It sounds like a good part of what you were pursuing with the President or trying

11    to get the President to pursue was simply finding out if we had foreign countries

12    interfering with our elections?

13    A     And/or anybody else.

14    Q     And/or anybody else.    And knowing that for its own sake, for whatever

15    measures needed to be taken, whatever response needed to be made, it was important

16    in its own right, separate and apart from what was happening with the electoral politics

17    for you to get an answer to that.    Is that accurate?

18    A     Accurate.    Yes.

19    Q     Did you -- were any of the efforts -- well, I know the answer to this is going

20    to be true.    Isn't it true that some of the efforts you were taking were directed towards

21    the electoral politics and changing the what -- the announced outcome of the election?

22    A     Only if -- well, all our lawsuits were to try to secure the machines first and

23    collect the evidence.    And then depending on what the evidence showed, if that

24    required changing the results of the election, yes.    If it didn't, then no.    But to know

25    one way or the other what really happened in our election for the sake of the whole

1      country and every citizen I know that wants to know for sure.

2            I mean there's nothing more horrible than confronting the possibility that there's

3      no one elected in the last 20 years that was actually elected by the votes of the voters

4      who voted for them.    And that's without regard to position, whether it's dogcatcher, or

5      mayor, or Congress, or whoever.    I can't imagine there aren't Congress people -- I mean,

6      some obviously know that they weren't truly elected, and then others I would think have

7      to wonder if they were actually elected or somebody installed them.    That's not the way

8      our country's supposed to work.    And I think it goes back to the year 2000.    I think it

9      goes back to Bush versus Gore.

10           Q      So I hear what you're saying.    And I think I understand your point on that.

11           But were there other efforts you were taking that were more specifically focused

12     and directed on stopping the certification of Joe Biden as the President of the United

13     States?

14           A      Well, we filed the 12th Amendment lawsuit or part of my team did.    By that

15     time, we had defending the republic, and Louie Gohmert was a plaintiff, and we filed the

16     12th Amendment suit to raise the constitutional issue of whether the Electoral Count Act

17     violated the 12th Amendment of the constitution, but that was the last suit we filed

18     about it.

19           Q      Right.    That's one of the things I had in mind when I sort of asked you that

20     question.

21           Did you have an understanding as to the role that Vice President Pence would play

22     at the joint session of Congress on January 6th?

23           A      I know he was supposed to count or receive the electoral votes.    I mean, I

24     had done at least a cursory read I think of that draft brief.    But I am not the person who

25     researched or wrote it.    And I didn't -- I don't think I even signed onto it because I lacked

1    sufficient familiarity with the brief and the issues in it.    But I know it was a significant -- it

2    is a significant constitutional issue that needs to be resolved sooner than later.

3          Q        And were you generally, either based on your review of that lawsuit or your

4    just general knowledge, or otherwise, generally familiar with the timetable that's set out

5    in the -- the timetables that are set out in the 12th Amendment and the Electoral Count

6    Act in terms of how the electoral college process is supposed to work?

7          A        Well, we actually had some confusion about that to begin with, and I don't

8    think I have read it myself to resolve it to my own satisfaction.    But there was a debate

9    about when the -- what our timeframe was for getting our suits filed to begin with.    We

10   originally thought the date was sooner than it later turned out to be as a mandatory

11   thing.    But nonetheless, we had to time them so that they could go to the district court,

12   go to the court of appeals and go to the Supreme Court.    We were operating in this

13   massive time crunch under the tsunami of information that was coming at us,

14   disinformation and S-H-I-T flying from every direction.

15         Q        What deadline -- was December 14th a key deadline in your mind that was

16   creating this, sort of, expedited timeframe?

17         A        Yes.    That, and January 6th.    And first, I think we thought it was

18   December 6th.    I forgot what that was.    Something to do with choosing the electors.

19         Q        Yeah.    There's a safe harbor date and then the electors are chosen

20   December 14th, correct?

21         A        I think that's right.

22         Q        Okay.    And so did you have in your mind something should happen before

23   December 14th so that whatever litigation you had could be resolved such that the

24   electors could be properly appointed on the 14th?

25         A        Well, we set a goal of filing everything before the end of November so that

1   courts would have time to look at them.    And I think we managed to get two suits filed

2   the day before Thanksgiving, and the next two filed within the next 3 or 4 days.

3         Q     And when it appeared that the 14th was approaching that the lawsuits were

4   not going to be resolved by then, did you have an understanding whether there was

5   some -- whether they would become futile or whether there was any point in continuing

6   with those lawsuits after the 14th?

7         A     Oh, no.    We definitely needed to continue with them because the issue

8   needed to go to the Supreme Court.    And we got all of our filings done in the time in the

9   Supreme Court.    One we filed -- I think one we filed as a mandamus, but all were filed on

10  an emergency basis with requests for immediate review and briefing schedules.    And

11  they all could have been decided well before the January 6th had the Supreme Court

12  decided to do its job.

13        Q     Were you part of discussions or did you have any concerns about the fact

14  that even if the case was resolved in late December or early January, that the deadline for

15  the appointment of electors would have already passed on December 14th?

16        A     No.    I thought the Supreme Court was going to fix it.

17        Q     Okay.    Were you part of any discussions in which that eventuality was

18  discussed, that electors already have been appointed and there wouldn't be any recourse

19  even if the Supreme Court were to step in?

20        A     I don't remember that.

21        Q     Had you ever heard of the notion of having alternate electors appointed on

22  December 14th so that they would be available if there were some change -- if the courts

23  were to rule some way that changed the outcome in one of the disputed states?

24        A     I remember hearing that there were some multiple slates of electors in

25  multiple states, but I don't remember being part of any discussions about how that was

1    gonna happen or work or what would be the result of it.

2        Q      Did you -- do you understand the sort of thought process behind it?

3        A      I didn't focus on that at all.

4        Q      Did you play any part in trying to arrange or coordinate the appointment of

5    alternate electors?

6        A      No.

7        Q      Do you know whether Mr. Giuliani's team was working in that space?

8        A      I don't.

9        Q      You don't.

10   And when you said you thought the Supreme Court was going to take care of this

11   situation, what did you understand the Supreme Court would be able to do if it chose to

12   grant the mandamus petition or otherwise provide relief?

13       A      The Supreme Court, at the very least, should have addressed the Bush versus

14   Gore issues raised.    It should have looked at our complaints alleging fraud and

15   remanded to a district court to actually hear evidence.

16   I hope you all realize that not a single judge in a single court heard one of our

17   actual witnesses on the mathematical impossibilities, any of the data, any of the statistics,

18   any of the eye witness testimony, any of the expert opinions.    The only judge that ever

19   heard a witness talk about any of these things was Amy Totenberg in the Curling versus

20   Raffensperger case in which she said it's not a matter of if it happens, but when.    And

21   everything she lays out in Curling versus Raffensperger happened in the election of 2020.

22   Everything that could go wrong went wrong.    And people had been warned

23   about it for 20 years.    So it's not an accident that what happened in November 2020

24   happened.    And we've got to fix this for the sake of our children and our grandchildren.

25   I mean, what kind of -- do you want to live in a country where some unknown thing and

1    people decide who our president is?    We're talking about the whole free world here.

2         Q    So --

3         A    And it's not just about the United States.    Every other country in the world

4    that aspires to freedom looks to us too.

5         Q    So we were talking about the Supreme Court and what it might do, and you

6    said it could remand to a district court for a proper evidentiary hearing.

7              But were you, sort of, faced with these timetables, these statutory and

8    constitutional timetables in terms of when the election was going be officially and

9    formally decided?

10        A    Well, here's the situation, fraud vitiates everything.    There's long-standing

11   Supreme Court precedent that says that.    So the Supreme Court -- I mean, god forbid it

12   should have to do this, but it's what it could have and should have done in this

13   unprecedented constitutional crisis, put a screeching halt to everything and sent back to

14   the district court with directions to have the machines secured and an independent

15   forensic analysis done of them to see what the situation was in multiple jurisdictions.    I

16   mean, frankly it only needed to be done in three to five cities, and maybe a couple of

17   extras to spare for comparison purposes.    That was what we were talking about the

18   night of December 18th, to look at a few key cities and the machines relevant to those

19   and a couple of spares for comparison purposes.

20        Q    What was your understanding of what role, if any, Congress could play

21   absent or barring a ruling by the Supreme Court along the lines of what you described?

22        A    Well, I know there have been objections made to electors in the past.    I

23   don't think any of those ever amounted to a hill of beans.    I don't know whether there

24   could have been some kind of delay with respect to accepting the electors or not.    I'm

25   not sure.    That's not my area either.

1       Q     Yeah.   And I realize the way I framed the question as you started to answer

2    it.   I didn't mean to frame it as calling for a legal conclusion, which objection is also

3    sustained.

4         But to just ask whether you had in mind any expectation as to what the members

5    of Congress could or would do on January 6th in the absence of a ruling from the

6    Supreme Court?

7       A     I remember telling the people around me that January 6th was too late.   I

8    mean, if our 12th Amendment lawsuit wasn't going to work, I didn't see anything that was

9    going to work with respect to Congress.   I told people not to come to the stupid rally.   I

10    was pissed at the President for asking people to come up here that day only to be

11    disappointed, which I was pretty sure was gonna happen.   And just -- I told people to get

12    the hell out of DC or not come.

13       Q     When you say you were pissed at the President for asking people to come,

14    what are you referring to?

15       A     I'm referring to just the open invitation to come stand on the Mall on

16    January 6th.

17       Q     Is it your understanding that the President played some role in telling people

18    or asking people to come to the Mall?

19       A     I don't know.   I mean, from the general press, I heard that there was gonna

20    be a rally on January 6th, and I think I heard the President was gonna speak.   And I

21    thought the whole thing was a waste of time, effort, stupid and dangerous.

22       Q     Did you ever hear the President say in your presence that he thought it was

23    a good idea to have people come to Washington on the 6th?

24       A     No.   It wasn't discussed in my presence.

25       Q     So you were with the President on the 18th until close to midnight, right?

1    We talked about that?    December 18th?

2         A    I know I was in the White House until close to midnight, but I still have a

3    total gap as to after leaving the Oval Office.

4         Q    Okay.    So -- well, I can tell you that meeting went until about midnight on

5    December 18th.    At 1:45 in the morning on the 19th, so less than 2 hours later after

6    folks left, was the first time the President tweeted about the January 6th rally, and he

7    tweeted among other things, "be there, will be wild."

8         And I'm wondering if there was any discussion about the fact that he was going to

9    do that or he thought it was a good idea to have people come to Washington for the rally

10   while you were there on the 18th?

11        A    I don't remember anything about the rally when I was there.    And I think I

12   would remember that because I was pissed about the whole thing.

13        Q    Okay.    So going back to -- we were talking about what Congress might do.

14   And then we -- I got us off track asking you about the 6th itself and the rally and the

15   President.

16        Did you participate in a meeting on the 4th, January 4th, with members of

17   Congress or senators to try to convince them to take some action on the 6th?

18        A    I participated in a meeting on -- I think it was the 4th, to tell them about

19   certain evidence.    There were only a couple of Congress people there.    There was a

20   woman whose name I can't remember, and a Senator whose first name was Kevin.    And

21   we kind of gave them a rundown of the status of the evidence, but it wasn't about -- at

22   least no part I was involved in was about January 6th.

23        Q    Who organized that meeting, or who asked you to participate?

24        A    I think Mike Lindell did.

25        Q    Was Phil Waldron also part of that team that did the presentation?

1     A    I think Phil was.

2     Q    Anyone else that you remember being there?

3     A    There was a man from Sandia Labs there who could explain how the votes

4  were flipped.   I'd forgotten about that, yes.   He knows how to flip the votes.

5     Q    Do you remember his name?

6     A    Nope.

7     Q    Was it at the Trump Hotel?

8     A    Yes.

9     Q    In sort of the townhouse portion of the hotel?

10    A    Yes.

11    Q    Okay.   Do you know if Mr. Waldron was -- did he tell you he was making

12  similar presentations in other parts of Washington in the same -- in that same timeframe?

13    A    Not that I recall.

14    Q    That he went up to Capitol Hill and gave a briefing to some members of

15  Congress and a power point presentation?

16    A    I don't remember hearing about anything of that.

17    Q    Did he use a power point?   If you remember, was there a power point

18  presentation at the meeting you attended?

19    A    Yes.   Somebody did a power point, but I don't remember whether it was

20  Phil or somebody else.

21    Q    Was there -- at that discussion, at that meeting, was there any

22  discussion -- and I think there's slides in Mr. Waldron's power point deck on this, about

23  the role the Vice President would play on January 6th?

24    A    I don't remember.

25    Q    Did you have an understanding or belief as to what -- I think we started to

1    touch on this a while ago, and I didn't follow up with you, as to what the Vice President's

2    role would be at the joint session of Congress on the 6th.

3            Mr. Tobin.    Calls for a legal conclusion.

4                    BY ███████

5        Q    What was your expectation as to what role he was going to play?

6        A    My expectation was that he was going to count and receive the votes of the

7    electors.

8        Q    Were you aware or privy to any conversations with Vice President Pence

9    about taking a more active role in terms of counting certain electoral votes or

10   disregarding others?

11       A    No.    I never talked to Vice President Pence.    I think I met him one time a

12   couple of years ago, but that was it.

13       Q    And the meeting -- there's -- we understand there was a meeting in the

14   White House on the 21st where Vice President Pence -- December 21st, where he was

15   present and Members of Congress were there.    Might be the meeting you were

16   excluded from?

17       A    I definitely was not at that one.

18       Q    And you've never been in a White House meeting with Vice President Pence

19   present?

20       A    Nope.

21       Q    Take a look at Exhibit 60.    Take a look -- it will come up in a second.

22   Exhibit 60.    This is another text message from Ms. Collins, Tommi Collins.

23           And it looks like she's sending you an article from nationalfile.com about what

24   Vice President Pence can do under the constitution.    And she says, "we need to get

25   pressure on Pence."    Exclamation point, exclamation point.

1         And you say, "on it.   Stay tuned."

2         Do you remember this exchange with Ms. Collins?

3     A    No.

4     Q    Do you know what you meant -- well, do you know she meant when she said

5 we need to get pressure on Pence?

6     A    No.

7     Q    Do you know what you meant when you said on it?

8     A    No.

9     Q    Were you taking any steps or engaged in any discussions on December 21st

10 or around that timeframe regarding pressuring Vice President Pence in any way?

11     A    No.   No.

12         BY ███████████

13     Q    Did you discuss the Gohmert versus Pence lawsuit with anyone else at the

14 White House before that suit was filed?

15     A    I think we let somebody know we were filing it.   And I remember thinking,

16 you know, we were filing it as a friendly suit.   So I would think that we at least told Mark

17 Meadows that we were filing it.   I mean, I don't think we blind-sided anybody with it, I

18 guess is what I'm trying to say.   But there was no big discussion about it.   If anything, I

19 thought it would take pressure off pence.

20     Q    Tell me what you mean when you said that you envisioned it as a friendly

21 suit?

22     A    How do I describe that?   I, you know, just as a person, I would imagine that

23 Pence was under unspeakable political pressure and no telling what all bullshit from

24 multiple avenues to try to get him to do a certain thing at that proceeding.   And I

25 wanted the court to act.   From my perspective, it was the responsibility of the Supreme

1    Court of the United States to decide the law on this issue because we were supposed to

2    be a country that is -- does things based on the rule of law, and we've had a serious

3    abdication of that and eroding by the day over the last two decades.    So the Court

4    should have, I think, held the Electoral Count Act unconstitutional in light of the 12th

5    Amendment and taken all the pressure off Pence and done its job.

6         Q    So is it fair to say you felt filing that lawsuit and getting a favorable ruling

7    would give Vice President Pence an avenue to take some step during the certification on

8    January 6th?

9         A    It would have enabled the law to apply the way the law should apply if, in

10   fact, the Electoral Count Act is unconstitutional.    To my knowledge in 44 years of

11   practice, Congress cannot pass a law that contradicts the constitution.    The Electoral

12   Count Act does change the way things should be handled under the 12th Amendment.

13   So the Supreme Court needs to resolve that issue for the sake of the country, and if it

14   done so timely, it might have resulted in a different result.

15        Q    Did you think that Vice President Pence wasn't going to take some action like

16   that unless he received a favorable court ruling?

17        A    I don't know what I thought then about that.

18        Q    Well --

19        A    I wasn't expecting a lot of backbone and change of whatever from Vice

20   President Pence either -- I don't know.

21        Q    Why was that?    Why weren't you expecting him to do anything?

22        A    Because I don't think he thinks he had the authority to do it.

23        Q    Oh, why did you think that?

24        A    Just observing the man as I have observed any other politician.

25        Q    Do you recall any specific observations that made you think he wasn't going

1      to take a particular action on January 6th?

2               A    No.    The Vice President wasn't a go-along kind of guy.

1

2    [3:40 p.m.]

3                BY ███████████

4    Q    Earlier you mentioned --

5    A    He wasn't a go-along kind of guy.

6    Q    Understood.    Earlier you mentioned that the Vice President was under a

7 tremendous amount of pressure.    Was any of that pressure coming from people within

8 the White House?

9    A    I don't know.    I said I would imagine that he was under enormous pressure

10 from every conceivable direction, including some he never probably imagined.

11    Q    Did Mark Meadows respond to you whenever you told him that you were

12 going to file this lawsuit?

13    A    I don't remember.

14    Q    Do you remember discussing it with anyone else in the White House other

15 than that conversation with Mr. Meadows?

16    A    No.

17    Mr. Tobin.    Object to the form.

18    The Witness.    And I'm -- yeah, I'm not even sure I discussed it with Mark

19 Meadows.    I just said I think we took some action to make sure we didn't blind side

20 anybody.

21                BY ███████████

22    Q    Understood.    And, outside of the context of the lawsuit, did you ever have

23 any discussions with anyone in the White House about the constitutional role of the Vice

24 President in the electoral count on January 6th?

25    A    I don't think so, because I'm not that studied in what it is.

1       Q       Okay.

2               BY █████████████

3       Q       Can you pull up 59?   This is another text message with Ms. Collins.    It's

4       actually the day -- even though it's the day after the one we just looked at.    And you're

5       laughing, but you did turn -- you did turn these over to us, so --

6       A       Oh, yeah.    No, I know, yeah.    No, she's a dear, huge-hearted person.    She

7       just goes on and on and on.

8       Q       So this is the next day after the one with this "on it, stay tuned" message

9       that we showed you earlier, and this is late at night on the 22nd.    And it says -- if you go

10      down, can you scroll down a little more, █████████    Thank you.

11              It says:    Just making sure -- tomorrow's an important day, just making sure it's

12      not overlooked.    Do you know how is Pence acting?

13      A       I don't know that I even read this one.    I don't even remember this one.    I

14      mean, I --

15      Q       Okay.

16      A       You know, I mean, there would be so many, I -- I would say I didn't read most

17      of them.

18      Q       Okay.    Fair enough.    And then, if we scroll down a little further, she seems

19      to be talking about Pence, although it's not entirely clear -- keep going -- and you answer,

20      not trustworthy.    Does that refresh any recollection, or do you know what you might've

21      been referring to by saying "not trustworthy"?

22      A       I don't understand what she was referring to.

23      Q       Well, the question she asks is:    Do you know how is Pence acting?

24      A       Can you back it up for me?

25      Q       Sure.    A little further back.    Keep going up a little more, just so she can see

1    the context.    There we go.

2          A    Drafted this.    I don't even know what "this" is she's talking about.

3          Q    Well, it might be, we saw earlier there was this article from National Life -- or

4    excuse me -- National File, the "Law Prohibits Pence," and it seems to me she's referring

5    back to that National File article.

6          Mr. <u>Tobin.</u>    Object to the form.    Speculation.    Go ahead.

7          The <u>Witness.</u>    I don't know.

8                BY █████████

9          Q    Okay.    Did you feel -- let me ask it this way:    Did you feel, in this

10   timeframe, that Vice President Pence was not trustworthy?

11         A    I don't know what I was talking about there.    I was -- it was more likely I

12   was talking about Ivan Raiklin, who I like and I think means well, but again I wouldn't trust

13   Ivan's legal work, which is why I never hired him to work with me on Flynn or anything

14   else.

15         Q    Understood.    Do you know if Mr. Raiklin, in this time period, was pushing or

16   discussing with folks a theory that he was calling "the Pence card"?    Have you heard

17   that?

18         A    No, I haven't heard that, but that wouldn't surprise me.

19                █████████    Okay.    Let's go off the record.

20         [Discussion off the record.]

21                ███████    So we're back on the record.

22                BY █████████

23         Q    So just a couple more questions before we wrap up.    One is something

24   new, and the other, I want to circle back to something I don't think I closed the loop on

25   earlier.

1          I had asked you earlier about a lawyer by the name of Jeff Clark, and you said you

2    didn't recognize that name.    Did you --

3          A     No, I've -- I've heard the name.

4          Q     Okay.

5          A     I couldn't pick him out of a lineup.

6          Q     And you don't recall interacting with him at all?

7          A     No.

8          Q     Do you have -- did you have any interaction with anybody at the Department

9    of Justice in the timeframe that we're talking about?

10         A     I can't think of anybody.

11         Q     Were you of the view that the Department of Justice was not doing enough

12   to --

13         A     Yeah.

14         Q     -- investigate?

15         A     Totally.

16         Q     And what, if anything, did you do to try and sort of change that or to spur

17   them to action?

18         A     Other than any public statements, I can't think of anything.

19         Q     I saw -- we didn't go through it today, but I saw in an email you shared, that

20   you had -- and I know this isn't DOJ per se, but -- I mean, technically it is, but always

21   thought of as a separate entity -- you had concerns about --

22         A     -- Wray, yeah.

23         Q     Yes.    You had concerns about Director Wray and thought he should be

24   fired?

25         A     I've had concerns about Mr. Wray since he was appointed.

1    Q    Okay.    And Mr. Gohmert sort of weighed in and shared that he agreed with

2  you on that?

3    A    Yes.

4    Q    Did you ever have discussions with Mr. Gohmert, nonprivileged discussions

5  with Mr. Gohmert, about whether there's some action that could be taken to spur the FBI

6  or DOJ to action on these election fraud issues?

7    A    I don't remember talking to Louie about that.

8    Q    Okay.    Or any other Member of Congress?

9    A    I mean, I could've in general said that to any or all of them, that, you know,

10  you need to do something to get the FBI to investigate this.    I mean, I was very public in

11  my criticism of Wray from the time he was named Director and I realized he had

12  supervised Andrew Weissman when he was at the Justice Department, and Weissman

13  was running roughshod on the Enron Task Force, screwing everybody in Houston, naming

14  a hundred people as unindicted co-conspirators and forcing them to lawyer-up, making

15  our Merrill Lynch counsel unable to even discuss with us, our own Merrill Lynch guys,

16  what happened in the Merrill Lynch transaction, in the Nigerian barge case.    I mean, I'll

17  send you a copy of my book.

18    Q    Okay.    How about, I'm going to throw another couple of names for you,

19  with respect to DOJ.    Have you ever had any interactions with someone named Ken

20  Klukowski?

21    A    I've heard that name, but I don't remember him either.

22    Q    Okay.    All right.    Maybe we'll just leave it at that.

23       I want to circle -- the issue I want to circle back to, and, again, respecting the

24  attorney-client issues, I'm not trying to invade your privileged communications with these

25  folks, but when I had asked you earlier about the Members of Congress who you had

1    attorney-client communications with, I asked a compound question, and you said yes or

2    no, and then I don't know that I ever came back to ask about all of them.

3            So, with respect to Mr. Biggs, Congressman Biggs, did you have a attorney-client

4    relationship with him that related to election fraud issues?

5       A    I think so.

6       Q    And Ms. Taylor Greene?    Same question.

7       A    Yes.

8       Q    And Mr. Gaetz?

9       A    Yes.

10      Q    Okay.    And, if I'm overstepping, you'll tell me or Mr. Tobin will tell me.

11   Were your discussions with the possibility that they might become plaintiffs in some

12   action?

13      A    Yes.

14      Q    Okay.

15   ████████████    Anything else on that?

16   ████████████    Not on that specifically.

17   ████████████    Okay.    I think that's all I have.    We are going to recess the --

18   ████████████    I actually do have a couple questions --

19   ████████████    Oh, on something else?

20   ████████████    -- on other things, if that's all right.

21   ████████████    Yes, please.

22           BY ████████████

23      Q    All right.    Just a couple of quick things, Ms. Powell, and thank you for your

24   patience in bearing with us.

25      A    Sure.

1      Q      Earlier you mentioned that it was your opinion that it wasn't a good idea for

2    the President to tell people to come to Washington, D.C., on January 6th.    Did you ever

3    convey that opinion to the President?

4      A      No, I don't think I did.

5      Q      Did you ever convey that opinion to anyone at the White House?

6      A      I don't think so.    I think I just -- I think I just told it to my team.

7      Q      Okay.    ▆▆▆▆▆ was asking you if you had sort of any discussions with

8    anyone about the Department of Justice investigating allegations of election fraud.    Do

9    you know if anyone on Mr. Giuliani's team was talking to, reaching out to, trying to

10   coordinate with anyone at the Department of Justice related to election fraud

11   allegations?

12     A      I don't know.

13     Q      Do you remember hearing anything during this period, so, you know, late

14   December, early January, about replacing the Department of Justice leadership?

15     A      I mean, I thought they all should've been fired, but I don't remember any

16   specific conversations about it.

17     Q      Well, specifically, I think this has been publicly reported at this point quite

18   extensively, but it's been reported that President Trump was considering replacing some

19   of his top leadership at the Department of Justice, specifically with Mr. Clark as Acting

20   Attorney General.    Do you recall any discussions about that, have any recollection of

21   anything related to that?

22     Mr. Tobin.    Objection.    Asked and answered.    Go ahead.

23     The Witness.    Yeah.    I was going to say, I think they should've all been fired, but

24   I don't have any specific recollection of that.

25            BY ▆▆▆▆▆▆▆

1    Q    Okay.    Do you have any knowledge or awareness of any of the protests that

2    were slated to take place in Washington, D.C. on January 5th or 6th?

3    A    No.

4    Q    Did you have any sense before that day that there was a possibility that

5    there could be violence on January 6th?

6    A    Yes.

7    Q    And how did you have that sense?

8    A    Because any time a group of Trump people get together, there are always

9    infiltrators and people that target them for infiltration and causing violence, ever since

10   the Democrats paid the people to go into the Trump rallies when he was first running and

11   cause problems.

12   Q    Do you have any, you know, specific sources of information or any indication

13   specifically in the lead-up to January 6th that made you think there was going to be

14   violence on that day, or is this more just related to the general sense that you just

15   described?

16        Mr. Tobin.    Objection.    Asked and answered.    Go ahead.

17        The Witness.    I think somebody circulated a map that antifa had put out, and

18   there was talk of them closing roads exiting D.C., and I think I'd heard that the mayor

19   wasn't going to have any portapotties put anywhere, and the restaurants were being

20   closed, and, you know, people needed to bring their own stuff with them.

21        I mean, all of that to me sounded like a recipe for a nightmare for just Americans

22   that were coming to express their concern for this President and their disdain for what

23   happened in the election.    And I didn't want to see innocent people set up.

24        ████████████    All right.    Well, that's all I have on that topic.    ████████    do

25   you have anything else?

1            BY ███████

2        Q    Do you think that's what happened on the 6th -- ultimately happened, that

3    people were set up?

4        A    I think that's a lot of what happened on January 6th.    I don't think that's all

5    of it.    I think there are definitely some people that did some things wrong, that they

6    should not have done, but, yes, I think there was a huge set-up factor contributed to by

7    the FBI and others.

8        Q    Can you tell me what you base that on?

9        A    Well, the police opening doors to invite people in, canisters of tear gas being

10    shot off behind the crowd that ultimately pushed them toward the building.

11            I still don't understand why the building was closed down to begin with.    I mean,

12    I've walked in and out of the Capitol for years all my life.    I know I used to be able to do

13    it with, you know, just my driver's license.

14            I don't want to date myself there, I mean, you know, you got to remember, I

15    started doing everything when I was only 5 years old.    But, you know, I don't like the

16    turn any of our politics and activities have taken generally in the last two decades in

17    particular.

18        Q    Okay.    Is there anything else that we haven't asked about that you think is

19    important for us to know, anything else you'd like to sort of share on these issues that

20    we've been talking about?

21        A    Yeah.    I think you need to take seriously the fact this is a longstanding

22    problem.    People have been given information on it.    There were whistleblowers from

23    Sequoia.    There were whistleblowers from Diebold.    You need to watch "Kill Chain" if

24    you haven't.    You need to watch "Hacking Democracy" if you haven't.

25            Our -- any computerized electoral system is subject to being hacked and/or

1     programmed to achieve results inconsistent with what the voters want to achieve, and

2     until we get back to paper ballots on certified ballot paper that are hand-counted in a

3     completely transparent process, we are screwed as a country that is supposed to be a

4     republic founded on the rule of law.

5           And you need to really closely examine the intelligence community and

6     particularly the CIA and the Department of Defense for their role in all of this.

7     ████████    Okay.    That will be the last word, at least for today.    So we'll

8     recess the deposition, subject to the call of the chair and go off the record.

9           [Whereupon, at 3:57 p.m., the deposition was recessed, subject to the call of the

10     chair.]

1                         Certificate of Deponent/Interviewee

2

3

4          I have read the foregoing _____ pages, which contain the correct transcript of the

5     answers made by me to the questions therein recorded.

6

7

8

9                              _____

10                                      Witness Name

11

12

13                             _____

14                                          Date

15